**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ANGEL BAKOV and JULIE HERRERA, individually and on behalf of all others similarly situated, | : : : : | Case No. 1:15-cv-02980 Hon. Harry D. Leinenweber |
| *Plaintiffs,* | : : | Hon. Susan E. Cox |
| v. | : : : | |
| CONSOLIDATED WORLD TRAVEL, INC. d/b/a HOLIDAY CRUISE LINE, a Florida corporation, | : : : : | |
| *Defendant.* | : : | |
| | : | |
| KINAYA HEWLETT, on Behalf of Herself and all Others Similarly Situated, | : : : | Case No. 1:17-cv-00973 Hon. Harry D. Leinenweber |
| *Plaintiff,* | : : : | |
| v. | : : | |
| CONSOLIDATED WORLD TRAVEL, INC. d/b/a HOLIDAY CRUISE LINE, | : : : | |
| *Defendant.* | : : | |

---

**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

---

**PUBLIC REDACTED**

743022.4

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................ iii

EXHIBIT LIST ..................................................................................................v

I.     INTRODUCTION ...................................................................................1

II.    PROPOSED CLASS DEFINITION ........................................................2

III.   SUMMARY OF COMMON FACTS ......................................................2

      A.  CWT played the same prerecorded voice message to every class member ............................................................................................2

      B.  Speaking with "Jennifer" was nothing like speaking with a real person .................................................................................................4

      C.  CWT's prerecorded voice messages were misleading and coercive ................6

      D.  Like all class members, plaintiffs received and were harmed by CWT's misleading prerecorded messages .........................................8

      E.  CWT called millions of class members without prior consent ........................10

IV.    APPLICABLE LEGAL STANDARDS ....................................................11

      A.  The TCPA Ban On Unwanted Prerecorded Voice Messages ..........................11

      B.  Federal Rule Of Civil Procedure 23................................................................12

V.     ARGUMENT............................................................................................13

      A.  The Proposed Class Satisfies Rule 23(a) ........................................................13

            1.  Numerosity is satisfied because VVT made millions of calls for CWT.................................................................................13

            2.  Commonality is satisfied because class members suffered same injury.............................................................................13

            3.  Typicality is satisfied because Plaintiffs and class members received the same calls from "Jennifer" and assert the same TCPA violation ........14

743022.4

4.  Adequacy is satisfied because Plaintiffs and class members' interests are aligned and Plaintiffs retained competent counsel ...............15

5.  The implied requirement of ascertainability is also satisfied because the proposed class is defined by objective criteria....................................16

B.  The Proposed Class Satisfies Rule 23(b)(3) ......................................................17

1.  Predominance is satisfied because Plaintiffs' proposed class definition leaves no room for variation or individual issues.....................17

2.  Superiority is satisfied because class member indemnification presents no insurmountable manageability concerns................................18

CONCLUSION...........................................................................................................................20

743022.4

## TABLE OF AUTHORITIES

**Cases**

*American Pipe & Construction Co. v. Utah*,
    414 U.S. 538 (1974)........................................................................................................15

*Aranda v. Caribbean Cruise Line, Inc.*,
    179 F. Supp. 3d 817 (N.D. Ill. 2016)
    *aff'd*, No. 17-1626, 2018 WL 3545146 (7th Cir. July 24, 2018) ................................14

*Arreola v. Godinez*,
    546 F.3d 788 (7th Cir. 2008) ......................................................................................15

*Birchmeier v. Caribbean Cruise Line, Inc.*,
    302 F.R.D. 240 (N.D. Ill. 2014)........................................................................ Passim

*Blow v. Bijora, Inc.*,
    855 F.3d 793 (7th Cir. 2017) ......................................................................................12

*China Agritech, Inc. v. Resh*,
    138 S. Ct. 1800 (2018)................................................................................................15

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    563 U.S. 804 (2011)....................................................................................................17

*G.M. Sign Inc. v. Stealth Sec. Sys., Inc.*,
    No. 14-cv-09249, 2017 WL 3581160 (N.D. Ill. Aug. 18, 2017) ................................20

*Gehrich v. Chase Bank USA, N.A.*,
    316 F.R.D. 215 (N.D. Ill. 2016)..................................................................................14

*Hughes v. Kore of Ind. Enter., Inc.*,
    731 F.3d 672 (7th Cir. 2013) ......................................................................................20

*In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*,
    30 F.C.C. Rcd. 7961 (F.C.C. 2015) ...........................................................................11

*Ira Holtzman, C.P.A. v. Turza*,
    728 F.3d 682 (7th Cir. 2013) ......................................................................................13

*Jamie S. v. Milwaukee Pub. Schools*,
    668 F.3d 481 (7th Cir. 2012) ......................................................................................13

*Kleen Prod. LLC v. Int'l Paper*,
    306 F.R.D. 585 (N.D. Ill. 2015)..................................................................................12

743022.4

*Messner v. Northshore Univ. HealthSystem*,
   669 F.3d 802 (7th Cir. 2012) ................................................................................12, 17

*Mims v. Arrow Fin. Servs., LLC*,
   565 U.S. 368 (2012) ...............................................................................................11

*Mullins v. Direct Digital, LLC*,
   795 F.3d 654 (7th Cir. 2015) ............................................................................ Passim

*Prac. Mgt. Support Serv., Inc. v. Cirque du Soleil, Inc.*,
   301 F. Supp. 3d 840 (N.D. Ill. 2018) ................................................................ Passim

*Rosario v. Livaditis*,
   963 F.2d 1013 (7th Cir. 1992) ................................................................................15

*Toney v. Quality Res., Inc.*,
   323 F.R.D. 567 (N.D. Ill. 2018).........................................................14, 15, 16, 17, 18

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011).................................................................................................13

**Statutes**

47 U.S.C. § 227(b)(1)(A)–(B).............................................................................11, 12, 14

47 C.F.R. § 64.1200, *et seq*.....................................................................................*12, 14*

Fed. R. Civ. P 23(a)(4).........................................................................................15

Fed. R. Civ. P 23(b)(3).............................................................................12, 17, 18

