# EXHIBIT B

COLIN B. WEIR - 04/25/2018

```
 1    UNITED STATES DISTRICT COURT
      NORTHERN DISTRICT OF ILLINOIS
 2    EASTERN DIVISION
      --------------------------------------x
 3    ANGEL BAKOV and JULIE HERRERA,
      individually and on behalf of all
 4    others similarly situated,

 5                         Plaintiff,
                                           Case No.
 6         -against-              1:15-cv-02980

 7    CONSOLIDATED WORLD TRAVEL, INC.,
      d/b/a HOLIDAY CRUISE LINE, a
 8    Florida corporation,

 9                         Defendant.
      --------------------------------------x
10    KINAYA HEWLETT, on Behalf of Herself
      and all others similarly situated,
11
                           Plaintiff,   Case No.
12                                      1:17-cv-00973
              -against-
13
      CONSOLIDATED WORLD TRAVEL, INC.,
14    d/b/a HOLIDAY CRUISE LINE,

15                         Defendant.
      --------------------------------------x
16                         April 25, 2018
                           11:20 a.m.
17

18         Deposition of COLIN WEIR, taken by

19    Defendant, pursuant to Notice, at the offices of

20    Greenspoon Marder, LLP, 590 Madison Avenue, New

21    York, New York 10022, before SUZANNE PASTOR, a

22    Shorthand Reporter and Notary Public within and

23    for the State of New York.

24

25
```

Page 2

```
 1    A P P E A R A N C E S:
 2         BURSOR & FISHER, P.A.
           Attorneys for Plaintiff
 3         KINAYA HEWLETT
                888 Seventh Avenue
 4              New York, New York  10019
 5         BY:   YITZCHAK KOPEL, ESQ.
                212.989.9113
 6              ykopel@bursor.com
 7
           GREENSPOON MARDER LLP
 8         Attorneys for Defendant
           CONSOLIDATED WORLD TRAVEL, INC., d/b/a
 9         HOLIDAY CRUISE LINE
                200 East Broward Boulevard
10              Suite 1800
                Ft. Lauderdale, Florida  33301
11
           BY:   ROY TAUB, ESQ.
12              954.491.1120
                roy.taub@gmlaw.com
13              (Appearance via telephone)
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1                      INDEX
 2   WITNESS           EXAMINATION BY         PAGE
 3
     COLIN B. WEIR    MR. TAUB                  5
 4
 5
 6
                       EXHIBITS
 7
     WEIR          DESCRIPTION                PAGE
 8
     Exhibit 1     Declaration of Mr. Weir     22
 9
     Exhibit 2     CWT-BH 294 through 295      55
10
     Exhibit 3     Point to Numbers List       62
11
     Exhibit 4-A   Screen Shot of              62
12                 8552091304 Tax
13   Exhibit 4-B   Printout of 8552091304      62
                   Tab
14
     Exhibit 5-A   Screen Shot,                74
15                 Consolidated World
                   Travel
16
     Exhibit 5-B   Printout of                 74
17                 Consolidated World
                   Travel Tab
18
     Exhibit 6-A   Screen Shot of              89
19                 Consolidated Travel
                   Termination
20
     Exhibit 6-B   Printout of                 89
21                 Consolidated Travel
                   Termination Tab
22
     Exhibit 7-A   Screen Shot of              90
23                 CR_Civil_Action
24
25
```

Page 4

```
 1   WEIR          DESCRIPTION                PAGE
 2
     Exhibit 7-B   Printout of                 91
 3                 CR_Civil_Action Tab
 4   Exhibit 8     Screen Shot, Weir           60
                   Production File
 5
     Exhibit 9     .do Files                  115
 6   through 13
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1              COLIN B. WEIR,
 2   having been first duly sworn by the Notary
 3   Public (Suzanne Pastor), was examined and
 4   testified as follows:
 5   EXAMINATION BY
 6   MR. TAUB:
 7        Q.    Good morning, Mr. Weir.  Can you
 8   please state your full name for the record.
 9        A.    Good morning.  My name is Collin B.
10   Weir.
11        Q.    My name is Roy Taub, I represent
12   the defendant Consolidated World Travel, Inc.
13   Is it okay with you if I refer to them as CWT?
14        A.    That's fine.
15        Q.    Or Holiday Cruise Line in this
16   deposition?
17        A.    I'll understand both.
18        Q.    Okay, great.
19              And I understand you've been
20   deposed before, so I won't go through all the
21   rules, so to speak.  But there are just a couple
22   that I want to stress.
23              Especially because this deposition
24   is being conducted telephonically, I ask that
25   you please wait for me to finish my question
```

