# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| ANGEL BAKOV and JULIE HERRERA, individually and on behalf of all others similarly situated, | : : : | Case No. 1:15-cv-02980 |
| | : | Hon. Harry D. Leinenweber |
| *Plaintiffs,* | : : | Hon. Susan E. Cox |
| v. | : : | |
| CONSOLIDATED WORLD TRAVEL, INC. d/b/a HOLIDAY CRUISE LINE, a Florida corporation, | : : : : | |
| *Defendant.* | : : | |
| KINAYA HEWLETT, on Behalf of Herself and all Others Similarly Situated, | : : : | Case No. 1:17-cv-00973 |
| | : | Hon. Harry D. Leinenweber |
| *Plaintiff,* | : : | |
| v. | : : | |
| CONSOLIDATED WORLD TRAVEL, INC. d/b/a HOLIDAY CRUISE LINE, | : : : | |
| *Defendant.* | : : : | |

## OPPOSITION TO DEFENDANT'S MOTION TO STRIKE THE TESTIMONY OF COLIN WEIR

749917.1

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. i

EXHIBIT LIST .................................................................................................................. iii

I.     INTRODUCTION ................................................................................................. 1

II.    STATEMENT OF RELEVANT FACTS ............................................................ 2

III.   APPLICABLE LEGAL STANDARD ................................................................. 4

IV.   ARGUMENT ......................................................................................................... 5

       A.   Mr. Weir reliably interpreted the carrier records based on his years of experience with similar records and Defendant's deposition testimony, and Defendant has agreed his interpretation is correct. ........................ 5

       B.   Mr. Weir's analysis is sophisticated and required expertise but, even if it did not, his testimony would still be admissible under Rule 1006 as a summary of the tens of thousands of pages the carriers produced ................................................................................................ 8

V.    CONCLUSION .................................................................................................... 12

749917.1

# TABLE OF AUTHORITIES

*Abante Rooter & Plumbing, Inc. v. Alarm.com, Inc.*,
   No. 15-cv-6314, 2017 WL 1806583 (N.D. Cal. May 5, 2017)..........................................11

*Cage v. City of Chicago*,
   979 F. Supp. 2d 787 (N.D. Ill. 2013) ...................................................................................7

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993)................................................................................................ *passim*

*Ervin v. Johnson & Johnson*,
   492 F.3d 901 (7th Cir. 2007) ...............................................................................................4

*Klaczak v. Consol. Med. Trans.*,
   458 F. Supp. 2d 622 (N.D. Ill. 2006) .................................................................................11

*Lakeside Feeders, Inc. v. Producers Livestock Marketing Ass'n*,
   666 F.3d 1099 (8th Cir. 2012) .............................................................................................8

*Legg v. Voice Media Grp., Inc.*,
   13-cv-62044, 2014 WL 1767097 (S.D. Fla. May 2, 2014).................................................12

*Trustees of Chi. Painters and Decorators Pension v. Royal Intern. Drywall and Decorating, Inc.*,
   493 F.3d 782 (7th Cir. 2007) ...............................................................................................5

United States v. Cruz-Velasco,
   224 F.3d 654 (7th Cir. 2000) ...............................................................................................5

United States v. Parra,
   402 F.3d 752 (7th Cir. 2005) ...............................................................................................5

United States v. Smith,
   869 F.2d 348 (7th Cir. 1989) ...............................................................................................4

*U.S. ex rel. Liotine v. CDW Govm't Inc.*,
   No. 05-33, 2012 WL 2807040 (S.D. Ill. July 10, 2012) ....................................................10

U.S. v. Hall,
   93 F.3d 1337 (7th Cir. 1996) .............................................................................................10

U.S. v. Sears Hdg. Corp.,
   No. 09-cv-588, 2013 WL 12291533 (S.D. Ill. Nov. 22, 2013)..........................................10

