# EXHIBIT 2

COLIN B. WEIR - 04/25/2018

**EXCERPTED ANNOTATED**

```
 1    UNITED STATES DISTRICT COURT
      NORTHERN DISTRICT OF ILLINOIS
 2    EASTERN DIVISION
      ---------------------------------x
 3    ANGEL BAKOV and JULIE HERRERA,
      individually and on behalf of all
 4    others similarly situated,

 5                         Plaintiff,
                                         Case No.
 6         -against-                     1:15-cv-02980

 7    CONSOLIDATED WORLD TRAVEL, INC.,
      d/b/a HOLIDAY CRUISE LINE, a
 8    Florida corporation,

 9                         Defendant.
      ---------------------------------x
10    KINAYA HEWLETT, on Behalf of Herself
      and all others similarly situated,
11
                           Plaintiff,   Case No.
12                                      1:17-cv-00973
              -against-
13
      CONSOLIDATED WORLD TRAVEL, INC.,
14    d/b/a HOLIDAY CRUISE LINE,

15                         Defendant.
      ---------------------------------x
16                         April 25, 2018
                           11:20 a.m.
17

18        Deposition of COLIN WEIR, taken by

19    Defendant, pursuant to Notice, at the offices of

20    Greenspoon Marder, LLP, 590 Madison Avenue, New

21    York, New York 10022, before SUZANNE PASTOR, a

22    Shorthand Reporter and Notary Public within and

23    for the State of New York.

24

25
```

Page 2

1   A P P E A R A N C E S:
2       BURSOR & FISHER, P.A.
        Attorneys for Plaintiff
3       KINAYA HEWLETT
              888 Seventh Avenue
4             New York, New York  10019
5       BY:   YITZCHAK KOPEL, ESQ.
              212.989.9113
6             ykopel@bursor.com
7
        GREENSPOON MARDER LLP
8       Attorneys for Defendant
        CONSOLIDATED WORLD TRAVEL, INC., d/b/a
9       HOLIDAY CRUISE LINE
              200 East Broward Boulevard
10            Suite 1800
              Ft. Lauderdale, Florida  33301
11
        BY:   ROY TAUB, ESQ.
12            954.491.1120
              roy.taub@gmlaw.com
13            (Appearance via telephone)
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1                    INDEX
2   WITNESS         EXAMINATION BY        PAGE
3
    COLIN B. WEIR   MR. TAUB              5
4
5
6
                    EXHIBITS
7
    WEIR        DESCRIPTION               PAGE
8
    Exhibit 1   Declaration of Mr. Weir   22
9
    Exhibit 2   CWT-BH 294 through 295    55
10
    Exhibit 3   Point to Numbers List     62
11
    Exhibit 4-A Screen Shot of            62
12              8552091304 Tax
13  Exhibit 4-B Printout of 8552091304    62
                Tab
14
    Exhibit 5-A Screen Shot,              74
15              Consolidated World
                Travel
16
    Exhibit 5-B Printout of               74
17              Consolidated World
                Travel Tab
18
    Exhibit 6-A Screen Shot of            89
19              Consolidated Travel
                Termination
20
    Exhibit 6-B Printout of               89
21              Consolidated Travel
                Termination Tab
22
    Exhibit 7-A Screen Shot of            90
23              CR_Civil_Action
24
25

Page 4

    WEIR        DESCRIPTION               PAGE
2
    Exhibit 7-B Printout of               91
3               CR_Civil_Action Tab
4   Exhibit 8   Screen Shot, Weir         60
                Production File
5
    Exhibit 9   .do Files                 115
6   through 13
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1              COLIN B. WEIR,
2   having been first duly sworn by the Notary
3   Public (Suzanne Pastor), was examined and
4   testified as follows:
5   EXAMINATION BY
6   MR. TAUB:
7       Q.   Good morning, Mr. Weir.  Can you
8   please state your full name for the record.
9       A.   Good morning.  My name is Collin B.
10  Weir.
11      Q.   My name is Roy Taub, I represent
12  the defendant Consolidated World Travel, Inc.
13  Is it okay with you if I refer to them as CWT?
14      A.   That's fine.
15      Q.   Or Holiday Cruise Line in this
16  deposition?
17      A.   I'll understand both.
18      Q.   Okay, great.
19           And I understand you've been
20  deposed before, so I won't go through all the
21  rules, so to speak.  But there are just a couple
22  that I want to stress.
23           Especially because this deposition
24  is being conducted telephonically, I ask that
25  you please wait for me to finish my question

Page 18

1  case. Have you formulated any opinions in this
2  case, any expert opinions?
3        A.    Yes, and they're set forth in my
4  declaration.
5        Q.    Okay, so without looking at your
6  declaration, can you state what your opinions
7  are?
8        A.    I always find that question kind of
9  preposterous since it's black and white in the
10 report. But if you want to do the memory quiz,
11 my assignment was to tabulate the number of
12 unique telephone numbers and unique telephone
13 calls that were contained in a set of telephone
14 billing and call detail records that were
15 transmitted to certain point to numbers. The
16 precise numbers that we determined I don't
17 remember as I sit here, but they are set forth
18 in the declaration. I believe the unique calls
19 was 9 -- sorry, the unique telephone numbers
20 were 900-odd thousand and something like 1
21 million or 1.1 million telephone calls.
22       Q.    Okay, and we will obviously take a
23 look at the report. I just want to ask these
24 questions first.
25             In arriving at your opinions, did

