# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| ANGEL BAKOV and JULIE HERRERA, individually and on behalf of all others similarly situated, | ) ) ) ) | Case No. 1:15-cv-02980 |
| | ) | Hon. Harry D. Leinenweber |
| Plaintiffs, | ) ) | Hon. Susan E. Cox |
| v. | ) ) | |
| CONSOLIDATED WORLD TRAVEL, INC. d/b/a HOLIDAY CRUISE LINE, a Florida corporation, | ) ) ) ) | |
| Defendant. | ) ) ) | |
| KINAYA HEWLETT, on Behalf of Herself and all Others Similarly Situated, | ) ) ) | Case No. 1:17-cv-00973 |
| | ) | Hon. Harry D. Leinenweber |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| CONSOLIDATED WORLD TRAVEL, INC. d/b/a HOLIDAY CRUISE LINE, | ) ) ) ) | |
| Defendant. | ) ) | |

**DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE THE EXPERT OPINION TESTIMONY OF KENNETH R. SPONSLER**

| | **EXHIBIT LIST** |
|---|---|
| Ex. A | Expert Report of Kenneth R. Sponsler, Mar. 7, 2018 (exhibits omitted) |
| Ex. B | Excerpts of Vance Vogel Deposition Transcript, Aug. 24, 2017 |
| Ex. C | Excerpts of Clifford Albright Deposition Transcript, Aug. 25, 2017 |
| Ex. D | Declaration of Kenneth R. Sponsler, Sept. 4, 2018 |
| Ex. E | Excerpts of Kenneth R. Sponsler Deposition Transcript, Apr. 10, 2018 |
| Ex. F | FTC Advisory Opinion Letter, Sept. 11, 2009 |
| Ex. G | FTC Advisory Opinion Letter, Nov. 10, 2016 |

**PRELIMINARY STATEMENT**

Defendant Consolidated World Travel, Inc.'s ("CWT") expert Kenneth Sponsler has nearly two decades' worth of operational experience in ensuring business compliance with the Telephone Consumer Protect Act, 47 U.S.C. § 227 *et seq.* ("TCPA"), and other laws and regulations regarding marketing and business communications by telephone. Sponsler rebuts the declaration submitted by Plaintiffs' supposed expert Randall Snyder regarding the technology utilized by Virtual Voice Technologies Ltd. Pvt. ("VVT") to make the telephone calls at issue in this case. Generally stated, Sponsler opined that because the calls were manually placed by live agents who selected audio prompts to interact with and have dynamic, different conversation with each consumer with whom they spoke, the VVT platform "is not akin to the" robocall and prerecorded message blast "technology that the [TCPA] sought to eliminate at the time it was enacted." Ex. A at ¶ 1.

In their Motion to Exclude, (Dkt. No. 169), Plaintiffs twist Sponsler's report and deposition testimony into an unrecognizable state. Plaintiffs do not challenge Sponsler's qualifications to provide expert testimony nor, given his credentials and experience, could they plausibly do so. Plaintiffs' attack on Sponsler is fairly focused. At bottom, all they argue is that his opinions are inadmissible because they are supposedly based on incorrect facts – that the telephone calls were dynamic one-on-one conversations between the VVT agent and the person that was called akin to a telephone call with a live agent – and incorrect law (regarding robocalls and the consideration of human intervention). Neither is the case. When this Court looks beyond Plaintiffs' mischaracterizations to what the evidence actually is, the Court will find that what Plaintiffs continually allege to be undisputed facts are very much disputed (if even supporting Plaintiffs' description), so that their Motion is little more than them disagreeing with

CWT and Sponsler regarding some of the facts. And, in any event, that factual question is irrelevant for Sponsler's opinion that the VVT platform did not utilize prerecorded voices of the type sought to be prohibited under the TCPA. As for their contention that Sponsler's opinions are based on incorrect law, Plaintiffs misapprehend his discussion and the limited role those legal precepts have for his opinion. Plaintiffs are grasping at straws. The mere fact that Plaintiffs disagree with Sponsler's opinions or their bases does not render his expert opinions inadmissible.