Fed. R. Civ. P. 23(g) ...........................................................................................15

| EXHIBIT LIST | |
|---|---|
| Ex. 1 | CWT script for 47 prerecorded marketing messages (VOGEL-0011–13) |
| Ex. 2 Under Seal | July 25, 2014 Declaration of Vance L. Vogel regarding the VVT Software (CWT-BH003160–62) (confidential) |
| Ex. 3 Under Seal | December 29, 2014 "Advertising Agreement" between CWT and VVT (CWT-BH002556–58) (confidential) |
| Ex. 4 Under Seal | April 27, 2015 email chain regarding CWT-VVT Advertising Agreement (CWT-BH002559) (confidential) |
| Ex. 5 | May 4, 2015 email to plaintiff Herrera regarding cruise aboard the Grand Celebration (Dkt. No. 31-1, Exhibit A) |
| Ex. 6 Under Seal | July 31, 2015 email chain regarding "dead air" calls (CWT-BH000567–70) (confidential) |
| Ex. 7 Under Seal | November 7, 2015 email chain reporting on VVT call volume (CWT-BH001262–63) (confidential) |
| Ex. 8 Under Seal | November 10, 2015 "BZ Script" (CWT-BH000305–11) (confidential) |
| Ex. 9 Under Seal | November 27, 2015 email chain regarding a wire transfer for VVT (CWT-BH000324–26) (confidential) |
| Ex. 10 | November 10, 2016 opinion letter issued by the Federal Trade Commission staff, 2016 WL 7495392 |
| Ex. 11 | February 8, 2000 "Final Judgment and Consent Decree" as to Daniel Lambert and James Verillo (Dkt. No. 31-1, Exhibit C) |
| Ex. 12 | Plaintiffs' Rule 30(b)(6) Deposition Notice, dated October 16, 2017 (reissued to reflect new deposition date) |

743022.4

| EXHIBIT LIST | |
|---|---|
| Ex. 13 | CWT's Responses and Objections to Plaintiffs' Notice of Rule 30(b)(6) Deposition, dated October 13, 2017 |
| Ex. 14 | Jennifer Poole Rule 30(b)(6) Deposition Transcript, dated October 18, 2017 |
| Ex. 15 | Vance Vogel Deposition Transcript, dated August 24, 2017 |
| Ex. 16 | Clifford Albright Deposition Transcript, dated August 25, 2017 |
| Ex. 17 | Randall A. Snyder Declaration, dated February 5, 2018 |
| Ex. 18 Under Seal | Colin B. Weir Declaration, dated February 6, 2018 (confidential) |
| Ex. 19 | Christina Peters-Stasiweicz Declaration, dated April 9, 2018 |
| Ex. 20 Under Seal | February 18, 2016 email chain providing list of "VVT numbers" (CWT-BH002864–71) (confidential) |
| Ex. 21 Under Seal | More complete list of VVT numbers (CWT-BH002874–3159) (confidential) |
| Ex. 22 | Expert Report of Kenneth R. Sponsler, dated March 7, 2018 |
| Ex. 23 | Sponsler Deposition Transcript, dated April 10, 2018 |
| Ex. 24 | Lite DePalma Greenberg LLC Firm Resume |
| Ex. 25 | Bursor & Fisher Firm Resume |
| Ex. 26 | Plaintiff Angel Bakov Deposition Transcript, dated May 9, 2017 |
| Ex. 27 | Plaintiff Julie Herrera Deposition Transcript, dated May 10, 2017 |

743022.4

| EXHIBIT LIST | |
|---|---|
| Ex. 28 | Plaintiff Kinaya Hewlett Deposition Transcript, dated February 16, 2018 |
| Ex. 29 | Plaintiff Bakov Declaration, dated August 6, 2018 |
| Ex. 30 | Plaintiff Herrera Declaration, dated August 6, 2018 |
| Ex. 31 | Plaintiff Hewlett Declaration, dated August 6, 2018 |
| Ex. 32 | April 23, 2015 email regarding calls to plaintiff Bakov (CWT-BH000264–66) |
| Ex. 33 | May 21, 2015 email chain regarding calls to plaintiff Herrera (CWT-BH000268–69) |
| Ex. 34 | September 14, 2016 email chain regarding calls to plaintiff Hewlett (CWT-HEWL000261–63) |

743022.4

## I.    INTRODUCTION

From December 29, 2014 through March 20, 2016 (the "Class Period"), an Indian company called Virtual Voice Technologies Pvt. Ltd. ("VVT") called millions of people in the United States purportedly to offer anybody who was interested "a free cruise simply to show you a great time." Ex. 1 at VOGEL-0011. Defendant Consolidated World Travel, Inc., which was doing business at the time as Holiday Cruise Line, Inc. ("CWT" or "Defendant"), paid VVT to make those calls. They all began with the same innocuous introduction:

> Hi, this is Jennifer with Holiday Cruise Line on a recorded line.
> Can you hear me okay?

*Id.* But this was all a con. There was no "Jennifer." The people who answered these calls were listening to a recording of a professional voice actor reading from a script approved by CWT. Nor was CWT out to give anyone a "free cruise." According to CWT's corporate designee, what CWT really wanted was to "upsell" Plaintiffs and members of the proposed class on its bigger vacation packages that ran a thousand dollars or more. Ex. 14 (Poole Tr. 106:17–22).

This case is ideally suited to class treatment because the scope of CWT's illegal marketing campaign is well-defined and the underlying conduct is uniform. During the Class Period, CWT paid *one* third-party to use *one* piece of software to play *one* set of prerecorded voice messages to *one* target audience for *one* purpose. Since the number of people who consented to receive these calls is *zero*, *see* Ex. 13 at 11 ("CWT . . . has no responsive information [regarding class member consent]"), they all violated the TCPA's ban on delivering unwanted prerecorded voice messages. Plaintiffs have also obtained enough evidence to prepare a list of 928,023 unique telephone numbers CWT called. Plaintiffs thus request that the Court grant their motion for class certification, appoint them as class representatives, appoint Lite DePalma Greenberg LLC and Bursor & Fisher, P.A. as class counsel, and award other relief the Court deems just and appropriate.

743022.4

1

## II.    PROPOSED CLASS DEFINITION

All persons in the United States (1) who Virtual Voice Technologies Pvt. Ltd. called from December 29, 2014 through March 20, 2016 to market a cruise aboard the Grand Celebration cruise liner sold by Consolidated World Travel, Inc. (d/b/a Holiday Cruise Line), and (2) who answered such call or calls.

## III.   SUMMARY OF COMMON FACTS

### A.    CWT played the same prerecorded voice messages to every class member.

CWT promotes vacation packages by mail, direct dial telephone calls, telephone call transfers, television, and radio for the purpose of selling vacation packages over the phone. The vacation package at issue here is a "free" two-night cruise for two aboard the Grand Celebration cruise liner sold for the cost of the port fees ($59.00 per person) (the "Grand Celebration Vacation Package"). *See* Ex. 5 (email to plaintiff Herrera describing offer). CWT contracted with VVT to help market and sell this vacation on a commission basis. Ex. 3 at ¶3 (12/29/2014 "Advertising Agreement"); *see also* Ex. 4 (4/27/15 emails regarding agreement); Ex. 14 (Poole Tr. 79:13–17) (affirming agreement related to Grand Celebration marketing campaign).