Page 22

1  (Weir Exhibit 1 for identification,
2  Declaration of Mr. Weir)
3      Q.   Mr. Weir, you've been handed what's
4  been marked as Weir Exhibit 1.  Do you recognize
5  the document?
6      A.   Subject to check against my file
7  copy, it appears to be a facsimile of the report
8  that I submitted in this litigation.
9      Q.   And you mentioned that there are
10 cases in the statement of qualifications where
11 you analyzed call detail records.  Do you
12 remember that testimony?
13     A.   Yes.
14     Q.   If you -- could you turn to the
15 statement of qualifications and identify those
16 cases for me.
17     A.   Sure.  I'm going to look at page 12
18 of that exhibit, and the two that come
19 immediately to mind, I might need to go back to
20 my records to identify some others, but Pac Bell
21 versus 01 Communications at the top of the page,
22 and Pac Bell versus Pac West Telecom in the
23 middle of the page.
24          It strikes me that the one below
25 that for the Illinois Commerce Commission may

Page 23

1  also have involved call detail records.  But I
2  know those two at the Cal PUC were focused on
3  analysis of call detail records.
4      Q.   Are there any other cases or
5  engagements listed in this document that call
6  for you to analyze call detail records?
7      A.   Yes, I'm sorry, it's been a while
8  since I've given this thought.  Page 11, Patrick
9  Hendricks versus AT&T Mobility.
10     Q.   Any others?
11     A.   That's what I recall in terms of
12 testimony.  But those, again, are -- this
13 document is listing cases where my work resulted
14 in public testimony.  There are probably dozens
15 of other instances where on behalf of our
16 telecommunications clients I have done analysis
17 of call detail records.
18          For some time, AT&T was our largest
19 client, so I'm sure I've done some of that work
20 with records involving AT&T.  I think we were
21 involved in a litigation that didn't result in
22 testimony relating to Qwest and its long
23 distance service that also would have involved
24 analysis of call detail records.  Those are some
25 of the ones that come to mind.

Page 24

1      Q.   Before the AT&T engagement, what
2  were you analyzing call detail records for?  For
3  what purpose?
4      A.   I think there were several but the
5  one instance that comes to mind, we were
6  attempting to determine whether a particular
7  telephone number was likely being used by an
8  internet service provider to provide dial-up
9  internet access based upon the nature of the
10 telecommunications traffic being transmitted to
11 that number.  For example, multiple calls to the
12 same number and calls with relatively longer
13 duration, or consistent longer duration that
14 were consistent with potential patterns of
15 internet-bound telecommunications traffic.
16     Q.   Have you had any prior engagements
17 where you were tasked with analyzing call detail
18 records to trace telephone calls and where they
19 were forwarded to or where they ultimately ended
20 up?  Kind of like the analysis you performed in
21 this case.
22     A.   Well, they almost all will relate
23 to that in some way.  So for example, the
24 ISP-bound traffic study that we just described
25 clearly relates to that because we're tracking

Page 25

1  telecommunications traffic to particular numbers
2  and looking at the nature of the call.  So the
3  database manipulation would be very, very
4  similar to what we've done in this case.
5      Q.   That engagement also involved point
6  to numbers and drilling down which numbers in
7  the records related to the point to numbers?
8          MR. KOPEL:  Objection.  Was that a
9  question?
10         MR. TAUB:  Yes.
11         MR. KOPEL:  What is the question?
12     A.   I'm not sure I follow.
13     Q.   The AT&T matter you've just been
14 talking about, did that also involve you
15 analyzing call detail records to determine -- to
16 compare records and identify unique telephone
17 numbers that were -- that match point to
18 numbers?
19     A.   So I think we need to make sure we
20 have some terminology straight on the record.  A
21 point to number is not really any different than
22 any other telephone number, except that in this
23 litigation it identifies transmissions made and
24 received by the defendant.  So in the AT&T call
25 detail record analysis, we are looking for