*Wellogix, Inc. v. Accenture, L.L.P.*,
   716 F.3d 867 (5th Cir. 2013) ...............................................................................................8

| EXHIBIT LIST | |
|---|---|
| Ex. 1 | Colin B. Weir Declaration, dated February 6, 2018 |
| Ex. 2 | Weir Deposition Transcript, dated April 25, 2018 |
| Ex. 3 | Jennifer Poole Rule 30(b)(6) Deposition Transcript, dated October 18, 2017 |
| Ex. 4 | Hearing Transcript, dated May 16, 2017 |
| Ex. 5 Under Seal | Defendant's "Point To" Numbers, CWT-BH000294–95 (confidential) |

I.      INTRODUCTION

Despite requesting that the Court strike the testimony of Plaintiffs' expert Colin Weir, defendant Consolidated World Travel, Inc. ("Defendant") has not argued that any of Mr. Weir's findings are incorrect. In fact, when Defendant crunched the numbers, it reached the *same conclusion* Mr. Weir reached. In a moment of confrontation at Mr. Weir's deposition, defense counsel stated that when they performed the analysis Mr. Weir conducted, they "got a result of 959,609 non-unique telephone calls[.]" Ex. 2 (Tr. 138:14–16). Mr. Weir responded: "Right. So I would direct your attention to footnote 7 where I also indicate that very same number." *Id.* (Tr. 140:3–5) (referring to his declaration, attached hereto as Exhibit 1). Thus, not only is there no challenge to Mr. Weir's findings, the parties agree they are correct.

Instead, Defendant has argued that Mr. Weir's analysis is unreliable because he "failed to verify the meaning of the terms in the records produced by the telephone carriers." Motion to Strike ("MTS") at 6. There was no need for that. Mr. Weir's prior experience analyzing similar records and the evidence Plaintiffs adduced in discovery provided sufficient grounds to understand the carriers' call records. Plus, again, Defendant did not challenge Mr. Weir's analysis. To the contrary, it has agreed that these records contain class members' telephone numbers.

Defendant has also argued that Mr. Weir "did not use any of his qualifications when he organized telephone numbers." MTS at 4. That is also incorrect. This was not a matter of counting rows in an Excel spreadsheet. Mr. Weir applied a sophisticated methodology to gather the relevant information from tens of thousands of pages of non-uniform telephone records, create a database to house that information, scrub the data to ensure it contained valid U.S. telephone numbers, and only then did he conduct his final tabulations. Both *gathering* and *analyzing* these records drew on Mr. Weir's considerable expertise in data analysis and his effort to distill useful information from these voluminous records will be helpful to both the Court and the finder of fact in this case.

1

749917.1

Even if Defendant is correct that these tasks were administrative or ministerial (they were not), his testimony should still be sustained as summary evidence under Federal Rule of Evidence 1006, which explicitly contemplates the use of a summary witness and summary evidence in circumstances such as these. Defendant has agreed that Mr. Weir's work is helpful.

The purpose of Rule 702 is "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). Mr. Weir's testimony satisfies these requirements. For that reason, and because Defendant has agreed to the substance of Mr. Weir's testimony, the motion should be denied.

## II. STATEMENT OF RELEVANT FACTS

As explained in Plaintiffs' motion for class certification, Defendant hired an Indian company called Virtual Voice Technologies Pvt. Ltd. ("VVT") to call consumers on its behalf to promote it vacation packages. VVT transferred consumers who expressed interest in learning more about this "free cruise" to Defendant's call centers located in the United States. Those call centers maintained what Defendant has referred to as "point to" numbers to receive transferred calls, and certain of those "point to" numbers were set aside at times solely to receive calls from VVT. Ex. 3 (Poole Tr. 74:10–14) ("Q: [T]hey were the numbers which . . . the VVT agent used to transfer calls to the call centers if consumers expressed an interest? A: Correct."); *see also id.* (Poole Tr. 73:20–74:14, 117:7–11, 193:5–194:23) (similar).

During discovery, Defendant produced these "point to" numbers, identified the carriers that serviced them, and disclosed their dates of use in connection with the marketing campaign at issue in this case. *See* Ex. 5 (list of "point to numbers"); *see also* Ex. 3 (Poole Tr. 194:14–23) (testifying that she prepared this list for this litigation and that it is complete). With this information in hand, Plaintiffs were able to subpoena the carriers for Defendant's call centers. These subpoenas sought documents that would contain telephone numbers belonging to the subset of class members

whom VVT called and then transferred to a Defendant call center. (Plaintiffs' proposed class includes all persons who received outgoing calls from VVT irrespective of whether they were transferred to a Defendant call center.)