Page 19

1  you employ any methodology?
2             MR. KOPEL:   Objection; vague.
3        A.    Yes, we did.
4        Q.    What methodology did you employ to
5  arrive at your opinions in this case?
6        A.    Again, I would refer you to the
7  declaration that kind of spells this out, but we
8  took several collections of data, including a
9  list of the point to numbers and a list of the
10 billing records and got the billing records into
11 a usable format in a database program.
12            We did what I would call a safety
13 check of the data to flag numbers that were
14 properly formatted as U.S.-based telephone
15 numbers. And then I guess the method, if you
16 were to give it a term, would be called a
17 database merge where we took the point to
18 numbers and take them -- in that direction it
19 would be a one too many merge against the call
20 detail records and billing records in order to
21 flag calls that were made as between -- calls
22 that were sent as between VVT and the point to
23 numbers used by defendant or call center
24 operating on behalf of defendant.
25       Q.    Using that methodology in arriving

Page 20

1  at your opinion, what field of expertise would
2  you say you were utilizing?
3        A.    ==I bring to bear expertise in the==
4  ==telecommunications industry. I have a long==
5  ==history of analyzing call detail records and==
6  ==other such voluminous telecommunications data.==
7             ==And also I would say I bring my==
8  ==expertise in data analytics which allows for the==
9  ==manipulation of that data through database==
10 ==programs in order to tabulate the data.==
11       Q.    So you identified several fields of
12 expertise. Telecommunications, analyzing
13 voluminous records, and data analytics. I guess
14 I'll take them one by one.
15            For telecommunications, did you
16 rely on any part of your educational background
17 in telecommunications in arriving at your
18 opinion?
19       A.    I think so. Part of my background
20 is -- you want to take these areas of expertise
21 and kind of chop them up, but they're really
22 interrelated. So when we're talking about
23 understanding call detail records, call detail
24 records are basically a collection of database
25 data. So in those senses, I think I do bring my

Page 21

1  educational background as well as my -
2  experience sort of across the board and not as
3  individual fields.
4        Q.    What experience do you have with
5  call detail records?
6        A.    Well, our firm had a connection to
7  the telecommunications industry since it was
8  founded in 1972. And so many of our clients
9  have had us analyze call detail records on their
10 behalf both within and without the regulatory or
11 litigation context. So I have a couple of cases
12 that are listed in my statement of
13 qualifications where I was asked by corporations
14 in the telecommunications industry to do
15 analyses of call detail records. And there
16 are -- there's sort of a catchall in the
17 statement of qualification that we do lots of
18 work that doesn't result in either any testimony
19 or testimony from me.
20            So there are many other instances
21 where I've looked at call detail records for
22 various purposes to reach whatever necessary
23 conclusion for our projects.
24            MR. TAUB:  Sue, can you please
25 enter tab 1.

Page 22

1  (Weir Exhibit 1 for identification,
2  Declaration of Mr. Weir)
3      Q.   Mr. Weir, you've been handed what's
4  been marked as Weir Exhibit 1.  Do you recognize
5  the document?
6      A.   Subject to check against my file
7  copy, it appears to be a facsimile of the report
8  that I submitted in this litigation.
9      Q.   And you mentioned that there are
10 cases in the statement of qualifications where
11 you analyzed call detail records.  Do you
12 remember that testimony?
13     A.   Yes.
14     Q.   If you -- could you turn to the
15 statement of qualifications and identify those
16 cases for me.
17     A.   Sure.  I'm going to look at page 12
18 of that exhibit, and the two that come
19 immediately to mind, I might need to go back to
20 my records to identify some others, but Pac Bell
21 versus 01 Communications at the top of the page,
22 and Pac Bell versus Pac West Telecom in the
23 middle of the page.
24          It strikes me that the one below
25 that for the Illinois Commerce Commission may

Page 23

1  also have involved call detail records.  But I
2  know those two at the Cal PUC were focused on
3  analysis of call detail records.
4      Q.   Are there any other cases or
5  engagements listed in this document that call
6  for you to analyze call detail records?
7      A.   Yes, I'm sorry, it's been a while
8  since I've given this thought.  Page 11, Patrick
9  Hendricks versus AT&T Mobility.
10     Q.   Any others?
11     A.   That's what I recall in terms of
12 testimony.  But those, again, are -- this
13 document is listing cases where my work resulted
14 in public testimony.  There are probably dozens
15 of other instances where on behalf of our
16 telecommunications clients I have done analysis
17 of call detail records.
18          For some time, AT&T was our largest
19 client, so I'm sure I've done some of that work
20 with records involving AT&T.  I think we were
21 involved in a litigation that didn't result in
22 testimony relating to Qwest and its long
23 distance service that also would have involved
24 analysis of call detail records.  Those are some
25 of the ones that come to mind.

Page 24

1      Q.   Before the AT&T engagement, what
2  were you analyzing call detail records for?  For
3  what purpose?
4      A.   I think there were several but the
5  one instance that comes to mind, we were
6  attempting to determine whether a particular
7  telephone number was likely being used by an
8  internet service provider to provide dial-up
9  internet access based upon the nature of the
10 telecommunications traffic being transmitted to
11 that number.  For example, multiple calls to the
12 same number and calls with relatively longer
13 duration, or consistent longer duration that
14 were consistent with potential patterns of
15 internet-bound telecommunications traffic.
16     Q.   Have you had any prior engagements
17 where you were tasked with analyzing call detail
18 records to trace telephone calls and where they
19 were forwarded to or where they ultimately ended
20 up?  Kind of like the analysis you performed in
21 this case.
22     A.   Well, they almost all will relate
23 to that in some way.  So for example, the
24 ISP-bound traffic study that we just described
25 clearly relates to that because we're tracking

Page 25

1  telecommunications traffic to particular numbers
2  and looking at the nature of the call.  So the
3  database manipulation would be very, very
4  similar to what we've done in this case.
5      Q.   That engagement also involved point
6  to numbers and drilling down which numbers in
7  the records related to the point to numbers?
8          MR. KOPEL:  Objection.  Was that a
9  question?
10         MR. TAUB:  Yes.
11         MR. KOPEL:  What is the question?
12     A.   I'm not sure I follow.
13     Q.   The AT&T matter you've just been
14 talking about, did that also involve you
15 analyzing call detail records to determine -- to
16 compare records and identify unique telephone
17 numbers that were -- that match point to
18 numbers?
19     A.   So I think we need to make sure we
20 have some terminology straight on the record.  A
21 point to number is not really any different than
22 any other telephone number, except that in this
23 litigation it identifies transmissions made and
24 received by the defendant.  So in the AT&T call
25 detail record analysis, we are looking for