## ARGUMENT

### I. THE APPLICABLE STANDARDS

An expert's testimony is admissible if he satisfies the requirements under Rule 702 of the Federal Rules of Evidence:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. This Court must act as an evidentiary "gatekeeper" to determine that expert testimony is reliable and relevant. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993). The question on a motion to exclude is not whether the court agrees with the expert's opinion. "The Court is not deciding the weight to be given to any of these opinions at trial or the merits of any position of any party on any issues to which the opinions may relate." *United States v. Dish Network LLC*, No. 09-3073, 2016 WL 157387, *2 (C.D. Ill. 2016). As this Court has observed, "[t]he soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment." *Kleen Prod. LLC v. Int'l Paper*, No. 10 C 5711, 2017 WL 2362567, *2 (N.D. Ill. May 31, 2017)

2

(Leinenweber, J.) (quoting *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000)). In other words, the Court's gatekeeping role is not a substitute for the adversarial system. *Accord Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

## II. SPONSLER'S OPINIONS ARE NOT FACTUALLY FLAWED

Plaintiffs contend that Sponsler's opinions are inadmissible because they are not based on sufficient facts, specifically that Sponsler does not base his opinions on the purported fact that "VVT agents were making *multiple* calls at the same time." *See* Mot. at 5-10. Plaintiffs claim that "[t]he evidence is clear that VVT agents were dividing their time and attention among overlapping calls," apparently as a routine practice. *Id.* at 7. As discussed below, this question of fact is immaterial to Sponsler's opinion regarding the VVT platform and that the telephone calls are akin to human to human telephone conversations – if one such call was lawful, then they were all lawful. But, regardless, even if Plaintiffs' position is entertained, there is no such evidence, and thus no need for Sponsler to have included that purported "fact" in his analysis. Indeed, this "simultaneous call" theory of liability was never articulated until now. The entire premise of Plaintiffs' attack on Sponsler is contrived and thus fails.

Plaintiffs did not seek to obtain any discovery from Virtual Voice Technologies Pvt. Ltd. ("VVT"), the company in India that placed the telephone calls, about what its agents did or how they conducted their telephone calls. So they are left to base their false narrative on the testimony of two independent contractors, Vance Vogel and Cliff Albright. While Vogel and Albright testified that it was ***possible*** that a live agent at VVT *could* conduct two calls at the same time using *two separate terminals*, (Ex. B at 88:1-9; Ex. C at 48:1-12), there is no evidence

3

that this was done, done on a routine basis or done pursuant to VVT policy or procedure so as to require an expert to treat that as a proven, uncontradicted fact.

Albright testified that he only *heard* from Vogel that some of the VVT "centers are doing this," but he has no knowledge as to "how he [Vogel] found out," and could recall only one conversation with Vogel where the topic was discussed. Ex. C at 48:21-49:25. Vogel testified that he thought VVT agents used "two monitors, two computers, and they logged into two log-ins," but he was asked only if he believed it "happened more than one time," (Ex. B at 88:11-89:13), which is hardly probative of a routine practice.

Plaintiffs also contend that Vogel and Albright "oversaw and fulfilled VVT's requests for multiple logins per agent" "as part of an established onboarding process for new call centers," suggesting that they therefore knew agents were using multiple log-ins. *See* Mot. at 6. That is simply not true. Vogel initially testified that he did not know how VVT System user log-ins were assigned or used, and that Albright was responsible for assignment. Ex. B at 74:15-22. After then musing that *some* – not all – of the VVT call centers would request that Albright create multiple log-ins for their agents, Vogel clarified:

> Actually I'm not sure if even Cliff would know. The center would – the center would say how many log-ins they wanted. We really don't know how many of them were dual. We really wouldn't know. There's really no way to tell. . . . I mean we weren't in India. So you don't know. No one would really know.

*Id.* at 90:1-93:4.