Instead of using their own voices, the agents in VVT call centers used a type of "soundboard" telemarketing technology called Virtual Voice Technology software ("VVT Software") to play prerecorded voice messages or prompts. Ex. 14 (Poole Tr. 70:12–71:2) ("Q. "[T]he agents working for VVT were making use of prerecorded audio on the calls with consumers, is that correct? A. They were voice-assisted prompts that were scripted out and recorded prior."). Plaintiffs' expert explained that, with this type of technology, audio clips "are recorded before the outbound calling campaign is executed and are stored in audio files that are configured as part of the outbound voice-assisted calling campaign." Ex. 17 at ¶13 (Snyder Declaration); *see also id.* at ¶¶14–19 (describing the VVT Software further). These audio clips were recorded by voice actors reading from scripts CWT approved. *See* Ex. 14 (Poole Tr. 70:16–

743022.4

17, 99:4–25); Ex. 15 (Vogel Tr. 124:19–22). "That capability was important when agents spoke English as a second language and spoke with a noticeable foreign accent." Ex. 22 (Sponsler Report); *see also* Ex. 15 (Vogel Tr. 117:17–19) (VVT agents had "heavy" Indian accents).

VVT agents accessed the VVT Software like a regular web page. Ex. 16 (Albright Tr. 31:12–32:1); Ex. 15 (Vogel Tr. 74:7–14). Armed with a username and password, they could log in to the VVT Software from any computer with a web browser and internet access. *Id.* Once logged in, VVT agents saw the main screen from which they would make and transfer calls:

> It's a screen that has a dial next button on it, and then it has a bunch of voice prompt buttons. And then so you dial next, the phone rings. When the person answers, you hit the first recording which is the hello greeting, and then you go down to the required prompts. There's about 40 of them, various ones to use for various responses, and you click on the prompts to generate the customer's interest and get them qualified, and then you transfer the call.

Ex. 15 (Vogel Tr. 75:7–23); *see also* Ex. 2 (Vogel declaration describing software in more detail). The VVT Software was "very self-explanatory." Ex. 15 (Vogel Tr. 62:6). It was "designed in a way to be pretty much idiot proof . . . press button 1, then go to button 2, dial next button 3, dial next—there's not really a lot of training involved." *Id.* (Vogel Tr. 62:6–8).

VVT agents had 47 prerecorded voice messages to choose from on the main screen. *See* Ex. 1. The first was the initial greeting ("Hi, this is Jennifer. . .") that was played on every answered call. *See* Ex. 17 at ¶ 17 (Snyder Declaration) ("If the called party (*i.e.*, the consumer) answers, the [VVT] call center agent clicks on the first prerecorded voice message prompt which is a 'hello' greeting."); Ex. 22 at ¶ 35 (Sponsler Report) (same); Ex. 15 (Vogel Tr. 81:1–11) (same); Ex. 16 (Albright Tr. 46:10–18) (same). Next up was an initial sales pitch offering "a free cruise simply to show you a great time." Ex. 1 at VOGEL-0011. The next few asked whether the person who answered the call was "above 18 years of age," wanted "to travel sometime in the next 18 months," and had "a credit card or debit card in your name[.]" *Id.* The sixth "congratulat[ed]" them for

"qualify[ing] for the free cruise[.]" *Id.* The list goes on, but others included, "you should know that I'm not selling anything," "I'm a real person," and "I'm assisted by prerecorded audio." *Id.* at VOGEL-0011–13 (prompts 10, 33–34).

**B.      Speaking with "Jennifer" was nothing like speaking with a real person.**

Though CWT provided VVT agents a voice prompt insisting, "I'm a real person," Ex. 1 at VOGEL-0011, speaking with "Jennifer" was nothing like speaking to a real person. For starters, VVT agents were making *multiple* calls simultaneously. Class members were thus often subject to one-way marketing pitches and not taking part in normal two-way conversations. *See* Ex. 10 at p.2 (11/10/2016 FTC staff opinion letter, 2016 WL 7495392) ("A human being cannot conduct separate conversations with multiple consumers at the same time using his or her own voice.").

Clifford Albright, who created the VVT Software and knows more about it than anyone else, Ex. 16 (Tr. 29:1–12), testified it was possible to make multiple simultaneous calls with his software by logging into to two different computers at the same time, *id.* (Tr. 48:1–12) ("Q. If an agent has two terminals in front of him or in front of her, is it possible to do two calls simultaneously? . . . A. Yes."), and by wearing two headsets, *id.* (Tr. 50:15–22) (Albright advised VVT to "buy [two] single [ea]r headsets" rather than "cutting [standard] headsets" in half). Vance Vogel, who together with Albright trained VVT agents to use Albright's software, Ex. 15 (Tr. 23:4–14, 58:7–58:13), gave similar testimony, *id.* (Tr. 88:1–11) ("Q. Is it possible using the VVT software for one agent to make two calls at the same time? . . . A. Yes").

Not only was it *possible*, but Albright and Vogel also testified that VVT agents *actually* were running two calls with consumers at the same time. Ex. 16 (Albright Tr. 48:13–49:4) (Q. Are you aware of whether the VVT agents were actually using two terminals to make calls? A. Yes."); Ex. 15 (Vogel Tr. 88:11–89:13) ("Q. Are you aware of that [VVT agents making two calls at the same time] ever actually happening? A. Yes."); *see also id.* (Vogel Tr. 89:17–25) (same). They

4

know this because, as part of an established onboarding process for new call centers, they oversaw and fulfilled VVT's requests for multiple logins per agent. Ex. 15 (Vogel Tr. 89:17–90:11) ("Q. How would you find out [that VVT agents were making multiple simultaneous calls]? A. The center would request it . . . [w]hen they signed up to operate. Q. So they would ask permission for agents to have multiple log-ins? . . . A. Yeah.").