Page 26

1  specific telephone numbers, just like we are
2  here.  There we're looking for the telephone
3  numbers of ISPs, internet service providers.
4  Here we're looking for the telephone numbers
5  that identify the transmissions to defendant.
6         But in terms of the call detail
7  record and the database analysis, once you have
8  a number in mind that you're looking for, the
9  method or the database merge is going to be
10 identical to flagged traffic to and from those
11 particular numbers.
12     Q.    So have you had an opportunity to
13 look at the entire statement of qualifications
14 to see if there are any other engagements you
15 had that are listed where you analyzed call
16 detail records?
17     A.    I think I've identified for you the
18 ones that are in the statement of
19 qualifications.  But again, with the caveat that
20 there are many engagements, as you just used
21 that word, that involve me analyzing call detail
22 records that didn't result in public testimony
23 by me leading to something being on this list.
24     Q.    I see on page 11 there's a Southern
25 District of New York case, Fisher PA versus

Page 27

1  Federal Communications Commission.
2     A.    Yes.
3     Q.    Do you see that?
4     A.    Uh-huh.
5     Q.    What was your assignment in that
6  case?
7     A.    So the case background is that the
8  Bursor law firm was attempting to access
9  wireless telecommunications data through a FOIA
10 request.  And the FOIA request was denied
11 because the underlying carriers objected to
12 their data potentially falling into the hands of
13 competitors and that they insisted that the
14 particular data being requested could be used to
15 identify sensitive information about their
16 businesses.
17        I was retained to discuss how it
18 was that that data that was being requested
19 could not be reverse engineered in a way that
20 would -- because it was aggregated data, how
21 that aggregated data could not be reverse
22 engineered into carrier-specific information.
23        The particular algorithm used to
24 generate the aggregation basically makes it
25 impossible to understand the individual carrier

Page 28

1  data.  So I had provided testimony suggesting
2  that the aggregated data would be suitable for
3  public disclosure because the sensitive carrier
4  information could not be ascertained from that
5  high level data.
6     Q.    And you submitted that opinion on
7  behalf of the Bursor law firm?
8     A.    Yes.
9     Q.    Do you know what the result was in
10 that case?
11    A.    I think, if my memory is correct,
12 the end result is that I was permitted access to
13 the industry data and was subsequently able to
14 use that data.  But the Bursor & Fisher firm was
15 not permitted to have access to it.
16    Q.    So did you ultimately obtain the
17 data?
18    A.    Yes, I did obtain the data pursuant
19 to the FOIA request, or that was being sought
20 under the FOIA request.  I don't know that I
21 received it as a result of the FOIA request.
22    Q.    Was the FOIA request made by you or
23 ETI?
24    A.    No, the FOIA request was made by
25 Bursor & Fisher, which was why ultimately the

Page 29

1  fact that I got it meant that it came through
2  however the case got resolved rather than
3  through the standard FOIA process.
4     Q.    And what did you do with the data
5  that you obtained?
6     A.    I analyzed the wireless carrier
7  market concentration on a market-by-market
8  basis.
9           MR. TAUB:  Sue, could you please
10 repeat that answer.
11          (The preceding answer was read.)
12    Q.    So that analysis, did that take the
13 form of a report?
14    A.    I'm trying to think about whether
15 or not I can actually answer that question for
16 you.
17    Q.    Well, I don't hear an objection.
18    A.    I don't think there was any further
19 testimony from me in Bursor & Fisher PA versus
20 FCC as it relates to the data that I analyzed.
21 I think that's what I can feel comfortable
22 saying.
23    Q.    Okay, but that wasn't my question.
24 The analysis that you conducted, was there
25 ultimately an end product that you created?