Plaintiffs took this course and served these subpoenas at Defendant's behest. Though Defendant possessed this same information, it told the Court that it would be too burdensome for them to produce it and that it could be readily obtained by subpoena:

> [W]e gave [Plaintiffs] the telephone numbers over which the calls are transferred. That telephone number is assigned to a telephone carrier. We gave them the carrier information for that telephone number. You send a subpoena to the carrier. The carrier will produce the records relating to calls that were transferred over that particular line for that period of time. . . . [W]e've seen it work [to identify class members in another litigation]. The lawyers in that case got over a million phone numbers.

Ex. 4 (5/16/17 Hr'g Tr. 10:19–11:2). This is the course Plaintiffs took in this case and, in response to their subpoenas, Plaintiffs' received *tens of thousands* of pages of account invoices and call detail records from the telephone carriers.

To "aggregate and analyze" this mountain of information, Plaintiffs retained Mr. Weir. He used sophisticated computer-assisted methods to report the number of calls and unique telephone numbers transferred to these numbers during the applicable time periods. Ex. 1 at ¶8. Mr. Weir also "validated the connected numbers to ensure that they comprise a valid US area code and Central Office code (NPA-NXX) pursuant to the North American Numbering Plan ("NANP")." *Id.* The results of Mr. Weir's tabulations showed "1,051,227 calls connected to the 'point to' number analyzed," or 959,609 calls when "[e]xcluding connected calls to the same telephone number on the same day." *Id.* ¶9. "These calls [we]re between the 'point to' numbers and 928,023 unique US telephone numbers." *Id.*

Mr. Weir also conducted an additional tabulation based on data produced by Defendant in discovery known as a "master report" which "shows all calls which were transferred to the

3

Defendant's call centers during the Holiday Cruise Line campaign." *Id.* ¶10. Mr. Weir determined that the "master report shows that there were 1,674,565 such calls." *Id.*

Mr. Weir has "a long history of analyzing call detail records and other such voluminous telecommunications data." Ex. 2 (Tr. 20:3–6). He has been retained by companies in the telecommunications industry (including AT&T) in "dozens of instances where . . . [he has] done analysis of call detail records." *Id.* (Tr. 23:14–19). He has also served as an expert witness in several other litigations in which he was tasked with analysis of voluminous call detail records or telephone bills. *Id.* (Tr. 22:17–23:9) (identifying three cases involving analysis of call detail records); *see also id.* (Tr. 38:9–17) (identifying ten cases involving analysis of telephone bills).

In their motion for class certification, Plaintiffs cited Mr. Weir's testimony three times. *See* ECF No. 165 at 10, 13, 19. First, on page 10, Plaintiffs noted that Mr. Weir "identified unique telephone numbers for 928,023 of th[e] transferred calls" in support of their assertion that "CWT called millions of class members without prior consent." Second, on page 13, Plaintiffs noted that Mr. Weir identified these phone numbers in support of their argument that numerosity was satisfied. Finally, on page 19, Plaintiffs again noted that Mr. Weir identified these phone numbers in support of their argument that they "have adduced significant discovery relevant to class membership" in the "superiority" section of their brief.

### III. APPLICABLE LEGAL STANDARD

Trial courts have broad discretion under Federal Rule of Evidence 702 to admit or exclude expert testimony. *United States v. Smith*, 869 F.2d 348, 351 (7th Cir. 1989). Rule 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), govern the admissibility of expert testimony. *Daubert* provides a three-step analysis for district courts to consider in determining whether the proffered expert testimony is both relevant and reliable. *See Ervin v. Johnson & Johnson*, 492 F.3d 901, 904 (7th Cir. 2007). *Daubert* instructs

4

district courts to determine (1) whether the witness is qualified as an expert "by knowledge, skill, experience, training or education"; (2) whether the theory [the expert is relying on] "has been subjected to peer review and publication"; and (3) whether the theory is "generally accepted in the scientific community." *Daubert*, 509 U.S. at 593–94.