Page 38

1  instances you opined on the issue of damages or
2  the possibility of calculating damages, which
3  obviously could involve voluminous business
4  records.
5            I'm more interested in the
6  engagements where it involved call detail
7  records, telephone bills or similar
8  telecommunication data.
9       A.   Okay.  So page 10, In Re Cell Phone
10 Termination Fee Cases.  Same page, Desiree Moore
11 versus Verizon.  We talked about Bursor & Fisher
12 versus FCC.  In Re Sprint Premium Data Plan
13 Marketing and Sales Practices Litigation, In the
14 Matter of Applications Between AT&T and Deutsche
15 Telecom, Pac Bell versus 01, Judy Larson, et al.
16 Pac Bell versus Pac West, Illinois Bell, Qwest
17 petition for forbearance.
18           Again, there are numerous other
19 times that I have conducted such analyses, but I
20 think those might be the list of cases where
21 I've given public expert testimony.
22      Q.   Okay, thank you.  Let's go through
23 them.
24           MR. KOPEL:  Roy, whenever you're at
25 a decent point, I'd like a very brief break,

Page 39

1  please.
2            MR. TAUB:  We might as well take
3  one now.
4            MR. KOPEL:  Okay, thank you.
5            (Recess taken.)
6  BY MR. TAUB:
7       Q.   Mr. Weir, if you could please turn
8  to page 10 of the statement of qualifications
9  attached to your declaration.
10      A.   Okay.
11      Q.   You identified In Re Cell Phone
12 Termination Fee Cases as a case that you worked
13 on that is one of the cases referred to in that
14 sentence we looked at in paragraph 1.
15      A.   That's right.
16      Q.   Now, does this case involve
17 telephone bills, or does it fall under the
18 category of other similar telecommunication
19 data?
20      A.   I think the answer is both.  There
21 was telephone bill information in database form
22 as well as other types of telecommunications
23 business records.
24      Q.   And what was the assignment that
25 you had in that case?

Page 40

1       A.   My assignment was quite broad, and
2  that was one of the longest running cases that
3  I've had.  I think I started work on that case
4  in 2006.  I provided all manner of consulting
5  services as it related to that case, but I
6  analyzed data relating to the early termination
7  fees charged to wireless consumers.
8            I analyzed data relating to the
9  other types of charges that came on people's
10 telephone bills where we were looking at a
11 category-by-category breakdown of contractual
12 services, those that a consumer were obligated
13 to buy versus optional services, such as those
14 that were available to the consumer but they had
15 no obligation on a monthly basis to pay for.
16           We looked at telecommunications
17 financial data, including property plant and
18 equipment, capital investments and other things,
19 to understand the incremental cost of providing
20 wireless service, and to understand the impacts
21 of early terminations on the operation of a
22 wireless telephone company.
23           I think that's probably a good high
24 level summary.  Again, it was years and years of
25 work, so there's a lot of detail if we wanted to

Page 41

1  get into it.
2       Q.   No, that's not necessary.
3            Turn to the next case, Desiree
4  Moore.
5       A.   Okay.
6       Q.   The next case you identified.  What
7  kind of records did you analyze in that case?
8       A.   That was another case involving
9  telephone bill data as it related to the
10 practice of so-called cramming.
11      Q.   When you say telephone bill data,
12 what kind of data were you analyzing in the
13 Desiree Moore case?
14      A.   Again, rather than being individual
15 telephone bills, it was a database of telephone
16 bill data that reflected charges that were put
17 on consumer bills.  And we were looking at --
18 the practice of cramming is basically placing an
19 unauthorized charge on the bill.  So we were
20 looking at, for example, what constituted
21 legitimate calls on the bill versus unauthorized
22 charges.
23      Q.   The next case you identified is on
24 page 11, In Re Sprint Premium Data Plan
25 Marketing.  Do you see that, Mr. Weir?

Page 58
1  transit the traffic from VVT or from VVT's
2  carrier to Holiday Cruise Line or the third
3  party call center operated on behalf of Holiday
4  Cruise Line.
5      Q.    And you had data from certain of
6  the carriers that are identified on Exhibit 2?
7      A.    Are we still talking about Exhibit
8  2 or are you referencing the fact that there is
9  other data relating to the carriers that are
10 shown on Exhibit 2?
11     Q.    Let me ask it a different way.  For
12 your analysis, what did you do with -- how did
13 you use the information reflected in Exhibit 2?
14     A.    Okay, so it's my understanding that
15 the point to numbers are on the side of the call
16 center in the U.S.  And so I was asked to find
17 telephone calls within the call detail records
18 of the various carriers providing the point to
19 number service where calls were transferred from
20 the point to number -- sorry, calls were
21 transferred from VVT where they had already
22 connected with an end user customer to the point
23 to number.
24     Q.    And what did you do to fulfill that
25 assignment?