Vogel thus ultimately claimed ignorance on the subject. Albright's testimony contradicts Vogel's (already inconsistent) testimony about the request for multiple log-ins per agent. Albright testified that he designed his system so that log-ins were not assigned by him to individual users, but instead, "[b]efore the implementation of the system" at any center, he "prebuilt the log-ins past their capacity. So I don't have to touch it again in a sense." Ex. C at

4

36:7-37:7. If new log-ins were required, someone at the VVT center would not contact him but would only have to utilize one of the extra log-ins that had already been created when the VVT System had been implemented at that center. *Id.* at 37:8-17. As a result, the number of log-ins that Albright created for any VVT center at the outset was not based on requests and "wasn't reflective of how many agents actually used it," (*id.* at 37:18-21), whether on a one to one ratio or otherwise, as Plaintiffs seem to suggest.

To give added weight to their mischaracterization of Vogel's and Albright's testimony, Plaintiffs also state that Vogel and Albright "trained VVT agents to use Albright's software . . . ." Mot. at 5. That, too, is flatly incorrect. The training provided by Vogel and Albright was limited to training one VVT manager remotely at the time the VVT System was being implemented at a call center, and then that one manager would train the VVT agents in the call center. *See* Ex. B at 58:14-60:13 ("The training [of agents] took place by the center itself. So, you know, the center would be trained by – one person would be trained, and then that one person would train the entire center."); Ex. C at 25:17-20, 33:20-24 ("Q. Did you ever train agents directly? A. No."). Vogel and Albright thus did not train VVT agents how to use the platform.

From the false "simultaneous calls" premise, Plaintiffs take aim at Sponsler for not subscribing to *their* view of the facts. But to the extent there is even any admissible evidence in support of their narrative, it is a subject of dispute. Plaintiffs note that Sponsler indicated in his notes that he planned to ask Albright if VVT agents could conduct "two calls at a time," (Mot. at 8), but they insinuate he never asked the question (or ignored the answer). Sponsler was never asked about that at his deposition. In fact, Sponsler did ask Albright if agents made multiple calls at a time, and Albright answered the question in the negative. *See* Ex. D at ¶ 3. And, as

5

discussed above, a review of Vogel's and Albright's deposition testimony leads to the conclusion that such conduct was technologically possible – something Sponsler already knew from his experience, including observing an agent for a different company handling four telephone calls at the same time, as discussed at his deposition, (Ex. E at 21:20-22:4) – but there was no first-hand testimony by either of them that it had been done, certainly not with any great frequency. *See* Ex. D at ¶ 4.

Plaintiffs also misstate the importance of this factual dispute. They contend that Sponsler's opinions "*totally flip* once you cross the one-call-per-agent threshold." Mot. at 8. To begin with, this "threshold" has no precedent in the law, let alone the record in this case. There is simply no evidence that any of the Plaintiffs received a telephone call where they were one of several calls handled by one VVT agent. Sponsler never subscribes to any such threshold. The deposition testimony cited by Plaintiffs in support of that position is plainly Sponsler's description of the Federal Trade Commission's rationale for why it withdrew its prior guidance that technology similar to the VVT platform is not a "prerecorded message" for purposes of the Telemarketing Sales Rule ("TSR"), after previously issuing a staff letter concluding that such calls are "virtually indistinguishable from calls conducted by live operators." *See* Ex. E at 42:9-23 & 43:18-45:8; Ex. F at 2.[1] Sponsler was clear in his testimony that he does not believe the FTC's decision departing from that approach was correct, and he did not subscribe to a "one-call-per-agent threshold" to meet that standard. Indeed, Sponsler testified that from one of his prior engagements – not for this case – he "observed an agent handling four calls at once and didn't skip a beat with four calls." Ex. E at 21:20-22:4. *See also Id.* at 43:6-12, 54:11-55:8, 61:17-62:10, 73:13-74:4.

---

[1] The two FTC staff opinion letters are discussed below and are referred to as the 2009 and the 2016 Letters.

Plaintiffs rely upon *Cage v. City of Chicago*, 479 F. Supp. 2d 787, 810 (N.D. Ill. 2013), but they ignore its ruling that "[t]he law does not support exclusion on this basis" of reliance on a disputed fact. As the Seventh Circuit has explained, "[t]he soundness of the factual underpinnings of the expert's analysis" is a "factual matter[ ] to be determined by the trier of fact, or, where appropriate, on summary judgment." *Smith*, 215 F.3d at 718. The Advisory Committee Notes to Federal Rule of Evidence 702 specifically reject this line of attack:

> When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis in the [Rule] on "sufficient facts or data" is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.