That extra call volume came at the expense of call quality. As CWT's own expert testified, when an agent conducts more than one call at a time, "[i]t's more difficult" to keep track of each conversation, to give appropriate responses, and thus "provide [a] seamless conversation." Ex. 23 (Sponsler Tr. 42:9–43:5). According to Sponsler, "having agents handle multiple calls" is an "abuse," is one of many "aggressive behaviors from unscrupulous marketers who only want to make the telephone ring," and is against "the rules." *Id.* (Tr. 42:9–23) (testifying to his understanding of why the FTC revoked its 2009 staff advisory letter regarding soundboard). Indeed, it was immediately obvious to Plaintiff Bakov that he was not speaking with a live person precisely because he received inappropriate responses to his questions. *See, e.g.,* Ex. 26 (Tr. 84:22–86:8) (in response to asking, "Hi, how are you?" Bakov recalled the VVT agent responded with an audio clip asking, "Can you hear me okay?" or, "Are you over the age of 18?").

Bakov's experience was not unique. The VVT Software created problems for any consumer who asked a question that could not be answered by one of the prerecorded prompts. For instance, one "███████████████████████████████████████████████████ ███████████████████████████████████████████████." *Id.* Ex. 6 at CWT-BH000568. The problem was there were no audio clips with a call back number. *See* Ex. 1 (the scripted prompts). Apparently, the agent elected instead to play and replay the six "qualifying" prompts hoping he or she would get the responses needed to transfer the call. CWT's corporate

representative, *see* Exs. 12–13, conceded her agents "ma[d]e mistakes all the time" and that type of problem would not have happened but for CWT's use of prerecorded voice, Ex. 14 (Poole Tr. 191:10–15 ("Q. Do you think this would have happened if it had been an agent without assistance of prompts? A. No. I think they would have given their phone number.").

## C.      CWT's prerecorded voice messages were misleading and coercive.

The Grand Celebration marketing campaign was inherently harmful because it invaded class members' privacy but it was also substantively misleading and coercive. The prerecorded message played immediately after the greeting states CWT is "looking for qualified travelers that would like to occupy unused cabin space aboard our magnificent cruise liner," Ex. 1 at VOGEL-0011, but the corporate representative for CWT testified that the true purpose was not to sell consumers on that "free" $59-per-person trip; it was to "upsell" them a *significantly* more expensive vacation package, Ex. 14 (Poole Tr. 13:3–24, 106:17–108:1), *see also id.* (Tr. 163:18–19) ("[P]eople could purchase upsales from . . . $298 to, as we've seen, $1,300, $1,400").

After consumers were transferred to CWT call centers (manned by live operators) and had paid the port charges on a supposedly "complimentary cruise offer," CWT subjected them to a high-pressure sales pitch. Ex. 14 (Poole Tr. 13:3–24); *see also, e.g.,* Ex. 8 at CWT-BH000307 (in all capital letters, "███████████████████████████████████████████ ███████████████████████████████████████████"). This "upsell" script is teeming with ploys to induce consumers to purchase vacation packages they would not otherwise be interested in. *Compare* Ex. 8 at CWT-BH000309 ███████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████") (emphasis original), *with* Ex. 14 (Poole Tr. 142:19–143:24) ("Q. Can you please explain how was it determined that this was a 70 percent discount? . . . A. I'm not sure . . . Q. Was

6

this package ever offered at a cost of $3,000 or $3,500? A. Not to my knowledge. Q. What is meant here by 'for a limited time'? . . . A. I don't know.").

The outgoing prerecorded messages also stated the "reason for my call is . . . [to] generate positive word of mouth advertising[.]" Ex. 1 (prompt 2); *see also id.* (prompts 12 and 26 also refer to "word of mouth advertising" and "a special awareness campaign"). This was also untrue. CWT was *not* generating "significant" sales through word-of-mouth referrals. Ex. 14 (Poole Tr. 106:8–16). Other messages were intended to lead people to believe that they had won something or had been selected as part of a select group to receive a special prize or opportunity. They were told that, if they "qualified," they would be entitled to a "free cruise." Ex. 1 (prompts 2 and 6); *see also* (prompt 6) ("Great! This looks really good. Congratulations[.]"). This was a farce. Not only was the Grand Celebration Vacation Package *not* free, but CWT was willing to and did sell vacation packages to anyone over 18 with access to a credit or debit card. Ex. 14 (Poole Tr. 108:3–109:2).

Adding insult to injury, the above contravenes settlements that CWT's owners (Daniel Lambert and James Verrillo) entered in 2000 with 19 State Attorneys General.[1] *See* Ex. 11 at p.18 n.1 ("Illinois Consent Decree"). The Illinois Consent Decree, like the others, applies to and binds Lambert and Verrillo personally and their employees and any businesses they control. *Id.* at ¶12. Together, these two "r[an] the operations" of CWT and "checked on all departments, marketing, fulfillment, [and] customer service[.]" Ex. 14 (Poole Tr. 36:18–37:12); *see also id.* (Tr. 34:22–35:10) (testifying that they were both in charge of determining salaries for higher-ranking CWT employees). Lambert authorized the arrangement with VVT, Ex. 4, and Verrillo had final say regarding payments to VVT and others, *see, e.g.*, Ex. 9. Both received reporting regarding the

---

[1] They were the Attorneys General for Arizona, Arkansas, Connecticut, Florida, Georgia, Illinois, Kansas, Michigan, Missouri, Nevada, New Mexico, North Carolina, Ohio, Oregon, Pennsylvania, Washington, West Virginia, Wisconsin, and the Corporation Counsel of the District of Columbia.

marketing campaign at issue in this case, *e.g.*, Ex. 7, and it concluded in March 2016 only because Lambert and Verrillo chose to cease "all their U.S. operations," Ex. 14 (Poole Tr. 60:8–13).

The Consent Decree *permanently* enjoins Lambert and Verrillo from engaging in certain telemarketing conduct. They are barred "from . . . [r]epresenting to any consumer, directly or by implication, that the consumer is a 'winner' or that the consumer has been 'selected' or is otherwise being included in a select group for receipt of a price or opportunity unless that is, in fact, true[.]" Ex. 11 at ¶17.C. The messages VVT agents played class members did just that. *See, e.g.*, Ex. 1 at VOGEL-0011 (prompts 2 and 6); Ex. 14 (Poole Tr. 108:3–109:2). They are prohibited from "[m]isrepresenting, directly or by implication . . . that the purpose of the contact or offer is to engender 'word of mouth' advertising, or any similar wording[.]" Ex. 11 at ¶ 17.G.3. Again, the CWT-approved prerecorded messages at issue here did this explicitly. Ex. 1 at VOGEL-0011–12 (prompts 2, 12, 26); Ex. 14 (Poole Tr. 106:8–16). The Consent Decree also prohibited Verrillo and Lambert from representing that a vacation package is "world class" or representing limitations on offers to create "a false sense of urgency," Ex. 11 at 17.B, D, which they also did, *e.g.*, Ex. 8 at CWT-BH000309 (using terms "████████" and "████████████████████").