Page 66

1  being assessed by Sprint for each call.
2      Q.   What is the basis for your
3  knowledge of what each of these columns means?
4      A.   Again, I would refer to the Poole
5  deposition as well as my long history of
6  analyzing this exact type of data in the
7  telecommunications industry.  This is not the
8  first time I've seen an invoice like this from
9  Sprint.
10     Q.   Was there any information provided
11 by Sprint that you used that explained what each
12 of these columns meant?
13     A.   I don't know if there was
14 additional information other than this data
15 itself.  But within the context of what this
16 data is, it's perfectly clear what these columns
17 are to anyone who was looked at this type of
18 data before.
19     Q.   Do you know why it is that the
20 originating number is the number of the person
21 that was called as opposed to the number of
22 we'll say VVT which called that person?
23     A.   So VVT was simply transferring the
24 call.  So the originating number is where the
25 call originates from in the eyes of Sprint,

Page 67

1  which is the end user who's on the other end of
2  the line.  And the destination is the point to
3  number which is where it's taking the call,
4  which is Holiday Cruise Line's call centers.
5      Q.   So for purposes of your analysis in
6  this case, you didn't confirm with anyone from
7  Sprint as to what each of these columns signify.
8      A.   There's absolutely no need to
9  confirm it because it's 100 percent apparent
10 what these columns signify.
11     Q.   Okay, I understand that's your
12 position.  I just want to make it clear that you
13 didn't talk to anyone at Sprint about what these
14 columns mean when you were conducting your
15 analysis in this case.
16     A.   Again, because of my experience
17 with analyzing records from Sprint like this
18 over a 14-year career, I didn't feel that it was
19 necessary to ask for additional clarification;
20 for example, about what the date and time of a
21 telephone call meant.
22     Q.   For the originating number.
23     A.   Again, within the context of this
24 case and my understanding about how the
25 relationship worked, there could be only one

Page 68

1  thing that that originating number means.  And
2  that is the end user that was called by VVT who
3  was an intermediary that transferred that call
4  to Sprint that would view that as the
5  originating number, and the destination number
6  being the point to number to which VVT sent the
7  call.
8      Q.   You testified that part of the
9  basis of your knowledge about what these columns
10 is Ms. Poole's deposition transcript.  What
11 testimony are you referring to?
12     A.   I don't have that 100-plus page
13 transcript in front of me, but the testimony
14 that I recall related to the relationship of the
15 parties and the relationship about how the call
16 sequence would take place.  So understanding
17 that class members were called by VVT on behalf
18 of Holiday Cruise Line, they would go through
19 the virtual voice prerecorded messages and then
20 some might ultimately then be transferred on to
21 one of these point to numbers through one of
22 these carriers being used by Holiday Cruise
23 Line.
24          So again, once you understand the
25 framework for that, the originating number can

Page 69

1  mean only one thing in this context.
2      Q.   Does your analysis assume that the
3  calls reflected in these records from Sprint
4  always utilize a telephone call that is the
5  subject of the class action?
6          MR. KOPEL:  Object to the form.
7      Q.   That objection is well taken.
8          Is it your understanding that this
9  case involved allegations related to a
10 particular type of telephone call?
11     A.   My understanding of my assignment
12 in this case was that I was to tabulate the
13 number of calls and number of numbers that were
14 associated with calls that were transferred from
15 VVT to the point to numbers.  I believe they're
16 all telephony calls, but beyond that, I'm not
17 looking for specific call types.
18          All I was asked to do was to
19 tabulate precisely what I had just indicated to
20 you.
21     Q.   Right, so for purposes of your
22 analysis, is it relevant what types of calls
23 were conducted that are reflected in these
24 records?
25          MR. KOPEL:  Objection.  Vague as to

Page 78
1  provided, which is then listed as the product
2  description.
3             Distance and distance ID are relics
4  of the old days when you paid for long-distance
5  calls based on distance rather than just time,
6  and I think are always null.
7             The date/time reflects the date and
8  time of the call.
9             The number of minutes is the
10 duration.  I didn't look at the amount and rate.
11 They appear to be zeros.  I would have to think
12 some more about that one.
13            The originating number and
14 originating city are the same as in the Sprint
15 data.  Those are the numbers that were called by
16 VVT and then transferred to one of the point to
17 numbers.
18            The originating state is the state
19 of that location.
20            The dialed number is the point to
21 number.
22            There's a blank field about
23 international destination.  We can see the
24 termination city is Ft. Lauderdale in most
25 instances.