The Seventh Circuit has noted that while *Daubert* provides a list of factors to be considered "when evaluating the admissibility of expert testimony—including testing, peer review, error rates, and acceptability within the relevant professional community—these factors do not establish a definitive checklist." *United States v. Cruz-Velasco*, 224 F.3d 654, 660 (7th Cir. 2000). Moreover, the Seventh Circuit has recognized that the *Daubert* opinion was limited to scientific testimony and that "while extensive academic and practical expertise in an area is certainly sufficient to qualify a potential witness as an expert, Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience." *United States v. Parra*, 402 F.3d 752, 758 (7th Cir. 2005). As such, the Seventh Circuit "consider[s] a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area." *Trustees of Chi. Painters and Decorators Pension v. Royal Intern. Drywall and Decorating, Inc.*, 493 F.3d 782, 787–88 (7th Cir. 2007).

IV.  **ARGUMENT**

    A.  **Mr. Weir reliably interpreted the carrier records based on his years of experience with similar records and Defendant's deposition testimony, and Defendant has agreed his interpretation is correct.**

Defendant has argued that the Court should strike Mr. Weir's declaration as unreliable because he "did not contact Sprint, InContact, or Matrix Telecom"—the carriers for Defendant's call centers—"to verify the meaning of [column headings]" in the records Plaintiffs subpoenaed at its behest. MTS at 8. Defendant's argument is not tethered to any particular headings in any particular documents. It does not challenge Mr. Weir's interpretation of any specific headings and

5

Defendant has not come forward with competing definitions for any headings, let alone any definition that would actually have some impact Mr. Weir's conclusions. To the contrary, Defendant has explicitly conceded that Mr. Weir correctly identified the column with class members' telephone numbers and has endorsed the process of utilizing carrier records to identify class members. Defendant's non-specific reliability argument should be rejected.

Mr. Weir relied on four categories of data in carrying out his analysis. They are "the [1] date and [2] time of the call as well as [3] the originating number, which indicates that party that was called by VVT, and then [4] the dialed number, which is an indicator of the point to number." Ex. 2 (Tr. 82:3–13). Though it did not identify any specific column headings, these are the "essential" headings that Defendant has alleged Mr. Weir should have sought verification. With respect to the first two terms—the date and time of each call—it is not clear there is even any room for disagreement about their meaning. They are written in plain English and have meanings consistent with their dictionary definitions. *See* Ex. 2 (Tr. 67:16–21) (Mr. Weir could see no need "to ask for additional clarification . . . about what the date and time of a telephone call meant."). Verifying the meaning of these terms with the carriers would be to verify the obvious.

How "originating number" and "dialed number" should be defined is clear as well. Mr. Weir concluded that "the originating number is where the call originates from in the eyes of Sprint, which is the end user who's on the other end of the line," and the dialed number "is the point to number which is where it's taking the call, which is Holiday Cruise Line's call centers." Ex. 2 (Tr. 66:23–67:4, 68:2–7). In other words, the originating numbers are the numbers at which class members' received Defendant's illegal marketing calls, and the dialed numbers are the call center numbers to which VVT transferred class members' calls. He used differing terminology,

6

749917.1

but Plaintiffs' telecommunications expert Randall Snyder reached the same conclusions about what information the carrier records contain. Snyder Decl. ¶23 (not attached).

Mr. Weir explained at his deposition that he arrived at this understanding of these various terms based on his extensive prior experience working with similar phone records. Ex. 2 (Tr. 66:2–9) ("Q: What is the basis for your knowledge of what each of these columns means? A: Again, I would refer to . . . my long history of analyzing this exact type of data in the telecommunications industry. This is not the first time I've seen an invoice like this from Sprint."); *id.* (Tr. 66:15–18) ("[W]ithin the context of what this data is, it's perfectly clear what these columns are to anyone who has looked at this type of data before.").