Page 59
1      A.    Step 1 was to take this PDF
2  document that is Weir Exhibit 2 and to translate
3  that into a usable database, which I did using
4  the statistical software package called Stata.
5  That gave me a list in digital form of each
6  point to number, the relevant carrier and the
7  start and end date when calls to that number
8  would be related to the Holiday Cruise Line, I
9  guess we'd call it this litigation.
10            I then took the call detail records
11 from Sprint, InContact, Matrix Telecom and
12 digitized that information -- well, I think that
13 information was already digital.  I took that
14 information that was in a format like an Excel
15 spreadsheet and converted that into a database
16 form also in the software package Stata.
17            Once the data was imported, the
18 data was restructured to be in helpful and
19 usable formats in a consistent way across all
20 carriers and all datasets.  And then as I
21 described to you earlier, I use a database
22 method called Merge that takes the sets of data
23 and what we would do is take the point to number
24 list, Weir 2, and merge that with each of the
25 carrier datasets.  And what we would get is a

Page 60
1  result of any number -- we would get a flag in
2  the database for any call that was placed to one
3  of these point to numbers during the relevant
4  time period.  And then that data would already
5  contain from the carrier billing data
6  information as to the end user customer who was
7  already on the line that was transferred from
8  VVT over to Holiday Cruise Line.
9             Once those flags are in place to
10 identify calls that met the criteria and didn't
11 meet the criteria, the database software can
12 tabulate the number of unique end user telephone
13 numbers that meet those criteria as well as the
14 number of telephone calls that were transmitted
15 to the various point to numbers.
16            And I left out a step, which is
17 that we validated all of the carrier call
18 records to make sure that they were valid U.S.
19 NPA-NXX codes so that we were only looking at
20 calls relating to U.S. telephone numbers.
21     Q.    I want to work through that.
22           MR. TAUB:  Sue, can you please show
23 Mr. Weir what's been marked Exhibit 8.
24           (Weir Exhibit 8 for identification,
25 Screen Shot, Weir Production File)

Page 61
1      Q.    Mr. Weir, you've been handed what's
2  been marked Exhibit 8.  I'll represent this is a
3  screen shot of a file that was provided to us by
4  plaintiffs' counsel called Weir production.
5            MR. KOPEL:  Sorry to interrupt,
6  this actual screen shot was not provided, right?
7  This is a screen shot --
8            MR. TAUB:  It's a screen shot of a
9  file I believe called WeirProduction.SIP.
10           MR. KOPEL:  So in other words, you
11 guys took the screen -- we didn't provide the
12 screen shot, did we?
13           MR. TAUB:  No.
14           MR. KOPEL:  Good, understood.
15     A.    I'm sorry.  If there's a question
16 pending, I've lost track of it.
17     Q.    Understandable.  Do you recognize
18 this listing of files?
19     A.    Again, subject to cross-check
20 against my own file, this does look like the
21 document production that I prepared to turn over
22 in this litigation.
23     Q.    You described several steps.  So I
24 want to work through those with you just to make
25 sure we're all on the same page of what was done

Page 66

1  being assessed by Sprint for each call.
2      Q.   What is the basis for your
3  knowledge of what each of these columns means?
4      A.   Again, I would refer to the Poole
5  deposition as well as my long history of
6  analyzing this exact type of data in the
7  telecommunications industry.  This is not the
8  first time I've seen an invoice like this from
9  Sprint.
10     Q.   Was there any information provided
11 by Sprint that you used that explained what each
12 of these columns meant?
13     A.   I don't know if there was
14 additional information other than this data
15 itself.  But within the context of what this
16 data is, it's perfectly clear what these columns
17 are to anyone who was looked at this type of
18 data before.
19     Q.   Do you know why it is that the
20 originating number is the number of the person
21 that was called as opposed to the number of
22 we'll say VVT which called that person?
23     A.   So VVT was simply transferring the
24 call.  So the originating number is where the
25 call originates from in the eyes of Sprint,

Page 67

1  which is the end user who's on the other end of
2  the line.  And the destination is the point to
3  number which is where it's taking the call,
4  which is Holiday Cruise Line's call centers.
5      Q.   So for purposes of your analysis in
6  this case, you didn't confirm with anyone from
7  Sprint as to what each of these columns signify.
8      A.   There's absolutely no need to
9  confirm it because it's 100 percent apparent
10 what these columns signify.
11     Q.   Okay, I understand that's your
12 position.  I just want to make it clear that you
13 didn't talk to anyone at Sprint about what these
14 columns mean when you were conducting your
15 analysis in this case.
16     A.   Again, because of my experience
17 with analyzing records from Sprint like this
18 over a 14-year career, I didn't feel that it was
19 necessary to ask for additional clarification;
20 for example, about what the date and time of a
21 telephone call meant.
22     Q.   For the originating number.
23     A.   Again, within the context of this
24 case and my understanding about how the
25 relationship worked, there could be only one

Page 68

1  thing that that originating number means.  And
2  that is the end user that was called by VVT who
3  was an intermediary that transferred that call
4  to Sprint that would view that as the
5  originating number, and the destination number
6  being the point to number to which VVT sent the
7  call.
8      Q.   You testified that part of the
9  basis of your knowledge about what these columns
10 is Ms. Poole's deposition transcript.  What
11 testimony are you referring to?
12     A.   I don't have that 100-plus page
13 transcript in front of me, but the testimony
14 that I recall related to the relationship of the
15 parties and the relationship about how the call
16 sequence would take place.  So understanding
17 that class members were called by VVT on behalf
18 of Holiday Cruise Line, they would go through
19 the virtual voice prerecorded messages and then
20 some might ultimately then be transferred on to
21 one of these point to numbers through one of
22 these carriers being used by Holiday Cruise
23 Line.
24          So again, once you understand the
25 framework for that, the originating number can

Page 69

1  mean only one thing in this context.
2      Q.   Does your analysis assume that the
3  calls reflected in these records from Sprint
4  always utilize a telephone call that is the
5  subject of the class action?
6          MR. KOPEL:  Object to the form.
7      Q.   That objection is well taken.
8          Is it your understanding that this
9  case involved allegations related to a
10 particular type of telephone call?
11     A.   My understanding of my assignment
12 in this case was that I was to tabulate the
13 number of calls and number of numbers that were
14 associated with calls that were transferred from
15 VVT to the point to numbers.  I believe they're
16 all telephony calls, but beyond that, I'm not
17 looking for specific call types.
18          All I was asked to do was to
19 tabulate precisely what I had just indicated to
20 you.
21     Q.   Right, so for purposes of your
22 analysis, is it relevant what types of calls
23 were conducted that are reflected in these
24 records?
25          MR. KOPEL:  Objection.  Vague as to