Fed. R. Evid. 702, Advisory Comm. Note (2000).

As set forth above, there is no evidence that VVT agents made, let alone routinely made, multiple calls at the same time. Indeed, consistent with this issue being a complete red herring that Plaintiffs conjured out of thin air, there is no admissible evidence of such a practice at all. And there is not a single shred of evidence to support a conclusion that a single call to any of the named Plaintiffs – or even to a putative class member – was made by a live agent operating two terminals at the same time; not a shred! The only support that Plaintiffs advance for that is from the non-firsthand and hearsay knowledge of Vogel and Albright, who were never present at a VVT call center, did not receive requests for additional log-ins, and never trained any of the VVT agents. That Sponsler did not credit and include in his analysis a non-fact hardly renders his opinions "unreliable" or "junk science," (Mot. at 10), and it is not grounds for exclusion. At most, "[t]his kind of factual dispute . . . goes to the weight of [Sponsler's] opinions, not their reliability under *Daubert*." *In re Fluidmaster, Inc., Water Connector Components Prod. Liab. Litig.*, No. 14-CV-5696, 2017 WL 1196990, *23 (N.D. Ill. Mar. 31, 2017).

7

### III. SPONSLER'S OPINIONS ARE NOT BASED ON A MISTAKE OF LAW

Nor should Sponsler's opinion be excluded on the ground that it is predicated on a series of mistaken assumptions regarding the applicable law. Unlike Plaintiffs' expert, Sponsler's opinions are based on a review of the legislative history of the TCPA, Congress's aims in enacting it, the state of technology at the time and as it developed, and developments in the law regarding interpretation of the TCPA and similar provisions, including FCC rulings. Among these was the FTC's staff opinion letter dated September 11, 2009 advising that it would not enforce the TSR's prohibition on the use of a "prerecorded message" in telephone solicitations if calls used a technology virtually the same as the VVT platform. *See* Ex. A at ¶ 39; Ex. F (the "2009 Letter"). Sponsler acknowledged that the FTC staff subsequently issued an opinion letter seven years later, on November 10, 2016, revoking the guidance in the 2009 Letter, but delaying the effectiveness of the revocation by six months, and opined that the concerns that motivated the FTC's change in position regarding "prerecorded message" do not apply to the VVT platform.[2] *See* Ex. A at ¶ 47; Ex. G (the "2016 Letter"). Plaintiffs' argument is effectively nothing more than a disagreement with Sponsler's conclusions, which is not a basis for exclusion. They do not point to any step in his process or methodology that takes his opinions off the legal rails.

Plaintiffs first take issue with Sponsler's opinion that the TCPA

> does not preclude the simple use of audio files by a live agent, in real time to conduct a live, two-way, human-to-human conversation while the human agent controls the call from beginning to end, including the content of every call, with the option to continue the conversation with his or her own words at any time.

Ex. A at ¶ 39.

---

[2] Interestingly, the FTC's decision was based on supposed "abuses" of the technology. The FTC did not take back its prior conclusion that the calls were "virtually indistinguishable from calls conducted by live operators."

8

Sponsler details the bases for his view, which is largely informed by the legislative history about "what Congress had in mind when it passed the [TCPA] to regulate computerized calls it considered the scourge of modern civilization in 1991," about the fact that Congress did not prohibit live telemarketing calls, about the technology present then and since, and the 2009 and 2016 FTC Letters. Plaintiffs take issue with this holistic approach in arguing that "there is no textual support in the TCPA or any regulation for distinguishing calls on that basis," (Mot. at 10), but the same could have been said of the FTC staff's approach in the 2009 Letter when it found that the technology at issue here did not constitute a "prerecorded message" for purposes of liability.