**D.**   **Like all class members, plaintiffs received and were harmed by CWT's misleading prerecorded messages.**

Plaintiffs' records show they received calls from CWT during the Class Period. *See* Ex. 29 at ¶¶4–5 (Bakov Decl.) (Bakov was called on 3/26, 4/17, and 6/17/15); Ex. 30 at ¶6 (Herrera Decl.) (Herrera was called on 5/3/15); Ex. 31 at ¶¶3–4 (Hewlett Decl.) (Hewlett was called on 3/8 and 3/14/16). CWT's internal investigations confirmed outgoing calls were made to each Plaintiff. *See* Ex. 32 at CWT-BH000265 (4/23/15 email finding Bakov was called three times including on 3/26 and 4/17/15); Ex. 33 at CWT-BH000268 (finding Herrera was called six times including on 5/3/15); Ex. 34 at CWT-HEWL000261–62 (finding Hewlett was called three times in 1/2015).

Plus, many of those calls originated with numbers that appear on a partial list of over 13,000 numbers VVT used during part of the Class Period. Exs. 20–21 at CWT-BH002864, 2879, 3066 (including entries for 3/26 and 4/17/15 calls made to Bakov, and 3/8 and 3/14/16 calls made to Hewlett); *see also* Ex. 14 (Poole Tr. 205:10–14) (confirming VVT used these numbers).

Plaintiffs' documents and testimony also show they each answered calls from CWT, *see* Ex. 29 ¶¶4–8 (Bakov Decl.), Ex. 30 at ¶¶6–7 (Herrera Decl.), Ex. 31 at ¶¶3–4, 6–8 (Hewlett Decl.). In fact, CWT produced audio recordings of Bakov's conversations with CWT agents after being transferred by VVT. *See* CWT-BH000261, 63 (not attached); Ex. 26 (Bakov Tr. 102:8–10, 206:10–208:17) (affirming that he was transferred and identifying his voice on two recordings). Plaintiffs also described the prerecorded messages they heard in terms consistent with the CWT-approved scripts and audio clips produced in discovery, Ex. 29 at ¶¶6, 8 (Bakov Decl.), Ex. 31 at ¶¶6–8 (Hewlett Decl.), except for Herrera who had trouble understanding the recorded voice she awoke to in the middle of the night, Ex. 27 (Herrera Tr. 22:7–14).[2] None of the Plaintiffs gave consent for CWT to call them, Ex. 29 at ¶10 (Bakov Decl.), Ex. 30 at ¶12 (Herrera Decl.), Ex. 31 at ¶9 (Hewlett Decl.).

Plaintiffs were also all harmed by the experience. Bakov was "definitely harmed, frustrated, annoyed." Ex. 29 at ¶11 (Bakov Decl.). The calls he received during work hours "precluded [him] from doing actual work that I'm supposed to be doing while I'm at the office." *Id.* Herrera "found it very annoying and disruptive." Ex. 30 at ¶13 (Herrera Decl.). "[N]ewly pregnant at the time," VVT called her at midnight on a Sunday, "interrupt[ing her] sleep" at a time

---

[2] There is no doubt about who called her and how. When Herrera called back the next morning, an agent described the Grand Celebration Vacation Package to her and sent details via email. Ex. 30, Exhibit A at Herrera-CWT-0019 (showing two calls the morning of 5/4/15); Ex. 21 at CWT-BH003035 (showing VVT used phone numbers on Herrera's bill); Ex. 5 (the email); Ex. 27 (Herrera Tr. 26:1–27:3, 85:24–86:6) (testimony regarding the early morning phone call).

743022.4

when "[she] needed a lot of sleep" and "scar[ing]" her because, given the late hour, "[she] assume[d] that there [wa]s an emergency[.]" *Id.* (testifying further that "[she] spent that night of sleep concerned that there was an emergency [she] had missed"). CWT's calls also frustrated Hewlett. Ex. 31 at ¶¶ 7, 10 ("[E]very time they call, she said the same thing, and when I was getting frustrated, I would cuss the thing out, and it would be no response.").

### E.     CWT called millions of class members without prior consent.

During the Class Period, VVT transferred ▮▮▮▮ calls to CWT at an average rate of ▮▮▮▮ transfers per week in exchange for hundreds of thousands in commissions. CWT-BH003163 (This voluminous and confidential Excel spreadsheet is not attached, but Plaintiffs are prepared to make it available to the Court, if needed.) Based on records obtained from the carriers for CWT and its affiliates' call centers, Plaintiffs' summary witness identified unique telephone numbers for 928,023 of those transferred calls. *See* Ex. 18 at ¶9 (Weir Declaration) (explaining call detail records and call transfer volume in detail). The global number of outbound calls is unknown but is likely greater than the number of transfers by an order of magnitude. *See* Ex. 15 (Vogel Tr. 126:4–5) ("The vast majority of people aren't interested[.]").

CWT has conceded it did not obtain prior express consent from class members. Ex. 13 (responding to 30(b)(6) notice on this topic, "CWT will not designate a witness for this topic, as it has no responsive information"). CWT's corporate designee could not explain how VVT got class members' phone numbers, let alone describe any mechanism used to ensure that prior consent had been obtained. Ex. 14 (Tr. 76:7–77:15). CWT instead permitted VVT to purchase "leads" from "lead brokers" on its own. Ex. 15 (Vogel Tr. 39:15–40:19). So long as VVT was generating call transfers, CWT was satisfied. Ex. 14 (Poole Tr. 71:18–74:2) ("[S]o the leads . . . Whatever he was calling [and] doing worked in our testing for me so that's . . . all I needed to . . . analyze on that.").