Page 79
1             We've already covered the
2  information that was relevant to me so I'm not
3  sure I even looked at these last couple of
4  fields.
5             A LATA is, again, a relic of old
6  telecommunications regulation and are specific
7  geographies, often bigger than a particular city
8  but smaller than the state level.
9             OCN is typically the operating
10 company number.  So that's my best understanding
11 of these columns.
12      Q.    Could you explain what you think --
13 it's in the middle of the document,
14 orig_country_ID and switch_country_IDs signify?
15      A.    Again, that was not relevant to my
16 analysis, so I haven't looked at that.  It looks
17 like that may be essentially a blank field for
18 this type of service where the call detail
19 record contains all the potential fields that
20 would be used.  But in this case is not
21 particularly indicating anything.  If it is a
22 standard country code, then number 1 would be
23 the United States.
24      Q.    Does switch have a meaning in the
25 telecommunications field or in CDRs?

Page 80
1       A.    Again, the switch would be a relic
2  of circuit switch telephony.  And switch codes
3  would be much more like, if we were to look back
4  at 4-B, typical U.S. switch codes looks
5  something like the originating location where
6  they sort of describe the wire center and
7  location of the switch.  Which in some cases you
8  can kind of make out, like Chicago zone 1, but
9  in other instances are difficult to parse.
10            Having a switch country ID with a
11 number is not typical of a switching code.
12      Q.    What's the difference between
13 originating and switch?
14      A.    What do you mean by "originating"?
15      Q.    Sorry, the column before it, it
16 starts orig_ .  Based on your experience in the
17 field, do you have any understanding of how
18 those two columns are distinct from each other?
19      A.    I don't.  And in this case where
20 they don't factor into the analysis, I hadn't
21 given it any thought leading up to this moment.
22      Q.    Well, I mean is it fair to say that
23 you did not talk to anyone at ESN or InContact
24 about what these columns signify?
25      A.    I don't know whether that's fair to

Page 81
1  say.
2       Q.    Did you?
3             MR. KOPEL:  Object to the form.
4       Q.    Did you talk to anyone at ESN about
5  what these columns signify?
6       A.    I did not need to, so I did not.
7       Q.    Do you have an understanding of
8  whether ESN and InContact are the same company?
9       A.    I did not particularly care about
10 their corporate structure, so the answer is I
11 haven't made an investigation one way or the
12 other.
13      Q.    So just to be thorough, then did
14 you talk to anyone at InContact about what these
15 columns signify?
16      A.    I did not need to to accurately
17 complete my analysis, so I did not.
18      Q.    Thank you.
19            So when you were explaining to me
20 what you thought each of these columns means,
21 you were relying on your experience in the
22 field?
23      A.    And the deposition testimony of
24 Jennifer Poole.
25      Q.    Is it your recollection that

Page 82

1  Ms. Poole testified about what these columns
2  mean?
3       A.   It's my testimony, as I gave in the
4  same colloquy about the Sprint data, that
5  Ms. Poole gave testimony about the nature of the
6  relationships of the parties that makes it plain
7  when you look at these records what at least
8  some of the columns mean.  And in our instance
9  we care about, for example, the date and time of
10 the call as well as the originating number,
11 which indicates the party that was called by
12 VVT, and then the dialed number which is an
13 indicator of the point to number.
14      Q.   So based on your experience in this
15 field, do you have any understanding of what the
16 column orig_country_ID signifies?
17      A.   Again, because that's not relevant
18 to this particular analysis given the
19 relationship of these parties, I have not given
20 it any thought.
21      Q.   Okay, but that wasn't my question.
22 My question is, based on your experience in the
23 field, do you have any understanding of what
24 that term in this kind of report signifies?
25      A.   And I give you the same answer,