Mr. Weir also relied on Ms. Poole's deposition testimony to construe the carrier records. Ex. 2 (Tr. 66:2–9, 68:8–69:1, 81:19–82:13, 94:11–16, 95:12–16). In particular, Mr. Weir relied on Ms. Poole's testimony regarding "the relationship of the parties" and "how the call sequence would take place." *Id.* (Tr. 68:14–16). Her testimony helped him to "understand[] that class members were called by VVT on behalf of Holiday Cruise Line, they would go through the virtual voice prerecorded messages and then some might ultimately then be transferred on to one of these point to numbers through one of these carriers being used by Holiday Cruise Line." *Id.* (Tr. 16–23). "Once you understand the framework," which Ms. Poole described, "the originating number," for example, "can mean only one thing in this context." *Id.* (Tr. 68:24–69:1). *Compare* Ex. 3 (Poole Tr. 73:20–74:14, 117:7–11, 193:5–194:23) (explaining what the "point numbers" are, how they were used by VVT and Defendant, and that VVT's use was exclusive).

Mr. Weir's interpretation of the carrier records is thus well-founded and reliable. *See Cage v. City of Chicago*, 979 F. Supp. 2d 787, 803 (N.D. Ill. 2013 ("[A]n expert witness may opine on the accepted meaning . . . of a word or phrase within a particular industry based his or her

7

experience and training."); *see also Lakeside Feeders, Inc. v. Producers Livestock Marketing Ass'n*, 666 F.3d 1099, 1111 (8th Cir. 2012) ("Courts have frequently recognized the value of expert testimony defining terms of a technical nature and testifying as to whether such terms have acquired a well-recognized meaning in the business or industry."); *Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867 (5th Cir. 2013) (expert witness allowed to opine on the software industry's understanding of certain terms based on his experience and training in the software industry).

Moreover, Defendant has agreed with Mr. Weir's interpretation of these terms. It did so explicitly by conceded that the "originating numbers" belong to consumers whose calls were transferred from VVT to Defendant's call centers in its motion to strike. *See* MTS at 4 ("'[O]riginating locations' are the phone numbers of the called party being transferred to a call center"); *id.* at 1–2 (noting that Mr. Weir "isolate[d] telephone numbers that were connected to any of the 'point to' telephone numbers used by [VVT] to transfer telephone calls using the VVT platform"). And it did so in a more general way by representing to Plaintiff and this Court that the most effective and efficient approach to obtaining information responsive to Plaintiffs' demands for a class list was to subpoena its call centers' carriers for these exact records. *See, e.g.* Ex. 4 (5/16/17 Hr'g Tr. 10:19–11:2) (addressing the Court, defense counsel explained that "[t]he carrier will produce the records relating to calls that were transferred over that particular line for that period of time. . . . [W]e've seen it work [to identify class members in another litigation]. The lawyers in that case got over a million phone numbers.").

    **B.**    **Mr. Weir's analysis is sophisticated and required expertise but, even if it did not, his testimony would still be admissible under Rule 1006 as a summary of the tens of thousands of pages the carriers produced.**

Defendant has also argued that Mr. Weir's testimony in this case required no expertise because "he did nothing more than summarize, organize, and 'tabulate' phone numbers." MTS at 4 (citing Weir Tr. 69:8–20). As a preliminary point, this argument is directly at odds with its

8

reliability argument. Either Defendant believes Mr. Weir's work required expertise or it does not. Both cannot be true. In any case, like its nebulous argument concerning column headings, Defendant's contention that Mr. Weir's analysis was a rote administrative undertaking does not withstand scrutiny and, further, is legally irrelevant.

*First*, Weir was not simply counting phone calls in a preexisting list, as Defendant has suggested. Mr. Weir's tabulations required a background in data analysis due to their complexity and thus his work required him to draw on his specialized experience in this area:

> Step 1 was to take this PDF document . . . and to translate that into a usable database, which I did using the statistical software package called Stata. That gave me a list in digital form of each point to number, the relevant carrier and the start and end date when calls to that number would be related to . . . this litigation. . . . Once the data was imported, the data was restructured to be in helpful and usable formats in a consistent way across all carriers and all datasets. And then . . . I use a database method called Merge that takes the sets of data and what we would do is take the point to number list . . . and merge that with each of the carrier dataset. And what we would get is a . . . flag in the database for any call that was placed to one of these point to numbers during the relevant time period. . . . Once those flags are in place to identify calls that met the criteria . . . the database software can tabulate the number of unique end user telephone numbers that meet those criteria as well as the number of telephone calls that were transmitted to the various point to numbers.