Page 78

```
 1  provided, which is then listed as the product
 2  description.
 3              Distance and distance ID are relics
 4  of the old days when you paid for long-distance
 5  calls based on distance rather than just time,
 6  and I think are always null.
 7              The date/time reflects the date and
 8  time of the call.
 9              The number of minutes is the
10  duration.  I didn't look at the amount and rate.
11  They appear to be zeros.  I would have to think
12  some more about that one.
13              The originating number and
14  originating city are the same as in the Sprint
15  data.  Those are the numbers that were called by
16  VVT and then transferred to one of the point to
17  numbers.
18              The originating state is the state
19  of that location.
20              The dialed number is the point to
21  number.
22              There's a blank field about
23  international destination.  We can see the
24  termination city is Ft. Lauderdale in most
25  instances.
```

Page 79

```
 1              We've already covered the
 2  information that was relevant to me so I'm not
 3  sure I even looked at these last couple of
 4  fields.
 5              A LATA is, again, a relic of old
 6  telecommunications regulation and are specific
 7  geographies, often bigger than a particular city
 8  but smaller than the state level.
 9              OCN is typically the operating
10  company number.  So that's my best understanding
11  of these columns.
12      Q.      Could you explain what you think --
13  it's in the middle of the document,
14  orig_country_ID and switch_country_IDs signify?
15      A.      Again, that was not relevant to my
16  analysis, so I haven't looked at that.  It looks
17  like that may be essentially a blank field for
18  this type of service where the call detail
19  record contains all the potential fields that
20  would be used.  But in this case is not
21  particularly indicating anything.  If it is a
22  standard country code, then number 1 would be
23  the United States.
24      Q.      Does switch have a meaning in the
25  telecommunications field or in CDRs?
```

Page 80

```
 1      A.      Again, the switch would be a relic
 2  of circuit switch telephony.  And switch codes
 3  would be much more like, if we were to look back
 4  at 4-B, typical U.S. switch codes looks
 5  something like the originating location where
 6  they sort of describe the wire center and
 7  location of the switch.  Which in some cases you
 8  can kind of make out, like Chicago zone 1, but
 9  in other instances are difficult to parse.
10              Having a switch country ID with a
11  number is not typical of a switching code.
12      Q.      What's the difference between
13  originating and switch?
14      A.      What do you mean by "originating"?
15      Q.      Sorry, the column before it, it
16  starts orig_ .  Based on your experience in the
17  field, do you have any understanding of how
18  those two columns are distinct from each other?
19      A.      I don't.  And in this case where
20  they don't factor into the analysis, I hadn't
21  given it any thought leading up to this moment.
22      Q.      Well, I mean is it fair to say that
23  you did not talk to anyone at ESN or InContact
24  about what these columns signify?
25      A.      I don't know whether that's fair to
```

Page 81

```
 1  say.
 2      Q.      Did you?
 3              MR. KOPEL:  Object to the form.
 4      Q.      Did you talk to anyone at ESN about
 5  what these columns signify?
 6      A.      I did not need to, so I did not.
 7      Q.      Do you have an understanding of
 8  whether ESN and InContact are the same company?
 9      A.      I did not particularly care about
10  their corporate structure, so the answer is I
11  haven't made an investigation one way or the
12  other.
13      Q.      So just to be thorough, then did
14  you talk to anyone at InContact about what these
15  columns signify?
16      A.      I did not need to to accurately
17  complete my analysis, so I did not.
18      Q.      Thank you.
19              ==So when you were explaining to me==
20  ==what you thought each of these columns means,==
21  ==you were relying on your experience in the==
22  ==field?==
23      A.      ==And the deposition testimony of==
24  ==Jennifer Poole.==
25      Q.      ==Is it your recollection that==
```

Page 82

1  **Ms. Poole testified about what these columns**
2  **mean?**
3       A.    **It's my testimony, as I gave in the**
4  **same colloquy about the Sprint data, that**
5  **Ms. Poole gave testimony about the nature of the**
6  **relationships of the parties that makes it plain**
7  **when you look at these records what at least**
8  **some of the columns mean. And in our instance**
9  **we care about, for example, the date and time of**
10 **the call as well as the originating number,**
11 **which indicates the party that was called by**
12 **VVT, and then the dialed number which is an**
13 **indicator of the point to number.**
14      Q.    So based on your experience in this
15 field, do you have any understanding of what the
16 column orig_country_ID signifies?
17      A.    Again, because that's not relevant
18 to this particular analysis given the
19 relationship of these parties, I have not given
20 it any thought.
21      Q.    Okay, but that wasn't my question.
22 My question is, based on your experience in the
23 field, do you have any understanding of what
24 that term in this kind of report signifies?
25      A.    And I give you the same answer,

Page 83

1  because it's not necessary to conduct the
2  analysis that I performed here, I haven't given
3  it any consideration.
4       Q.    Is it your testimony that you have
5  no idea what the term "orig_country_ID" might
6  mean in a CDR?
7             MR. KOPEL: Objection. That
8  misstates the prior testimony which the witness
9  gave twice now and you've asked a third time.
10 Go ahead.
11      A.    Within the context of this
12 analysis, which is focussing on the originating
13 number, the destination number and the date and
14 time of the call, I have not given any
15 consideration to what that particular field may
16 mean within this particular record.
17      Q.    Okay, but yet again I haven't asked
18 you whether you gave it any consideration. I
19 understand your answer is you did not. My
20 question is, based on your experience in this
21 field, do you have any understanding of what
22 that term in the context of this kind of report
23 means?
24            MR. KOPEL: Objection. This is now
25 the fourth time counsel has asked the same