Plaintiffs are correct that the 2009 Letter did not address enforcement of the TCPA, nor was it issued by the government body that enforces and interprets the TCPA (which is the Federal Communications Commission). *See* Mot. at 10. That, however, does not make it an unreasonable authority for Sponsler to have considered. Plaintiffs ignore that it is the FTC's position that the TSR's rules relating to the permissibility of prerecorded telemarketing messages, "while . . . differ[ent] from those of the [FCC], . . . are not in conflict, and that entities subject to the authority of both agencies need only comply with the FTC's more restrictive requirements to ensure compliance with both agencies' rules." *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 F.C.C. Rcd. 1830, 1836 (2012) (citing *Telemarketing Sales Rule, Final Rule Amendments*, 73 Fed. Reg. 51164, 51172 n.104 (2008)). As Sponsler stated in his report and at his deposition, for nearly twenty years he has "run a consulting firm that helps companies comply operationally with the TCPA, the TSR, and State rules for consumer contact compliance," and accordingly his opinions are "an operational understanding of how to implement the TCPA, TSR, and State rule requirements into

9

their daily operations to make sure they're complying." Ex. E at 38:6-17. Thus, he is allowed to consider the 2009 Letter in his analysis. *Accord* Fed. R. Evid. 703 ("If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.").

Interestingly, while Plaintiffs contend Sponsler's opinion is "contrary to law" and "founded on [a] legal error[ ]" in this regard, (Mot. at 14), they point to no legal rule or authority to the contrary. Plaintiffs identify no case law that Sponsler misunderstood or ignored. The very fact that there is none demonstrates the need for his opinion and its approach. Plaintiffs' reliance upon the D.C. Circuit's decision in *Soundboard Association v. FTC*, 888 F.3d 1261 (D.C. Cir. 2018), is puzzling because the D.C. Circuit there merely considered whether the 2016 Letter constituted final agency action subject to judicial review under the Administrative Procedure Act, and determined that it was not. It is unclear how Plaintiffs can suggest the D.C. Circuit decided a substantive legal question when it concluded the action was procedurally improper.

Second, Plaintiffs contend that Sponsler's analysis of "the capacity of the VVT Software to deliver a prerecorded voice message without 'human intervention'" and "the capacity of the VVT Software to deliver a large number of calls in a short period" are irrelevant, on the ground that "capacity" and, apparently, human intervention "relate *exclusively* to autodialers." Mot. at 12. This argument is nonsensical. It is unclear if Plaintiffs simply take issue with the use of "capacity," which is used sparingly in Sponsler's report and is synonymous with the terms "ability," "capability," and "facility" for purposes of Sponsler's report. *See* Ex. A at ¶¶ 15, 43, 46. Do Plaintiffs seriously contend that a discussion of the VVT platform's capabilities is irrelevant to deciding their TCPA claim?

As for human intervention, Sponsler's opinion is effectively that because the VVT platform permits an agent "to conduct a live, two-way, human-to-human conversation while the human agent controls the call from the beginning to end, including the content of every call, with the option to continue the conversation with his or her own words at any time," it would not be understood to utilize a "prerecorded voice" within the meaning and purposes of the TCPA. Ex. A at ¶ 39. The ability to have dynamic conversations that a human being controls and in which he or she can even speak, as well as the attendant limitations on the number of recordings that could be played at a time (as opposed to a one-way message blast), are certainly relevant to Sponsler's analysis that the VVT platform is not akin to the *robocall* technologies that Congress aimed to end in enacting the TCPA in 1991. Sponsler thus reasoned that because a real person always launched every VVT telephone call and remained on the line to answer questions and honor "do not call" requests, the VVT platform was not what Congress intended to regulate under the TCPA. *Id.* at ¶ 19. And, again, Plaintiffs offer no legal rule or authority to the contrary or that Sponsler supposedly disregarded.