10

## IV.     APPLICABLE LEGAL STANDARDS

### A.     The TCPA Ban On Unwanted Prerecorded Voice Messages

The TCPA is a consumer protection statute designed to combat the "intrusive invasion of privacy" caused by "[u]nrestricted telemarketing." *Mims v. Arrow Fin. Servs., LLC,* 565 U.S. 368, 372 (2012). In enacting the TCPA, Congress reported that "[m]any consumers are outraged over the proliferation of intrusive, nuisance calls to their homes from telemarketers." TCPA, Pub L. No. 102-243, § 2 (1991). "[R]egardless of the content or the initiator of the message," prerecorded telephone calls made to private residences, Congress found, were rightly regarded by recipients as "a nuisance and an invasion of privacy." *Id.* "Banning such . . . prerecorded telephone calls to the home, except when the receiving party consents to receiving the call or when such calls are necessary in an emergency situation affecting the health and safety of the consumer, is the only effective means of protecting telephone consumers from this nuisance and privacy invasion." *Id.*

"Congress therefore put the responsibility for compliance with the [TCPA] directly on the party that 'makes' or 'initiates' automated and prerecorded message calls." *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 F.C.C. Rcd. 7961, 7980 (F.C.C. 2015) (the "2015 FCC Order"). Specifically, among various limitations the TCPA imposes on telemarketers, is a ban on the use of prerecorded voice messages:

> It shall be unlawful for any person within the United States . . .
>
> (A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using . . . *prerecorded voice* . . . (iii) to any telephone number assigned to a . . . cellular telephone service . . .
>
> (B) to initiate any telephone call to any residential telephone line using . . . *prerecorded voice* to deliver a message without the prior express consent of the called party[.]

47 U.S.C. § 227(b)(1)(A)–(B) (emphasis supplied). Pursuant to Section 227(b)(1)(B), the FCC promulgated a comprehensive set of rules governing telemarketing and telephone solicitations. *See*

11

47 C.F.R. § 64.1200, *et seq.* They contain terms similar to—though more comprehensive than—the TCPA. For example, where 47 U.S.C. § 227(b)(1)(B) bars using prerecorded voice messages to "initiate any telephone call to any residential telephone line," 47 C.F.R. § 64.1200(a)(2) additionally bars "caus[ing]" such calls to be initiated.

The TCPA and FCC's ban on the use of prerecorded voice messaging in telemarketing is not without limits, but they are affirmative defenses as to which TCPA defendants bear the burden of proof. *See Blow v. Bijora, Inc.*, 855 F.3d 793, 803 (7th Cir. 2017). Where, as here, none of those exceptions apply, the TCPA provides consumers with a private right of action to seek injunctive relief and a minimum of $500 in damages for each violation of the statute or FCC regulations. 47 U.S.C. § 227(b)(3). If the defendant knowingly or willfully violated the TCPA, the court has discretion to award treble damages. *Id.*

### B.      Federal Rule of Civil Procedure 23

"To be certified, a proposed class must satisfy the requirements of Federal Rule of Civil Procedure 23(a), as well as one of the three alternatives in Rule 23(b)." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012) (citation omitted). Rule 23(a) requires Plaintiffs to prove numerosity, typicality, commonality, and adequacy of representation. *Id.* Here, Plaintiffs seek certification under Rule 23(b)(3), which also requires them to prove that: (1) the questions of law or fact common to the members of the proposed class predominate over questions affecting only individual members; and (2) a class action is superior to other available methods of resolving the controversy. *Id.* In conducting the class certification analysis, the Court need only consider the evidence submitted by the parties and determine whether Plaintiffs have proven Rule 23's elements by a preponderance of the evidence. *Kleen Prod. LLC v. Int'l Paper*, 306 F.R.D. 585, 589 (N.D. Ill. 2015) (citing *Messner*, 669 F.3d at 811). Plaintiffs must also prove the proposed

class is "ascertainable" meaning the class is clearly defined and its parameters based on objective criteria. *See Mullins v. Direct Digital, LLC*, 795 F.3d 654, 659 (7th Cir. 2015).

## V.    ARGUMENT

"'Class certification is normal' under the TCPA 'because the main questions. . . are common to all recipients.'" *Prac. Mgt. Support Serv., Inc. v. Cirque du Soleil, Inc.*, 301 F. Supp. 3d 840, 846 (N.D. Ill. 2018) (quoting *Ira Holtzman, C.P.A. v. Turza*, 728 F.3d 682, 683 (7th Cir. 2013)). That is true here and Plaintiffs' class certification motion should be granted.

### A.    The Proposed Class Satisfies Rule 23(a)

#### 1.    Numerosity is satisfied because VVT made millions of calls for CWT.

CWT's records show that VVT transferred ██████ calls to CWT during the Class Period. CWT-BH003163 (not attached). Plaintiffs obtained records from some of the carriers who handled those transfers, from which Plaintiffs identified 928,023 unique telephone numbers belonging to Class members. Ex. 18 (Weir Declaration). The total number of outbound calls—and thus number of class members—is unknown, but the number is likely many times the number of transfers since most people hung up on VVT and were not transferred.

#### 2.    Commonality is satisfied because class members suffered same injury.

To show commonality, Plaintiffs must demonstrate that class members' claims "depend upon a common contention" which is "of such a nature that it is capable of classwide resolution." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "[E]ven a single common question will do." *Id.* at 359 (internal alterations and quotation marks omitted). Relying on the Supreme Court's decision in *Wal–Mart*, the Seventh Circuit has explained that to establish commonality, a plaintiff must show that class members all "suffered the same injury." *Jamie S. v. Milwaukee Pub. Schools*, 668 F.3d 481, 497 (7th Cir. 2012) (citing *Wal–Mart*, 564 U.S. at 350).

13

743022.4

Plaintiffs are pursuing a single claim for an alleged violation of the TCPA. The TCPA prohibits (with certain exceptions that do not apply here) making or initiating calls using a "prerecorded voice" without the prior express consent of the called party. 47 U.S.C. § 227(b)(1)(A)–(B); 47 C.F.R. § 64.1200(a)(1)–(2). To prevail on this claim, Plaintiffs need only establish "that they received calls as part of this call campaign, and that every call included a prerecorded message." *Aranda v. Caribbean Cruise Line, Inc.*, 179 F. Supp. 3d 817, 825 (N.D. Ill. 2016) (holding such a showing "is sufficient to trigger TCPA liability"), *aff'd*, No. 17-1626, 2018 WL 3545146 (7th Cir. July 24, 2018).

Throughout the Class Period, CWT's agent (VVT) utilized one piece of software (the VVT Software) to market one vacation package (the Grand Celebration Vacation Package) in the same way (by playing prerecorded voice messages) to all class members in violation of the TCPA. "This is a common alleged injury presenting a common question." *Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. 240, 251 (N.D. Ill. 2014) (reaching same conclusion where class members "received the same calls offering a free cruise in exchange for a political or public opinion survey, made by or for one of the defendants, using the same artificial or prerecorded voice technology"), *aff'd*, No. 17-1626, 2018 WL 3545146 (7th Cir. July 24, 2018); *see also Gehrich v. Chase Bank USA, N.A.*, 316 F.R.D. 215, 224 (N.D. Ill. 2016) (commonality satisfied where "[e]ach class member suffered roughly the same injury: receipt of at least one phone call . . . to her cell phone"); *Toney v. Quality Res., Inc.*, 323 F.R.D. 567, 584 (N.D. Ill. 2018) (same).