Page 83

1  because it's not necessary to conduct the
2  analysis that I performed here, I haven't given
3  it any consideration.
4       Q.   Is it your testimony that you have
5  no idea what the term "orig_country_ID" might
6  mean in a CDR?
7            MR. KOPEL:  Objection.  That
8  misstates the prior testimony which the witness
9  gave twice now and you've asked a third time.
10 Go ahead.
11      A.   Within the context of this
12 analysis, which is focussing on the originating
13 number, the destination number and the date and
14 time of the call, I have not given any
15 consideration to what that particular field may
16 mean within this particular record.
17      Q.   Okay, but yet again I haven't asked
18 you whether you gave it any consideration.  I
19 understand your answer is you did not.  My
20 question is, based on your experience in this
21 field, do you have any understanding of what
22 that term in the context of this kind of report
23 means?
24           MR. KOPEL:  Objection.  This is now
25 the fourth time counsel has asked the same

Page 84

1  question.  Just because you're not happy with
2  the answer does not mean that you can keep
3  asking the same question.  But I'll let the
4  witness go ahead.
5       A.   Because my analysis was focussing
6  on the originating number, the destination
7  number and the date and time, I have not given
8  it any consideration.
9       Q.   Did you give consideration to the
10 instrument column?
11      A.   I did not.
12      Q.   And yet you were able to tell me
13 what you understood that column to signify.
14           MR. KOPEL:  Objection.  Is that a
15 question?
16      Q.   Is that correct?
17           MR. KOPEL:  Is what correct?
18      Q.   That you were able to tell me what
19 you understood the instrument column to signify.
20      A.   I think I told you about the
21 product ID as being compared to the product
22 description.
23      Q.   Did your analysis consider the
24 product ID column?
25      A.   It did not.

Page 85

1       Q.   Okay, and yet you are able to tell
2  me what your understanding from your experience
3  in the industry is as to what product ID column
4  signifies, is that correct?
5       A.   The product ID does not factor into
6  my analysis, but the product description relates
7  to the carrier of interest of these bills,
8  InContact.  So in that sense I had given it
9  consideration in advance of the analysis even
10 though it's not included in the analysis.
11      Q.   Is it your testimony if someone
12 asked you, Mr. Weir, what does orig_country_ID
13 mean in a report of this nature, you would have
14 no idea?
15           MR. KOPEL:  Objection.  This is the
16 fifth time counsel has asked the same exact
17 question.  The witness can go ahead and answer
18 it.
19      A.   So in this particular litigation,
20 that field is not relevant to the analysis, so
21 I've given it no consideration.  If I was asked
22 to give consideration in some other additional
23 context, I would need to understand what that
24 context was and, for example, go back and think
25 about whether or not there was something as it

Page 86

1  relates to this litigation for example in
2  Ms. Poole's report. But since I haven't done
3  that, I can't offer you an opinion.
4       Q.   I'm not asking for your opinion.
5  I'm asking for what your understanding of what
6  that term is. And I've asked I guess it is five
7  times, I haven't received an answer yet.
8            Is it your testimony that if
9  someone asked you what switch_country_ID might
10 mean in a call detail report, you would have no
11 idea?
12           MR. KOPEL: Objection. Asked and
13 answered. This is now the sixth time counsel
14 has asked the same exact question in a row.
15           MR. TAUB: That's actually not
16 true.
17      A.   Are you guys done fighting?
18           MR. KOPEL: Go ahead.
19      A.   If I was asked that question and
20 asked to give my expert opinion, I would do what
21 I did in this case, which is to give
22 consideration to all of the relevant facts and
23 details in order to make an informed opinion
24 about that.
25           Since those two codes did not

Page 87

1  factor into my analysis, I have not given any
2  such consideration to those fields here.
3       Q.   Are you aware that the calls that
4  are at issue in this case originated outside the
5  United States?
6       A.   It's my understanding that VVT is
7  an Indian company.
8       Q.   So is the answer to my question
9  yes?
10      A.   Would you read back my answer,
11 please.
12      Q.   Are you aware that the calls that
13 are at issue in this case are alleged to
14 originate outside the United States? It's a yes
15 or no question.
16           THE WITNESS: Would you read back
17 my last substantive answer, please.
18           MR. TAUB: No, you don't need to do
19 that.
20           MR. KOPEL: The witness asked the
21 court reporter to please read back his last
22 substantive answer. Please go ahead.
23           (The preceding answer was read.)
24      A.   I stand by that testimony.
25      Q.   Is there a distinction that's