Ex 2 (Tr. 59:1–60:20). Mr. Weir also "validated the connected numbers to ensure that they comprise a valid US area code and Central Office code (NPA-NXX) pursuant to the North American Numbering Plan ("NANP")." Ex. 1 at ¶8. This process could not have been performed by someone without the requisite background. It bears mentioning that Defendant has *not* challenged Mr. Weir's "expertise in data analytics which allows for the manipulation of that data through database programs in order to tabulate the data." Ex. 2 (Tr. 20:3–10).

*Second*, Mr. Weir's testimony is also admissible under Rule 702 because it will be helpful for this information to be explained by an expert like Mr. Weir, particularly with respect to how "originating number" and "dialed number" should be construed here. As the Seventh Circuit has

9

stated, "the ultimate test is whether the testimony would assist the trier of fact in understanding the evidence. If the expert testimony would be helpful and relevant with respect to an issue in the case, the trial court is not compelled to exclude the expert just because the testimony may, to a greater or lesser degree, cover matters that are within the average juror's comprehension." *U.S. v. Hall*, 93 F.3d 1337, 1342 (7th Cir. 1996).

*Third*, Mr. Weir is still an expert in how he distilled his results from the tens of thousands of pages of records produced by the carriers and thus "an expert in how he *gathered* this information." *See U.S. v. Sears Hdg. Corp.*, No. 09-cv-588, 2013 WL 12291533, at *4 (S.D. Ill. Nov. 22, 2013) (finding witness that "has been retained to review voluminous business records provided by Defendants" was "an expert in how he gathered this information, which includes merging databases, making a master database, and making inquiries off of the database to draw out information that is relevant to the issues in this case.") (emphasis added); *U.S. ex rel. Liotine v. CDW Govm't Inc.*, No. 05-33, 2012 WL 2807040, at *4 (S.D. Ill. July 10, 2012) ("[T]he Court understands Dr. Albright to be an expert in order to accomplish the task he was asked to complete, *i.e.*, to use his specialized computer knowledge to summarize data within the parameters that have been given to him. . . . To the extent that Dr. Albright's testimony may qualify as expert testimony, regarding how he gathered the information for his testimony, under the framework of *Daubert* . . . the Court finds that his testimony qualifies for admission under Federal Rule of Evidence 702."). For this additional reason, his testimony is admissible under rule 702.

*Fourth*, even if Defendant is correct that Mr. Weir's work was ministerial (it was not), the remedy is not to strike his declaration. It would be to treat him as a summary witness and to admit his declaration and conclusions under Rule 1006 as "a summary . . . or calculation to prove the content of voluminous writings." Indeed, Defendant has conceded that Mr. Weir's declaration is

10

both a summary and calculation of voluminous evidence in this case. *See* MTS at 2 ("Weir's organization and computer coding saved some time[.]"). Federal Rule of Evidence 1006 explicitly permits a party to "use a summary, chart, or calculation to prove the content of voluminous writings . . . that cannot be conveniently examined in court." And "one need not qualify as an 'expert' to testify as a summary witness" under this rule. *Klaczak v. Consol. Med. Trans.*, 458 F. Supp. 2d 622, 666 (N.D. Ill. 2006).

There can be no disagreement that the carrier records and Mr. Weir's summary of those records are both "voluminous" within the meaning of Rule 1006. As noted above, the carrier records consist of tens of thousands of pages. Mr. Weir's final list of more than a million phone calls is also far too long to be conveniently examined in Court, as became apparent at his deposition:

> Q:  Is there any reason why a version [of the final list of numbers transferred] that could be attached to your report as an exhibit was not generated?
>
> A:  [I]n order to display that data, we would have 1 million lines of records . . . And it would have made the declaration *4,000 pages* or something like that. I think part of what I might bring to the table here is my ability to summarize that voluminous data.