Page 84

1  question. Just because you're not happy with
2  the answer does not mean that you can keep
3  asking the same question. But I'll let the
4  witness go ahead.
5       A.    Because my analysis was focussing
6  on the originating number, the destination
7  number and the date and time, I have not given
8  it any consideration.
9       Q.    Did you give consideration to the
10 instrument column?
11      A.    I did not.
12      Q.    And yet you were able to tell me
13 what you understood that column to signify.
14            MR. KOPEL: Objection. Is that a
15 question?
16      Q.    Is that correct?
17            MR. KOPEL: Is what correct?
18      Q.    That you were able to tell me what
19 you understood the instrument column to signify.
20      A.    I think I told you about the
21 product ID as being compared to the product
22 description.
23      Q.    Did your analysis consider the
24 product ID column?
25      A.    It did not.

Page 85

1       Q.    Okay, and yet you are able to tell
2  me what your understanding from your experience
3  in the industry is as to what product ID column
4  signifies, is that correct?
5       A.    The product ID does not factor into
6  my analysis, but the product description relates
7  to the carrier of interest of these bills,
8  InContact. So in that sense I had given it
9  consideration in advance of the analysis even
10 though it's not included in the analysis.
11      Q.    Is it your testimony if someone
12 asked you, Mr. Weir, what does orig_country_ID
13 mean in a report of this nature, you would have
14 no idea?
15            MR. KOPEL: Objection. This is the
16 fifth time counsel has asked the same exact
17 question. The witness can go ahead and answer
18 it.
19      A.    So in this particular litigation,
20 that field is not relevant to the analysis, so
21 I've given it no consideration. If I was asked
22 to give consideration in some other additional
23 context, I would need to understand what that
24 context was and, for example, go back and think
25 about whether or not there was something as it

Page 90

1   Q.   5-B and 6-B, those are printouts
2  from the Excel files that you considered for the
3  InContact CDRs?
4   A.   6-B appears to be a printout of
5  part of one of the spreadsheets that I
6  considered for InContact. 6-A I believe you
7  represented was a screen capture that you took
8  that is an even more partial view of one of
9  those workbooks.
10   Q.   Right, and 5-B is a printout from
11  one of the tabs of the other Excel file that has
12  the remainder of the InContact CDRs that you
13  considered for your analysis?
14   A.   That's the best of my recollection.
15   Q.   I'm looking at the columns and they
16  largely track the columns in 5-B. Do you agree
17  with that?
18   A.   They are similar, especially as to
19  the ones that we care about. Originating
20  number, terminating number, call start time,
21  which includes the date.
22         MR. TAUB: Sue, if you could please
23  show 7-A and 7-B.
24         (Weir Exhibit 7-A for identification,
25  Screen Shot of CR_Civil_Action).

Page 91

1         (Weir Exhibit 7-B for identification,
2  Printout of CR_Civil_Action Tab)
3   Q.   Mr. Weir, Exhibit 7-A is a screen
4  shot of one of the tabs in an Excel file, the
5  file name is shown on the top in the center,
6  CR_civil_action_no117-CV-973. Do you see that?
7   A.   I do.
8   Q.   And that's another one of the files
9  indicated on Exhibit 8 that was part of the Weir
10  production?
11   A.   Yes. And it's also cited by me in
12  footnote 4 of my declaration.
13   Q.   Right. And 7-B is a printout of
14  the tab that is partially reflected in 7-A, the
15  screen shot. Is it accurate that this Excel
16  file that's shown in Exhibit 7 is the set of
17  call detail records from Matrix Telecom?
18   A.   I'm sorry to be focused on the
19  semantics, all of these printouts are a subset
20  of the data that I relied upon to analyze the
21  call detail records. So 7-B is a fraction of
22  the Matrix Telecom data, to the best of my
23  recollection.
24   Q.   Right. I was asking you about the
25  files, the Excel files. ==If it was all printed==

Page 92

1  ==out, it would be many, many, many pages.==
2   A.   You did well to not print them out.
3  But you asked about the exhibit number in the
4  question. So I wanted to make perfectly clear
5  that the exhibit is not the whole document.
6   Q.   Looking at 7-B, can you tell me
7  what your understanding is of what each of the
8  columns in that report signifies?
9   A.   So we have call YYYY-MM-DD is the
10  date of the call. Call HH-MM-SS is going to be
11  the time of the call. The dialed number, which
12  is the same as the third party number, is the
13  point to number.
14         Further to the right we have the
15  originating number -- I'm sorry, I lost my train
16  of thought. All the way to the right is the
17  originating number. That's the number that was
18  called by VVT.
19         Going back over, the destination,
20  city and state, that's reflecting Ft. Lauderdale
21  where the point to numbers would have been
22  directed.
23         Duration, raw call, to the best of
24  my understanding is the duration of the call
25  probably. I'm not sure how they're using

Page 93

1  originating and terminating trunk here, but they
2  may relate to the facilities being used by the
3  carrier.
4         The originating city and
5  originating state are the location of the
6  originating number.
7         And then we have the call date and
8  disconnect date in more readable formats here
9  reiterating the information from the first two
10  columns.
11   Q.   Well, the disconnect date is not in
12  the first two columns.
13   A.   The disconnect date would be
14  determined based upon the start time of the
15  call, both the date and the hours and the
16  duration of the call from the middle. So I'm
17  sorry that I misspoke. It's the first two
18  columns, and then that column from the middle.
19   Q.   Okay, thank you.
20         Originating trunk and terminating
21  trunk, what is a trunk?
22   A.   A trunk is a term used to relate to
23  either physical or virtual facilities that can
24  handle telecommunications calls. You could find
25  people that might use the term in different