Third, for the same reasons, Plaintiffs' argument that Sponsler's use of the term "robocall" constitutes a mistake of law, (*see* Mot. at 13-14), is itself mistaken. Sponsler even offered a definition of that term. *See* Ex. A at ¶ 20. Again, Sponsler used that term to identify the harms that Congress sought to address and end in enacting the TCPA, and he contrasts such a call with the calls made using the VVT platform at issue. It is unclear how Plaintiffs can argue that type of comparison is legally defective when both of their cited authorities referred to "robocalls." *See Aranda v. Caribbean Cruise Line, Inc.*, 179 F. Supp. 3d 817, 829–30 (N.D. Ill. 2016) (describing the operative complaint's allegations as "alleging that defendants 'ma[de], or ha[d] or allow[ed] to be made on their behalf, the unsolicited robocalls utilizing an artificial or

11

prerecorded voice"); Ex. G at 3 & 4 (referring to "robocalls"). Indeed, in *Aranda* the same "prerecorded message played without regard to whether a call recipient gave a voice response," 179 F. Supp. 3d at 825, a fact that Sponsler noted did not apply to VVT calls (and thus further distinguishes them from robocalls). *See* Ex. A at ¶ 46.

There is no basis for exclusion. Plaintiffs are free to cross-examine Sponsler about these issues and the use of the terms "capacity," "robocalls," and "prerecorded message blasts" to communicate his opinions. The fact that they dispute his conclusions as to how the TCPA is operationally understood and how that understanding relates to the VVT platform does not justify exclusion. *See*, *e.g.*, *In re Fluidmaster*, 2017 WL 1196990 at *23 ("[A]n opinion is not inadmissible simply because defendants disagree with its conclusion.") (quoting *Paul v. Holland Am. Line, Inc.*, 2006 WL 3761368, *3 (W.D. Wash. Dec. 21, 2006)); *ABS Glob., Inc. v. Inguran, LLC*, No. 14-CV-503-WMC, 2016 WL 4204160, *7 (W.D. Wis. Aug. 9, 2016) ("The essence of ST's complaints about Dr. Murphy's opinions is not that they are inherently unreliable, but that ST disagrees with them. ST is free to attack Murphy's conclusions through cross examination, other witness testimony and argument, but the court will not exclude it."); *Jones v. Nat'l Cart Co.*, No. 12-1186, 2015 WL 5050265, *4 (C.D. Ill. Aug. 26, 2015) ("While Defendants disagree with Rueda's conclusions, they have not established that his methodology was unreliable. Accordingly, Defendants' complaints . . . go to weight rather than admissibility and can be explored on cross-examination.").

## CONCLUSION

Despite Plaintiff's bare assertions that Sponsler's opinions are founded on factual and legal errors, they have presented no undisputed facts or legal authority to dispute the bases of his opinions. They have, in reality, asked the Court to weigh the underlying evidence relied upon by

Sponsler and disregard his conclusions because Plaintiffs disagree with them. That is not the function of the Court, and the Court should therefore deny Plaintiffs' Motion to Exclude the Expert Opinion Testimony of Kenneth R. Sponsler.

| | |
|---|---|
| Dated: September 5, 2018 | GREENSPOON MARDER LLP |
| | */s/ Jeffrey A. Backman*<br>RICHARD W. EPSTEIN, ESQ.<br>(Fla. Bar No. 229091)<br>richard.epstein@gmlaw.com<br>JEFFREY A. BACKMAN, ESQ<br>(Fla. Bar No. 0662501)<br>jeffrey.backman@gmlaw.com<br>ROY TAUB, ESQ.<br>(Fla. Bar No. 116263)<br>roy.taub@gmlaw.com<br>200 East Broward Blvd., Suite 1800<br>Fort Lauderdale, Florida 33301<br>954-491-1120 (Telephone)<br>954-343-6958 (Facsimile) |
| | and |
| | TABET DIVITO & ROTHSTEIN LLC |
| | Timothy Hudson<br>The Rookery Building<br>209 South LaSalle St., Suite 700<br>Chicago, IL  60604<br>(312)762-9450 (Telephone)<br>(312)762-9451 (Facsimile) |
| | *Attorneys for Defendant Consolidated World Travel, Inc. d/b/a Holiday Cruise Line* |

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was served on all counsel of record via ECF on September 5, 2018.

                                                          */s/ Jeffrey A. Backman*
                                                          JEFFREY A. BACKMAN