> **3.  Typicality is satisfied because Plaintiffs and class members received the same calls from "Jennifer" and assert the same TCPA violation.**

"'A claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and [the] claims are based on the same legal theory.'" *Prac. Mgt. Support Services, Inc. v. Cirque du Soleil, Inc.*, 301 F. Supp. 3d at 850

743022.4

(quoting *Arreola v. Godinez*, 546 F.3d 788, 798 (7th Cir. 2008)).[3] Plaintiffs' claims arise from the same practice or course of conduct as class members' claims. Namely, CWT's use of VVT to call class members and play them audio recordings marketing the Grand Celebration Vacation Package during the Class Period. Plaintiffs and class members' claims are also based on the same legal theory of being subjected to unwanted prerecorded voice messages. These facts make a named plaintiff's claim typical in a TCPA case. *See Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. at 251 ("[B]ecause the named plaintiffs received the same type of call as the other class members, their claims are typical of those of the class."); *see also Toney*, 323 F.R.D. at 585 (typicality satisfied where plaintiff received the same type of phone call as the other class members same).

> **4.      Adequacy is satisfied because Plaintiffs and class members' interests are aligned and Plaintiffs retained competent counsel.**

Rule 23(a)(4) requires representative parties—both the named plaintiffs and class counsel—to "fairly and adequately represent the class." *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992). This requirement deals with "concerns about the competency of class counsel and conflicts of interest" between the class and its representatives. *Dukes*, 564 U.S. at 349 n.5. Here, Plaintiffs' counsel have significant experience with class action TCPA litigation, have vigorously litigated this case to date, and have the resources to continue to prosecute this action, *see* Exs. 24–25 (firm resumes), which facts support a finding of adequacy, *Toney*, 323 F.R.D. at 585 (citing Fed. R. Civ. P. 23(g)). Plaintiffs are also adequate because there are no meaningful differences between their individual claims and class members' claims. *See id.* (finding "factual similarities" between named plaintiff and class members' claims means their "interests are sufficiently aligned

---

[3] The class in *Prac. Mgt. Support Services* was decertified, but not for any reason relevant here. *See* No. 14-cv-2032, 2018 WL 3659349 (N.D. Ill. Aug. 2, 2018). Following the decision in *China Agritech, Inc. v. Resh*, 138 S. Ct. 1800 (2018), which resolved a circuit split regarding the application of the equitable tolling doctrine set forth in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), the case was deemed an untimely successive class action.

743022.4

and free of internal conflicts so that they do not pose any problems related to adequacy of representation").

> **5.     The implied requirement of ascertainability is also satisfied because the proposed class is defined by objective criteria.**

"[T]o be ascertainable, a class definition must identify 'a particular group of individuals . . . harmed in a particular way . . . during a specific period,' and must not be 'defined in terms of success on the merits' to avoid a fail-safe problem." *Prac. Mgt. Support Services*, 301 F. Supp. 3d at 848 (quoting *Mullins*, 795 F.3d at 660–61). Whether a class is ascertainable thus depends on "the adequacy of the class definition itself" and not on "whether, given an adequate class definition, it would be difficult to identify particular members of the class." *Mullins* at 658. The inquiry does not require Plaintiffs to demonstrate that "there is a 'reliable and administratively feasible' way to identify all who fall within the class definition." *Id.* at 657–58.

Here, the class is ascertainable because the proposed definition identifies a particular group of individuals (people who VVT called) harmed in a particular way (VVT played them unwanted prerecorded messages marketing the Grand Celebration Vacation Package) during a specific period (December 29, 2014 through March 20, 2016). This is specific enough because the arrangement between CWT and VVT was exclusive. VVT was the only entity making outbound calls to market the Grand Celebration Vacation Package, *see* Ex. 15 (Vogel Tr. 42:21–43:24), and VVT was not making outbound calls for any other travel company, *see* Ex. 3 at ¶4 (Advertising Agreement). Nor is the proposed class fail-safe. It leaves open the question of whether these calls violated the TCPA and thus "liability and class membership are not coterminous." *Toney v. Quality Resources, Inc.*, 323 F.R.D. 567, 581 (N.D. Ill. 2018).

743022.4

**B.      The Proposed Class Satisfies Rule 23(b)(3)**

**1.      Predominance is satisfied because Plaintiffs' proposed class definition leaves no room for variation or individual issues.**

"There is no mathematical or mechanical test for evaluating predominance." *Messner*, 669 F.3d at 814. Rule 23(b)(3) "is satisfied when common questions represent a significant aspect of [a] case and . . . can be resolved for all members of [a] class in a single adjudication." *Id.* at 815. "If, to make a *prima facie* showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question. If the same evidence will suffice for each member to make a *prima facie* showing, then it becomes a common question." *Id.* "Individual questions need not be absent. The text of Rule 23(b)(3) itself contemplates that such individual questions will be present. The rule requires only that those questions not predominate over the common questions affecting the class as a whole." *Id.*

The predominance analysis "'begins, of course, with the elements of the underlying cause of action.'" *Id.* (quoting *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011)). The elements of Plaintiffs' *prima facie* case are susceptible to proof common to the class, including whether VVT called class members on CWT's behalf as part of the Grand Celebration marketing campaign and whether those calls included prerecorded messages. Plaintiffs' proposed class definition thus "do[es] not leave much room for variation and [is] undoubtedly common to each class member[.]" *Birchmeier*, 302 F.R.D. at 253 (predominance satisfied where class was defined by "offer of a free cruise; offer made in exchange for participation in a political or public opinion survey; use of a prerecorded or artificial voice; date of call; by, on behalf of, or for the benefit of defendants"); *see also Toney*, 323 F.R.D. at 586 (predominance satisfied where "all members of the proposed class suffered the same injury and were generally subjected to the same telemarketing campaign by the same [d]efendant using the same automated dialer").