Page 88

1  understood in the telecommunications industry
2  between call origination and call switching?
3       A.   The origination would be where the
4  call is originated, and the switch could be at
5  one or more switch locations wherever those
6  switches happen to be.
7       Q.   And is it your testimony that the
8  switch locations are not relevant to your
9  analysis in this case?
10      A.   Based on my assignment, which was
11 to tally calls transferred from VVT to the point
12 to numbers, the location of one or any switches
13 in between those two points does not impact the
14 inquiry or the tabulation that I was asked to
15 make.
16           I would also note that, as I think
17 I said to you earlier today, switching locations
18 in many respects are a relic of the circuit
19 switched phone era and don't apply within the
20 context of internet-based telephony where the
21 traffic could be bounced all over the world
22 before arriving at its destination.
23           MR. TAUB: Sue, can you please
24 present to Mr. Weir Exhibit 6-A and 6-B.
25           (Weir Exhibit 6-A for identification,

Page 89

1  Screen Shot of Consolidated Travel Termination)
2            (Weir Exhibit 6-B for identification,
3  Printout of Consolidated Travel Termination Tab)
4            MR. KOPEL: Can you just identify
5  what's marked as what, please, because my copies
6  are not marked.
7            THE WITNESS: The small page is
8  6-A.
9            MR. KOPEL: The big one is 6-B?
10           THE WITNESS: Yes.
11           MR. KOPEL: Thank you.
12      Q.   Mr. Weir, 6-A is a screen shot of
13 an Excel file. The top center shows
14 consolidated travel termination. Do you see
15 that, Mr. Weir?
16      A.   I see that, yes.
17      Q.   And that's another one of the files
18 that's listed in Exhibit 8. Do you see that?
19      A.   Yes, and in footnote 4 of my
20 declaration.
21      Q.   You anticipated the next question.
22           Exhibit 6-B is a printout of the
23 tab that is shown in the screen shot in 6-A. Is
24 this another set of CDRs from InContact?
25      A.   It appears to be, yes.

Page 94

```
 1  ways, but typically a trunk is a facility that
 2  can handle more than one call at one time as
 3  compared to the official use of the word
 4  "telephone line" which would relate to a single
 5  line capable of transmitting a single call.
 6       Q.   And did you talk to anyone from
 7  Matrix Telecom to get an understanding of what
 8  these columns mean?
 9       A.   Because I did not need to do so to
10  complete my work accurately, I did not do that.
11       Q.   Did you rely solely on your
12  experience in the industry to ascertain what
13  these various columns signify?
14       A.   I've relied on my industry
15  experience and the deposition testimony of
16  Jennifer Poole.
17       Q.   You can put 7-A and 7-B aside.
18            In paragraph 8 of your report,
19  Exhibit 1, you stated that you validated the
20  connected numbers to ensure that they comprise a
21  valid U.S. area code and central office code
22  pursuant to the North American numbering plan.
23  Do you see that?
24       A.   You may have paraphrased, but yes,
25  I see where you're looking in the document.
```

Page 95

```
 1       Q.   I omitted some parenthetical.
 2            When you refer to "connected
 3  numbers," what are you referring to?
 4       A.   I am talking about what has been
 5  identified in most of these documents as the
 6  originating number.  That is, the numbers that
 7  were called by VVT to start this whole process.
 8  Those are the numbers that were ultimately
 9  connected to one of the point to numbers or to
10  the defendant, which is why I used that term
11  there.
12       Q.   Now, what is your basis for saying
13  that those numbers were called by VVT?
14       A.   Again, that's based on a reading of
15  the operative complaint and the deposition
16  testimony of Jennifer Poole.
17       Q.   Would it be more accurate to say
18  that those were numbers that were transferred to
19  the point to numbers reflected on what we've
20  marked as Exhibit 2?
21       A.   If you could just pause for a
22  moment, there's a conversation going on in the
23  hallway and it's hard to hear what you're
24  saying.
25            (The pending question was read.)
```