Ex. 2 (Tr. 137:9–21) (emphasis added). In fact, defense counsel did not print out Mr. Weir's source data in whole for his deposition due to their volume. *Id.* (Tr. 91:25–92:1) (explaining that an excerpt would be used because "[i]f it was all printed out, it would be many, many, many pages").

That the motion must be denied is readily-apparent from the authority Defendant itself cited. In *Abante Rooter & Plumbing, Inc. v. Alarm.com, Inc.*, No. 15-cv-6314, 2017 WL 1806583, at *5 (N.D. Cal. May 5, 2017), the court *denied* a motion to strike in which the movant argued that the declarant was "not an expert" because "expert testimony is not necessary to perform this type of tabulation." The fact that the declarant was not an expert was therefore irrelevant since the

11

tabulations were nonetheless relevant to the court's class certification analysis. *Id.* As explained above, Mr. Weir's analysis is relevant to Plaintiffs' showing on numerosity and superiority. Mr. Weir's testimony should thus be sustained as reliable and relevant.

The ruling in *Legg v. Voice Media Grp., Inc.*, 13-cv-62044, 2014 WL 1767097 (S.D. Fla. May 2, 2014), on which Defendant has relied, is not to the contrary. In that case, the court struck an expert declaration it found to be "misleading and speculative." *Id.* at *3–4. Defendant has not challenged the accuracy or relevance of Mr. Weir's testimony. Defendant does fault Mr. Weir for having "made no effort to exclude landline telephone numbers." MTS at 5. But Plaintiffs' proposed class definition includes persons who received calls from Defendant on their landline phones. *See* ECF No. 165 at 2. There was therefore no reason to exclude such numbers from his analysis.

Ultimately, Defendant has not come forward with any compelling reason Mr. Weir's testimony should be deemed inadmissible under Rule 702. At best, it has made a case for admitting Mr. Weir's testimony under Rule 1006, in which case its motion must still be denied.

## V. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that Defendant's motion to strike the testimony of Colin Weir be denied in its entirety.

Date: September 5, 2018                              Respectfully submitted,

**LITE DEPALMA GREENBERG, LLC**

By:    */s/ Katrina Carroll*
       Katrina Carroll
       *kcarroll@litedepalma.com*
       Kyle A. Shamberg
       *kshamberg@litedepalma.com*
       111 W. Washington Street, Suite 1240
       Chicago, IL 60602
       Telephone: (312) 750-1265

12

**JEFFREY GRANT BROWN, P.C.**
Jeffrey Grant Brown
*jeff@jgbrownlaw.com*
221 North LaSalle Street, Suite 1414
Chicago, IL 60601
Telephone: (312) 789-9700

**SIPRUT PC**
Joseph J. Siprut
*jsiprut@siprut.com*
Todd L. McLawhorn
*tmclawhorn@siprut.com*
Ke Liu
*kliu@siprut.com*
17 N. State Street, Suite 1600
Chicago, Illinois 60602
Telephone: (312) 236-0000

**AHDOOT & WOLFSON, PC**
Robert Ahdoot (admitted *pro hac*)
*rahdoot@ahdootwolfson.com*
Tina Wolfson (admitted *pro hac*)
*twolfson@ahdootwolfson.com*
1016 Palm Avenue
West Hollywood, California 90069
Telephone: (310) 474-9111

*Counsel for Plaintiffs Bakov and Herrera*

**BURSOR & FISHER, P.A.**
Yitzchak Kopel (admitted *pro hac*)
*ykopel@bursor.com*
888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7127

*Counsel for Plaintiff Hewlett*

13

749917.1

## **CERTIFICATE OF SERVICE**

The undersigned, an attorney, certifies that the foregoing PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO STRIKE THE TESTIMONY OF COLIN WEIR was filed electronically with the Clerk of the Court using the CM/ECF system this 5th day of September 2018 and served electronically on all counsel of record.

*/s/ Katrina Carroll*
Katrina Carroll