Page 94

```
 1   ways, but typically a trunk is a facility that
 2   can handle more than one call at one time as
 3   compared to the official use of the word
 4   "telephone line" which would relate to a single
 5   line capable of transmitting a single call.
 6        Q.    And did you talk to anyone from
 7   Matrix Telecom to get an understanding of what
 8   these columns mean?
 9        A.    Because I did not need to do so to
10   complete my work accurately, I did not do that.
11        Q.    Did you rely solely on your
12   experience in the industry to ascertain what
13   these various columns signify?
14        A.    I've relied on my industry
15   experience and the deposition testimony of
16   Jennifer Poole.
17        Q.    You can put 7-A and 7-B aside.
18              In paragraph 8 of your report,
19   Exhibit 1, you stated that you validated the
20   connected numbers to ensure that they comprise a
21   valid U.S. area code and central office code
22   pursuant to the North American numbering plan.
23   Do you see that?
24        A.    You may have paraphrased, but yes,
25   I see where you're looking in the document.
```

Page 95

```
 1        Q.    I omitted some parenthetical.
 2              When you refer to "connected
 3   numbers," what are you referring to?
 4        A.    I am talking about what has been
 5   identified in most of these documents as the
 6   originating number.  That is, the numbers that
 7   were called by VVT to start this whole process.
 8   Those are the numbers that were ultimately
 9   connected to one of the point to numbers or to
10   the defendant, which is why I used that term
11   there.
12        Q.    Now, what is your basis for saying
13   that those numbers were called by VVT?
14        A.    Again, that's based on a reading of
15   the operative complaint and the deposition
16   testimony of Jennifer Poole.
17        Q.    Would it be more accurate to say
18   that those were numbers that were transferred to
19   the point to numbers reflected on what we've
20   marked as Exhibit 2?
21        A.    If you could just pause for a
22   moment, there's a conversation going on in the
23   hallway and it's hard to hear what you're
24   saying.
25              (The pending question was read.)
```

Page 96

```
 1        A.    Sorry, I'm digging for Exhibit 2
 2   just to make sure I've got -- I'm not sure if
 3   it's any more accurate.  I think it is accurate.
 4              So my understanding of the nature
 5   of the calls is that VVT called many, many
 6   numbers and then it connected some of them to
 7   the point to numbers reflected in Exhibit 2.
 8   And my job was to identify instances where that
 9   transfer or connection took place.
10              But I think in order for VVT to
11   connect the customer to one of the point to
12   numbers, there has to have been a preexisting
13   call between VVT and the originating number.
14        Q.    I guess another way of going about
15   this, isn't it possible for anyone to have
16   transferred the "originating telephone numbers"
17   to any of the point to numbers?
18        A.    That's not my understanding based
19   upon the deposition of Jennifer Poole where she
20   testifies about the relationship between VVT and
21   the point to numbers.
22        Q.    What's your understanding of how
23   someone would transfer a telephone number to one
24   of these point to numbers?  What is the actual
25   process that they would undertake?
```

Page 97

```
 1        A.    I don't follow.  Are you asking
 2   like what buttons they would push on their phone
 3   system?
 4        Q.    Yes.  Mechanically how would that
 5   work?
 6        A.    That's really beyond the scope of
 7   my assignment to understand it, other than to
 8   understand the sequence of events.  Which is
 9   that typically what you have is VVT calling a
10   class member.  The class member interacts with
11   the prerecorded voice system that VVT operates.
12   At some point VVT will cause that call to be
13   transferred to one of the point to numbers which
14   would take the call to a call center operated by
15   or on behalf of Holiday Cruise Line.
16        Q.    What is your understanding of how
17   VVT would have transferred a telephone call over
18   to one of the point to numbers?
19              MR. KOPEL:  Objection.  Asked and
20   answered.
21        A.    Again, it's beyond the scope of my
22   assignment to understand all of the technical
23   details about how they might do that other than
24   to understand the nature of the system and the
25   order of events that would lead to the transfer,
```

Page 134

1  program instructions.
2     Q.   Okay, so there's no point in
3  running it a second time to make sure the
4  numbers -- the final results are the same?
5     A.   It's taken me a little while to get
6  comfortable with this, but if you've done the
7  programming right, the computer is always going
8  to give you the same answer to these
9  mathematical operations.  There's nothing about
10 this that's randomized or that's based on a
11 sample or anything like that.
12          So you will always get the exact
13 same result if you run this and make no changes
14 to the code or the underlying data.
15    Q.   Okay.  Having reviewed and walked
16 us through Exhibit 13, does it refresh your
17 recollection as to the order that the programs
18 have to be run in?
19    A.   I think it confirms what I said on
20 the record before.  Which is that you can run --
21 merge data has to be last, but you can run any
22 of the others in whatever order so long as
23 they're done before you run the merge file.
24    Q.   Is that because under append data,
25 it just adds whatever the outputs are for the

Page 135

1  various four programs to each other?
2     A.   The way I would describe the
3  process in lay terms would be step 1 is to run
4  Exhibits 9 through 12 which imports and formats
5  the data.  Step 2 is to take that formatted data
6  and to analyze it.  Which is what happens in the
7  back two-thirds of 13.
8     Q.   Now, you mentioned earlier, and I
9  think this is in reference to the last line on
10 page 1, you said code book would show you a
11 number.  What does that mean?
12    A.   The code book command tells Stata
13 to run a summary analysis of the variable that
14 you give after it.  So on the screen it would
15 tell us the number of unique values for the
16 telephone number variable, so that's gonna tell
17 us the 928,000 number.  And it's also going to
18 tell us how many observations there are.  And we
19 know based on the nature of the call detail
20 records that each observation represents a
21 telephone call.  So it will tell you that there
22 are observations ranging from the first
23 observation to the 1,051,227th observation,
24 indicating the number of calls in the dataset at
25 that point.