17

"The question of appropriate remedies also is common to the class." *Prac. Mgt. Support Services*, 301 F. Supp. 3d at 855 (citing *Birchmeier*, 302 F.R.D. at 253)). "'Plaintiffs are asking only for statutory damages, which eliminates individual variations.'" *Id.* (concluding "in TCPA case, 'defendants' contention about calculation of individual damages is a non-issue in terms of predominance") (quoting *Birchmeier*, 302 F.R.D. at 253). The appropriateness of treble damages will depend on proof related to CWT's conduct and also presents predominantly common issues. *See Toney*, 323 F.R.D. at 591 (where defendant "obtained the class members' cell phone numbers in the same way, and called each class member pursuant to the same company protocol or script . . . whether or not Defendants acted willfully or knowingly can be decided on a class-wide basis").

> **2.** **Superiority is satisfied because class member identification presents no insurmountable manageability concerns.**

"Rule 23(b)(3)'s superiority requirement . . . is comparative: the court must assess efficiency [of a class action] with an eye toward other available methods." *Mullins*, 795 F.3d at 664. Factors used to evaluate superiority include: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3). Here, factors (A) and (C) favor certification because the "class members have little economic incentive to sue individually based on the amount of potential recovery involved . . . and judicial efficiency is served by managing claims in one proceeding." *Prac. Mgt. Support Services*, 301 F. Supp. 3d at 856 (citation omitted). Factor (B) also favors certification because "there are no known existing individual lawsuits" that have not already been consolidated with this proceeding. *Id.*

Regarding the last factor, for TCPA cases, "class member identification issues . . . [are] assessed in the context of 'the likely difficulties of managing a class action' prong of the superiority requirement, which involves a relative assessment of the 'costs and benefits of the class device.'" *Prac. Mgt. Support Services*, 301 F. Supp. 3d at 857 (quoting *Mullins*, 795 F.3d at 657–58, 663). However, manageability "'is almost never a bar to class certification.'" *Id.* at 857 (quoting *Mullins*, 795 F.3d at 664) ("refusing to certify on manageability grounds alone should be the last resort."). The Seventh Circuit has "warned against '[r]elying on concerns about what are essentially claim administration issues to deny certification.'" *Id.* (quoting *Mullins*, 795 F.3d at 667–68). "'[A] class action has to be unwieldy indeed before it can be pronounced an inferior alternative . . . to no litigation at all.'" *Id.* (quoting *Mullins*, 795 F.3d at 658).

Plaintiffs have adduced significant discovery relevant to class membership: (1) a weekly and cumulative count of the number of calls transferred from VVT to CWT call centers during the class period, CWT-BH003163 (not attached); (2) call detail records from the carriers that handled a portion of those transferred calls, from which Plaintiffs' expert was able to isolate unique telephone numbers, Ex. 18 at ¶9 (Weir Declaration); (3) the opinions of Plaintiffs' experts that it is possible to identify the user of a given telephone number for a given timeframe and also provide a current address for that person from third-party data providers or from the telephone carriers, Ex. 17 at ¶¶24–31 (Snyder Declaration), Ex. 19 at ¶12 (Peters-Stasiweicz Declaration); and (4) a partial list of over 13,000 numbers VVT used during part of the Class Period, Exs. 20–21.

This discovery permits identifying and sending direct notice to a significant part of the proposed class. *See Birchmeier*, 302 F.R.D. at 247 (approving of use of "third-party database providers" to identify class members based on phone numbers). The remainder may self-identify in response to publication notice by submitting documentary proof that they received a call from

a number in use by VVT at the time of the call, such as a phone bill, or by affirming that they received the calls at issue in this case. *See id.* at 245–50 (approving of publication notice and permitting self-identification of claimants through affidavit). The Seventh Circuit has explicitly endorsed notice by publication and self-identification by sworn affidavit. *See Hughes v. Kore of Ind. Enter., Inc.*, 731 F.3d 672, 676–77 (7th Cir. 2013) ("When reasonable effort would not suffice to identify the class members, notice by publication, imperfect though it is, may be substituted."); *see also Mullins*, 795 F.3d at 672 (courts "should not decline certification merely because the plaintiff's proposed method for identifying class members relies on affidavits").

Courts routinely reject manageability challenges in TCPA cases where such procedures are available, as they are here. *See Prac. Mgt. Support Services*, 301 F. Supp. 3d at 858 ("[N]otice beyond the individuals and entities on the opt-out list and four target lists can be performed by publication. And all of the types of evidence described in [*G.M. Sign Inc. v. Stealth Sec. Sys., Inc.*, No. 14-cv-09249, 2017 WL 3581160 (N.D. Ill. Aug. 18, 2017)] [retained copies of faxes received, for example], including the affidavits the Seventh Circuit found appropriate in *Mullins* [795 F.3d at 669], can be submitted to establish class membership.") (additional citations omitted).

## VI.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that their motion for class certification be granted in its entirety.

Date: August 7, 2018                                    Respectfully submitted,
                                                        **LITE DEPALMA GREENBERG, LLC**

                                            By:    */s/ Katrina Carroll*
                                                   Katrina Carroll
                                                   *kcarroll@litedepalma.com*
                                                   Kyle A. Shamberg
                                                   *kshamberg@litedepalma.com*
                                                   111 W. Washington Street, Suite 1240
                                                   Chicago, IL 60602
                                                   Telephone: (312) 750-1265

20

743022.4

**JEFFREY GRANT BROWN, P.C.**
Jeffrey Grant Brown
*jeff@jgbrownlaw.com*
221 North LaSalle Street, Suite 1414
Chicago, IL 60601
Telephone: (312) 789-9700

**SIPRUT PC**
Joseph J. Siprut
*jsiprut@siprut.com*
Todd L. McLawhorn
*tmclawhorn@siprut.com*
Ke Liu
*kliu@siprut.com*
17 N. State Street, Suite 1600
Chicago, Illinois 60602
Telephone: (312) 236-0000

**AHDOOT & WOLFSON, PC**
Robert Ahdoot (admitted *pro hac*)
*rahdoot@ahdootwolfson.com*
Tina Wolfson (admitted *pro hac*)
*twolfson@ahdootwolfson.com*
1016 Palm Avenue
West Hollywood, California 90069
Telephone: (310) 474-9111

*Counsel for Plaintiffs Bakov and Herrera*

**BURSOR & FISHER, P.A.**
Yitzchak Kopel (admitted *pro hac*)
ykopel@bursor.com
888 Seventh Avenue
New York, NY 10019
Telephone:  (646) 837-7127

*Counsel for Plaintiff Hewlett*

21

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that the foregoing PLAINTIFFS' MOTION FOR CLASS CERTIFICATION was filed electronically with the Clerk of the Court using the CM/ECF system this 7th day of August 2018 and served electronically on all counsel of record.

*/s/ Katrina Carroll*
Katrina Carroll

22

743022.4