Page 96

```
 1       A.   Sorry, I'm digging for Exhibit 2
 2  just to make sure I've got -- I'm not sure if
 3  it's any more accurate.  I think it is accurate.
 4            So my understanding of the nature
 5  of the calls is that VVT called many, many
 6  numbers and then it connected some of them to
 7  the point to numbers reflected in Exhibit 2.
 8  And my job was to identify instances where that
 9  transfer or connection took place.
10            But I think in order for VVT to
11  connect the customer to one of the point to
12  numbers, there has to have been a preexisting
13  call between VVT and the originating number.
14       Q.   I guess another way of going about
15  this, isn't it possible for anyone to have
16  transferred the "originating telephone numbers"
17  to any of the point to numbers?
18       A.   That's not my understanding based
19  upon the deposition of Jennifer Poole where she
20  testifies about the relationship between VVT and
21  the point to numbers.
22       Q.   What's your understanding of how
23  someone would transfer a telephone number to one
24  of these point to numbers?  What is the actual
25  process that they would undertake?
```

Page 97

```
 1       A.   I don't follow.  Are you asking
 2  like what buttons they would push on their phone
 3  system?
 4       Q.   Yes.  Mechanically how would that
 5  work?
 6       A.   That's really beyond the scope of
 7  my assignment to understand it, other than to
 8  understand the sequence of events.  Which is
 9  that typically what you have is VVT calling a
10  class member.  The class member interacts with
11  the prerecorded voice system that VVT operates.
12  At some point VVT will cause that call to be
13  transferred to one of the point to numbers which
14  would take the call to a call center operated by
15  or on behalf of Holiday Cruise Line.
16       Q.   What is your understanding of how
17  VVT would have transferred a telephone call over
18  to one of the point to numbers?
19            MR. KOPEL:  Objection.  Asked and
20  answered.
21       A.   Again, it's beyond the scope of my
22  assignment to understand all of the technical
23  details about how they might do that other than
24  to understand the nature of the system and the
25  order of events that would lead to the transfer,
```

Page 154

```
1   WITNESS: _____
    DATE(S): _____
2   CASE:    _____
3   I wish to make the following changes, for the
    following reasons:
4
    PAGE LINE _____
5   ____ ____ CHANGE FROM:_____
    ____ ____ CHANGE TO:  _____
6
    REASON:_____
7   ____ ____ CHANGE FROM:_____
    ____ ____ CHANGE TO:  _____
8
    REASON:_____
9   ____ ____ CHANGE FROM:_____
    ____ ____ CHANGE TO:  _____
10
    REASON:_____
11  ____ ____ CHANGE FROM:_____
    ____ ____ CHANGE TO:  _____
12
    REASON:_____
13  ____ ____ CHANGE FROM:_____
    ____ ____ CHANGE TO:  _____
14
    REASON:_____
15  ____ ____ CHANGE FROM:_____
    ____ ____ CHANGE TO:  _____
16
    REASON:_____
17  ____ ____ CHANGE FROM:_____
    ____ ____ CHANGE TO:  _____
18
    REASON:_____
19  ____ ____ CHANGE FROM:_____
    ____ ____ CHANGE TO:  _____
20
    REASON:_____
21  ____ ____ CHANGE FROM:_____
    ____ ____ CHANGE TO:  _____
22
            _____
23  Subscribed and sworn to before me this _____ day
    of _____, 2018.
24
25  _____
```

Page 155

```
1                  C E R T I F I C A T E
2
3   STATE OF NEW YORK  )
4                     : SS.
5   COUNTY OF NEW YORK )
6
7           I, SUZANNE PASTOR, a Shorthand
8   Reporter and Notary Public within and for the
9   State of New York, do hereby certify:
10          That the witness whose deposition is
11  hereinbefore set forth, was duly sworn by me and
12  that such deposition is a true record of the
13  testimony given by the witness.
14          I further certify that I am not
15  related to any of the parties to this action by
16  blood or marriage, and that I am in no way
17  interested in the outcome of this matter.
18          IN WITNESS WHEREOF, I have hereunto
19  set my hand this May 9th, 2018.
20
                    Suzanne Pastor
21                  _____
22                    SUZANNE PASTOR
23
24
25
```