Page 136

1     Q.   In what form are the results shown?
2  Is it just on the computer screen in Stata?
3     A.   You would just see it visually in
4  the window.  It would print a little table to
5  the screen.  Print is the wrong word.  It would
6  just display on the screen.
7     Q.   Is there a document that has the
8  928,023 unique U.S. telephone numbers?
9     A.   That could be created, but we have
10 not saved that data.  But if you were to take
11 Exhibit 13 and run the code through the last
12 line of page 1 and then save that file, you
13 would have -- it would be more than just the
14 list, but it would be the list of each of the
15 unique U.S. telephone numbers.
16    Q.   Is there a list of the 1,051,227
17 telephone numbers?
18    A.   Same answer.  We haven't generated
19 that list, but if you were to run Exhibit 13
20 through the last line of page 1, there would be
21 1,051,227 observations, or lines of data in the
22 dataset, and each one of those would represent
23 one telephone call.
24    Q.   Is there any reason why a report
25 identifying the telephone numbers that are

Page 137

1  discussed in paragraph 9 of your declaration was
2  not generated?
3     A.   Well, when you say that, we did
4  generate a report about the numbers.  That's the
5  code book number 2.  But it was generated
6  digitally on a screen.  The information that was
7  relevant was captured and that was typed into my
8  declaration.
9     Q.   Okay, fair enough.  Is there any
10 reason why a version that could be attached to
11 your report as an exhibit was not generated?
12    A.   I don't know that it was even
13 considered that it would be an exhibit.  But as
14 you stated earlier today, in order to display
15 that data, we would have 1 million lines of
16 records, each about as wide as, for example,
17 Exhibit 6-B.  And it would have made the
18 declaration 4,000 pages or something like that.
19          I think part of what I might bring
20 to the table here is my ability to summarize
21 that voluminous data.
22    Q.   What's your understanding of how
23 that data is to be used in this case?
24    A.   I don't know that I have an
25 understanding of what plaintiffs intend to do

Page 138
1  with that number.  I was asked to tally those
2  data points and to provide them in a report.
3  And that's what I've done.
4       Q.    Have you talked with Randall Snyder
5  about this case?
6       A.    No.
7       Q.    Have you talked with Christina
8  Peters Sazowitz about this case?
9       A.    No.
10      Q.    I'm sure I mispronounced her name.
11 I apologize to her.
12            I will tell you, when we ran these
13 files through Stata, that we got a different
14 result in terms of numbers.  We got a result of
15 959,609 non-unique telephone calls, or telephone
16 numbers.
17            MR. KOPEL:  I'm sorry, did you
18 say -- I was writing it down.  You said
19 non-unique?
20            MR. TAUB:  Right, non-unique.  That
21 corresponds to the 1,051,227 numbers that
22 Mr. Weir --
23            MR. KOPEL:  Hold on, are you
24 talking about calls or phone numbers?
25            MR. TAUB:  Well, paragraph 9 uses

Page 139
1  both.
2             MR. KOPEL:  Right.  Can you just
3  repeat what you said, please?  Because I must
4  have misheard you.
5             MR. TAUB:  Sure.  If I could have
6  an opportunity to finish my question, that would
7  be great.
8             MR. KOPEL:  Please go ahead.
9       Q.    Mr. Weir, in paragraph 9 you say
10 that -- you write "these data show 1,051,227
11 calls connected to the point to numbers
12 analyzed."  Do you see that?
13      A.    Yes.
14      Q.    And that was the result of the
15 processes that we've been talking about in this
16 deposition.
17      A.    That's what you should see when you
18 run cumulatively Exhibits 9 through 12 and then
19 Exhibit 13 up through the code book number 2 at
20 the bottom of page 1.
21            Did you say something about the
22 959,609?
23      Q.    Yes.  That was the number of calls
24 that -- or telephone numbers that were shown --
25 no, sorry, calls that were shown in the data

Page 140
1  that was generated when we ran these scripts
2  through Stata.
3       A.    Right.  So I would direct your
4  attention to footnote 7 where I also indicate
5  that very same number.
6       Q.    Mm-hmm.
7       A.    And I'll direct your attention to
8  page 2 of Exhibit 13 where there's some
9  additional steps that are taken.  What we
10 noticed in the data as I was doing the analysis
11 is that there are certain instances in the data
12 where a number appears to have been connected to
13 one of the point to numbers multiple times
14 within a relatively short period of time.
15            So what I decided to do was to
16 rerun the analysis as indicated in footnote 7 in
17 order to show the number of calls if you
18 excluded duplicate calls from the same
19 originating number where those calls occurred on
20 the same day.
21            If you ran the Stata code all the
22 way to the end without stopping at code book
23 number 2 or looking back in the output to view
24 that, you would miss the numbers being generated
25 in paragraph 9 and would be taken to the results

Page 141
1  shown in footnote 7, which are generated by
2  those last four lines of code shown on page 2.
3       Q.    Okay, that answers that.  Thank you
4  for that clarification, or explanation I should
5  say.
6             Does the 959,609 number also
7  provide the unique U.S. telephone numbers?
8  Because paragraph 9 has two sets of numbers.
9       A.    I guess I would want to reserve my
10 right to double-check this, but if what is done
11 in footnote 7 is to remove duplicate calls to
12 the same number, then the number of unique
13 numbers will not change.  So the number in
14 paragraph 9, 928,023, would also correspond to
15 the number of calls reported in footnote 7.
16      Q.    Well, but what's in footnote 7,
17 that only excludes multiple calls to the same
18 number on the same day.  If there were calls to
19 the same number on different days, wouldn't that
20 be two calls to the same telephone number
21 included in that total?
22      A.    Correct, which is why there's still
23 a delta between 959,000 and 928,000, showing
24 that there are a handful of instances where an
25 originating number was transferred to a point to