# EXHIBIT A

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ANGEL BAKOV, JULIE HERRERA, and KINAYA HEWLETT, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> CONSOLIDATED WORLD TRAVEL, INC. d/b/a HOLIDAY CRUISE LINE, a Florida corporation, <br><br> Defendant. | No. 1:15-cv-02980 (Consolidated with 1:17-cv-00973) <br><br><br> **EXPERT REPORT BY KEN SPONSLER** |

## I.  INTRODUCTION

### A.  Assignment and Summary of Opinions

1.     I am Ken Sponsler.  I am over the age of twenty-one years, of sound mind, and competent to testify.   I am the Senior Vice President of CompliancePoint, Inc. ("CompliancePoint") located in Duluth, Georgia.  CompliancePoint, a wholly-owned subsidiary of PossibleNOW, Inc., is a global professional services firm specializing in consumer contact compliance consulting and audit services.  I was contacted for the purposes of being engaged as an expert witness by counsel for the Defendant Consolidated World Travel, Inc. ("CWT") d/b/a Holiday Cruise Line ("HCL") and to provide opinions in connection with Randall Snyder's "Declaration of Randall A. Snyder" dated February 5, 2018.

(a)     Opinion One: Defendant in this case was not delivering robocalls or prerecorded message blasts.

(b)     Opinion Two: The Virtual Voice Technology ("VVT") platform is not akin to the technology that the Telephone Consumer Protection Act ("TCPA") sought to eliminate at the time it was enacted.  Rather the VVT solution is akin to permissible live telephone agent calls,

(c)     Opinion Three: Mr. Snyder has erroneously opined that the VVT system is a prerecorded message under the TCPA.

    (d)     Opinion Four: The VVT platform does not encroach upon the TCPA regulations and FCC concerns regarding prerecorded messages.

    (e)     Opinion Five: The VVT platform requires significant human intervention.

2.     A list of other case materials I reviewed and considered is attached to as Exhibit A.

**B.    Qualifications**

3.     I have over eighteen years of operational experience in business-to-business and business-to-consumer global direct marketing compliance matters, as well as with respect to ensuring compliance when communicating with businesses and consumers by telephone. I have personally conducted dozens of onsite compliance assessments, gap analyses, and risk assessment studies. I have assessed numerous call center operations with respect to the use of various dialing platforms, as well as with respect to compliance with federal and state telemarketing laws and other laws that govern communications by phone. I have provided expert reports in several TCPA-related matters.

4.     I have personally analyzed dozens of contact-center and service provider telephone dialing systems, as well as text delivery platforms, in order to provide opinions as to whether they meet the definition of an ATDS under the TCPA. I am familiar with the operational aspects of dialing platforms, including specific implementation parameters, that should be considered in assessing whether a specific platform falls within the definition of ATDS.

5.     I founded CompliancePoint 's consulting practice, which, among other things, provides historical call data compliance analysis and wireless identification services for law firms and corporate clients. These services include call data audits in support of compliance monitoring and enforcement efforts. In my role at CompliancePoint, I have served as a court-appointed monitor, as well as an expert witness, to perform historical call record analysis for the purpose of determining compliance with the TCPA. As a result, I am intimately familiar with the methodologies that must be used to perform accurate and reliable call record analysis, whether in the context of analyzing calls to wireless numbers, calls to numbers that may be registered on the National Do Not Call Registry (the "NDNCR"), and calls to numbers on a company's entity-specific "Do Not Call" ("DNC") list.

6.     Prior to taking on my present role at CompliancePoint, I also served in a critical role at PossibleNOW, CompliancePoint's parent company. PossibleNOW is an industry leader in

telemarketing and telephone communications compliance services. It not only performs compliance services for companies engaged in telephone communications, but is also the federal government's contractor responsible for performing hygiene on the NDNCR. With respect to the NDNCR, PossibleNOW is responsible for purging numbers if it finds that they have been disconnected and reassigned to a new name and a new address. On a weekly basis, PossibleNOW performs an analysis of the numbers on the NDNCR to determine whether any of the numbers should be purged. PossibleNOW has maintained historical records of the NDNCR reflecting the numbers registered thereon as of each day since the NDNCR was created. PossibleNOW also maintains historical records of mobile telephone portability status since the beginning of U.S. portability implementation in late 2003. Wireless portability lists are updated daily, and PossibleNOW's record maintenance allows for historical calling records to be compared to the applicable wireless portability list given the date(s) of the call record.

7. PossibleNOW is a provider of, among other things, mobile telephone identity services and other solutions for DNC Compliance. In my role at PossibleNOW, I wrote the functional specifications for PossibleNOW's "DNCSolution." Among other things, the DNCSolution provides a scrubbing platform to scrub for wireless numbers and numbers registered on the NDNCR, state DNC lists and entity-specific DNC lists, while accounting for numbers associated with an established business relationship (inquiry or transaction EBR) as well as consent.

8. In my roles at CompliancePoint and PossibleNOW, I have also become intimately familiar with the lead generation industry, and the relationships between vendors that generate and seek to sell leads, vendors that serve as a "middleman" that buy leads from third parties and then look for opportunities to sell those leads to others, and the purchasers that buy leads from such vendors. I have also provided consulting services and audits for companies engaged in lead generation, as well as companies that purchase leads from third party vendors. I have been personally involved in dozens of lead generation audits designed to help ensure compliance with U.S. federal and state telemarketing, wireless and DNC laws. I have provided numerous compliance-related presentations at Lead Generator industry events such as LeadsCon East and LeadsCon West. Thus, I am intimately familiar with the lead generation industry across a wide variety of industry verticals.

EXPERT REPORT OF KEN SPONSLER

9.      In addition to my years of direct experience evaluating dialing, texting, and fax delivery platforms, I have conducted an in-depth study of very similar technology at issue in this case.  I reviewed and delivered a detailed study report of an early "soundboard" system called "Call Assistant."  The primary tenets of this system are very similar in most respects to the VVT system at issue in this case.  I also submitted comments to the Federal Trade Commission ("FTC") relevant to the CallAssistant request for Staff Advisory Opinion.

10.      Finally, as the Vice Chair and member of the Executive Committee of the National Board of Directors for the Professional Association of Customer Engagement ("PACE," formerly the American Teleservices Association), I interact with hundreds of corporate compliance professionals and companies/providers involved in consumer contact operations.  A copy of my current "*curriculum vitae*" ("CV") is attached hereto as Exhibit B, which contains a list of publications I have authored.  I am being compensated for my work preparing this report in accordance with my rates identified in Exhibit C.  My compensation is not dependent upon the outcome of this matter.

### Summary of Expert Experience

11.      In the last four years, I have been retained to provide deposition testimony as an expert in the following matters: *Horton v. Cavalry Portfolio Svcs.,* No. 3:13-cv-00307-JAH-WVG (S.D. Cal.); *Shamann v. Monex Credit Co., Arbitration Proceeding JAMS Reg. 1200041941; Molnar v. NCO Financial Systems, Inc.*, Nos. 3:13-cv-00131 and 3-13-cv-00685 (S.D. Cal.); *Hooker v. Sirius XM*, No. 13-cv-0003 (E.D. Va.); *True Health Chiropractic, Inc. v. McKesson Corp.,* No. 13-cv-02219 (N.D. Cal.); *Bridge v. Credit One Bank*, No. 2:14-cv-01512 (D. Nev.); *Raffin v. Medicredit, Inc*., No. 2:15-cv-04912 (C.D. Cal.); *Keim v. ADF Midatlantic, LLC,* No. 9:12-cv-80577 (S.D. Fla.); *Marcus v. CVS Pharmacy, Inc.*, No. 3:15-cv-00259 (D. N.J.); *Tomeo v. Citigroup, Inc. and CitiMortgage, Inc.,* No. 1-13-cv-04046 (N.D. Ill.); *Tillman v. Ally Financial, Inc*., No. 2:16-cv-00313 (M.D. Fla.); *Slovin v. Sunrun, Inc.*, No. 4:15-cv-05340 (N.D. Cal.); *Gorss Motels, Inc. v. Brigadoon Fitness,* No. 1:16-cv-00330 (N.D. Ind.); *Larson v. Harman-Management Corporation and 3Seventy, Inc.*, No. 1:16-cv-00219 (E.D. Cal.); *Glasser v. Hilton Grand Vacations Company, LLC,* No. 8:16-cv-00952 (M.D. Fla.); .); and *Gorss Motels, Inc. v. Otis Elevator Company*, No. 3:16-cv-01781 (D. Conn.).

I provided trial testimony in federal court in the matters *United States of America v. DISH*

*Network*, No. 3:09-cv-03070 (C.D. Ill.) and *ADT Security Services Inc., v. Security One International*, No. 11-cv-05149 (N.D. Cal.).

### C. Technology Evolution

12.     Senator Fritz Hollings submitted a report to the 102d Congress on Oct 8th, 1991. Senator Hollings served on the Committee on Commerce, Science, and Transportation and proposed the "Automated Telephone Consumer Protection Act (S. 1462).  In the Background and Needs Section Senator Hollings addressed Consumer Complaints.  In relevant part, the report stated: *"The use of automated equipment to engage in telemarketing is generating an increasing number of consumer complaints.  The Federal Communications Commission (FCC) received over 2,300 complaints about telemarketing calls over the past year.  The Federal Trade Commission, State regulatory agencies, local telephone companies, and congressional offices also have received substantial numbers of complaints."*[1]  In particular, they cite the following problems*: the entity placing the automated call does not identify itself; the automated calls fill the entire tape of an answering machine, preventing other callers from leaving messages; automated calls do not respond to human voice commands to disconnect the phone, especially in times of emergency; some automatic dialers will dial numbers in sequence, thereby tying up all the lines of a business and preventing any outgoing calls."*[2]

13.     *"Computerized calls are the scourge of modern civilization.  They wake us up in the morning; they interrupt our dinner at night; they force the sick and elderly out of bed; they hound us until we want to rip the telephone right out of the wall."*  These were the words of Senator Fritz Hollings, as he argued for the passage of the Telephone Consumer Protection Act (TCPA) in 1991.

14.     It is my opinion that in this expert report I will clearly show that the manually dialed single calls, where agents manually selected recorded audio-snippets at issue in this action are VASTLY different than the robocalling technology envisioned by Congress in 1991 and addressed by the passage of Telephone Consumer Protection Act of 1991.

15.     An Automatic Telephone Dialing System ("ATDS") or automatic dialer is defined by the TCPA equipment which has the capacity—

---

[1] S. Rep. No. 102-178, 102d Cong., 1st Sess. (1991), p. 1.
[2] S. Rep. No. 102-178, 102d Cong., 1st Sess. (1991) at p. 2.

EXPERT REPORT OF KEN SPONSLER

"(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and

"(B) to dial such numbers.

16.    The earliest article, according to my research, about autodialers was published in 1942, "Considerable time can be saved with a telephone set that automatically dials the number wanted. You set a pointer at the name of the person to be called, press a lever, and the instrument does the rest. The phone is offered in two styles, one providing the automatic feature for 12 phone numbers, and the other for 52 stations."[3]

17.    When a consumer answers a robocall, in general, the system delivers a prerecorded message. Some prerecorded messages prompt the consumer to press a number or wait on the line for the next available agent.

18.    Another concern voiced, "*[C]onsumer groups warn that there is a "potential for large numbers of consumers to be victimized" by coercive marketing pitches "given the trend toward negative-option marketing and the use of preacquired accounted numbers*," because **prerecorded calls "are by their very nature one-sided conversations**."[4] does not apply to the VVT system because VVT facilitates a two-way conversation from beginning to end between a live agent and the called party.

19.    VVT is completely different from the robotic calls referred to "*[r]obotic calls by machines such as autodialers and computer-generated voices to be a much greater threat to the privacy of our homes than calls by live operators. At least you can vent your anger to a real person if they have interrupted your dinner. You can ask them questions and hold them accountable to some extent. At least a live person can only call one person at a time.*"[5] because using VVT, a real person always launched every telephone call and remained on the line, thus, if the called

---

[3] Popular Mechanics 1942 "Phone Does Its Own Dialing When Lever Is Pushed", https://books.google.com/books?id=stYDAAAAMBAJ&pg=PA70&dq=popular+Mechanics+1942+Short&hl=en&ei=SnahTLSMIoifnQfxu6SJBA&sa=X&oi=book_result&ct=result&resnum=7&ved=0CEIQ6AEwBg#v=onepage&q=popular%20Mechanics%201942%20Short&f=true (last accessed February 21, 2018).

[4] Telemarketing Sales Rule ("TSR"), 73 FR 51164-01, Friday, August 29, 2008, page 5, Section 2, third paragraph from bottom.

[5] 137 Cong. Rec. H11307-01 (1991), Tuesday, November 26, 1991, page 15, third paragraph from top.

EXPERT REPORT OF KEN SPONSLER

person wanted to ask questions, he or she could do that at any time. The called party could hold the agent calling with VVT accountable, if so desired, by requesting that the agent put this particular number on the internal DNC list. With VVT, only one live person was calling one person at a time.

20. <u>"Robocall" definition:</u> The term "robocalling" has become very popular in recent years as a label for calls that deliver such prerecorded messages, in spite of the fact that to date "robocalling" has no legal definition. The dictionary defines "robocall" as, "A telephone call from an automated source that delivers a prerecorded message to a large number of people."[6] Prerecorded messages are used in two primary ways. In the first instance, consumers, who answer the call, are presented with a prerecorded message and either prompted to select a keypress option to speak with an agent or asked to hold for the next available agent. The second way prerecorded messages are used is the delivery of a one-way scripted message to the consumer. This method is used for marketing, political, informational, and other types of messages. This frustrates consumers because there is no opportunity to opt out or ask that further calls cease. These messages are inexpensive to deliver and can involve hundreds of thousands of consumer-contacts in a very short span of time. These types of messages generate the highest number of consumer complaints to the regulators and are a source of frustration as well as significant effort to find a way to stop it.

21. The US Federal Communications Commission ("FCC") has begun to use the term 'robocall' frequently, e.g., "FCC votes to expand crackdown on 'robocalls'." The FCC sought dependable authentication to prevent fraudsters from spoofing telephone numbers of a government agency (such as the Internal Revenue Service or "IRS"), financial institution, or any other entity that would entice consumers to disclose confidential financial information and such, and in November 2017 adopted an order to block robocalls. It is estimated 2.5 billion robocalls were placed to US consumers in October 2017, a 4.1 percent increase compared to September 2017. This means an estimated 80.5 million robocalls are placed on a daily basis.[7] Therefore, it is understandable and desirable to put a stop to robocalling.

---

[6] https://www.merriam-webster.com/dictionary/robocall (last accessed February 28, 2018).
[7] https://www.prnewswire.com/news-releases/scams-rising-as-consumers-hit-by-nearly-25-billion-robocalls-nationwide-300557597.html (last accessed February 21, 2018).

EXPERT REPORT OF KEN SPONSLER

22.     A typical annoying, and likely illegal, robocall is one many Americans are very familiar with, "Hi, this is Rachel from Card Services calling about your credit card account. It appears that you are now eligible for a significantly lower interest rate on your account. However, this offer is about to expire, so please press 1 now to be transferred to a live representative who can assist you in securing your lower interest rate."[8]

23.     The Defendant in this case did NOT deliver robocalled or prerecorded message blasts. None of the concerns that robocalls have caused are even remotely relevant to this case and this system. "Automatic dialing systems (automatic telephone dialers coupled with recorded message players) ensure that a company's message gets to potential customers in the exact same way, every time, without incurring the normal cost of human intervention."[9] HCL incurred the cost of human intervention. Every call dialed by an agent logged into the VVT platform resulted in a conversational two-way discussion, the contents of which were variable as the conversation progressed. They simply employed lower cost per sale agents outside the US, who presented the agent-controlled scripted messages to the consumer in clearly spoken English in a one-to-one ratio, by selecting the appropriate audio-file from their menu.

**Background**

***Consolidated World Travel, Inc. d/b/a Holiday Cruise Line***

24.     I understand that CWT offers cruise and vacation packages d/b/a HCL.

***Angel Bakov***

25.     It is my understanding that Plaintiff Bakov alleges he received telephone calls to his cellphone in or around February 2015 from a number that displayed as 1-773-453-7311 on his caller ID. Plaintiff Bakov also alleges on or around March 26, 2015 he received another call to his mobile phone displaying 1-773-453-7311 on his caller ID, and that he answered that call and had a conversation with a person identified as "Jennifer." Plaintiff Bakov alleges that Jennifer's responses were automated and not live. Finally, Plaintiff Bakov states on or about April 17, 2015 he received a third call to his cellphone that he asserts was dialed on behalf of Defendant, and the number displayed on his caller ID was 1-773-696-0507.[10]

---

[8] https://www.consumer.ftc.gov/blog/2015/08/whats-deal-rachel-card-services-your-top-3-questions-answered (last accessed February 28, 2018).
[9] H.R. REP. 102-317, 6 (discussing the problem and need for legislation).
[10] Consolidated Class Action Complaint (doc. # 31), ¶¶ 34-47.

*Julie Herrera*

26.    It is my understanding that Plaintiff Herrera states she received a call to her cellphone on May 3, 2015 at 11:19pm CST that displayed the number 918895491600 on her caller ID.  She states she answered the call but could only hear muffled sounds.  Plaintiff Herrera claims she called the number back on May 4, 2015 at 9:23am (if that was also CST is unclear) and said that a pre-recorded message informed her that the call was being recorded and that she had won a free cruise.  At some point, she said she spoke to an HCL representative and when she was asked to provide her credit card information, she requested something in writing to confirm the agent's identity and legitimacy, upon which she received an email with the sender's address register@holidaycl.com.[11]

*Kinaya Hewlett*

27.    I understand that Plaintiff Hewlett alleges that in March 2016 she received calls to her cellphone that displayed on her caller ID as (916) 340-8242 Holiday Cruise Line. Plaintiff Hewlett asserts that these calls were autodialed and robotic initially before a live person joined the conversation or conversations.[12]

*Vance Vogel*

28.    I understand that Vance Vogel owns The Marketing Source ("TMS")[13] and Media Monitors, Inc. "(Medial Monitors")[14].  TMS and Media Monitors were providing certain services for CWT.

29.    The software referred to as VVT software[15], according to Mr. Vogel's sworn testimony, stands for called "Virtual Voice Technologies" or "Virtual Voice Technology," and was developed by Mr. Albright for Mr. Vogel's company,[16]  however, the technology

---

[11] Id., ¶¶ 50-58.
[12] First Amended Complaint, case 2:16-cv-00713 (doc. # 14), ¶¶ 12-16.
[13] Vance L. Vogel deposition, page 10, 21-25 and page 22, 20-23.
[14] Id., page 23, 4-12.
[15] Id., page 35, 1-11.
[16] Id., page 29, 25 and page 30, 1-17.

EXPERT REPORT OF KEN SPONSLER

remained proprietary to SunBridge Systems.[17], [18]  The system was designed for easy usage for compliance reasons.[19]

### *Virtual Voice Technology – the Company ("VVT")*

30.     It is also my understanding that Mr. Satish Malla owns or owned a company named Virtual Voice Technology ("VVT")[20], which is located in India.  Some VVT managers and likely Mr. Malla himself (Mr. Vogel could not recall with absolute certainty) were trained by Mr. Vogel and Mr. Albright.[21]  VVT itself then trained most of the agents in the call centers on how to use the software.[22]

### *SunBridge Systems, LLC*

31.     It further is my understanding that SunBridge Systems, LLC ("SunBridge") provides computer-related systems and services and the company was founded by Clifford Albright, sole owner and operator, in 2013.[23]  Mr. Albright's testimony is that he developed the software referred to as the VVT platform or the VVT system in this matter himself, that he did not use other coders' programs to assist him, and that nobody knows more about the software than he does.[24]  Mr. Vogel testified that it was Mr. Albright's job to provide VVT access to the software and to grant that access to the centers and the provide the handshake when they came online to make sure they were connected.[25]  According to Mr. Vogel's sworn testimony, Media Monitors trained VVT in conjunction with Cliff [Albright] on how to onboard a center into his [Cliff's] software.[26]

### *Live Agent Marketing*

32.     VVT uses a Live Agent Marketing Model.  Live Agent Marketing is a business model where a live human being uses the software to communicate with consumers to generate

---

[17] Id., page 47, 10-13.
[18] Id., page 52, 13-20.
[19] Id., page 62, 11-18.
[20] Id., page 34, 10-11.
[21] Id., page 58, 25 - page 59, 1-9, 23-24.
[22] Id., page 58, 17-20.
[23] Clifford Albright deposition, page 15, 7-25 and page 16, 1-3.
[24] Id., page 29, 1-12.
[25] Vance Vogel deposition, page 57, 12-19.
[26] Id., page 58, 7-13.

interest, in this case, in the travel package, and then once that interest is generated, it transfers the call to Holiday Cruise.[27]

## II. How the VVT Calls Worked and Why the System Did Not Meet the TCPA's Definition of a Prerecorded Message.

33. VVT (the company), India, initiated calls to the United States.[28] Agents using the VVT system only initiated those calls during CWT's hours of operation.[29] Unlike some prerecorded message blasts, VVT agents manually dialed the calls in compliance with US regulations, such as not calling on US Federal and State holidays, adhering to US calling time restrictions based upon time zones, etc. The five primary benefits of the technology were:

1) Enabled the use of lower cost agent resources.

2) Solved a common complaint from US consumers about calls with agents, who speak English as a second language, and therefore may have a difficult-to-understand foreign accent or a strong American accent from a region unfamiliar to the call recipient.

3) Allowed employment of agents with disabilities, such as speech impediments.

4) Provided always professional, thorough, compliant, and consistent conversations with consumers.

5) Provided consumers with an interactive two-way conversation, including the ability to invoke a Do Not Call request at any time.

34. On March 2, 2018 at 3 PM Eastern, I conducted a telephonic interview with Mr. Clifford Albright. Mr. Albright is the developer of the VVT system as well as its Voice Assistance Engine. The purpose of the call was to enable me to gain a deeper understanding of the design and operational aspects of the VVT system. I asked Mr. Albright about the purpose and benefits he perceived while he undertook the design process. Mr. Albright stated in relevant part, "I believed I could create a platform that could operate as a manual only dial system, later, I added the Voice Assistance Engine, which provided users with the ability to create audio-snippets in a

---

[27] Vance Vogel deposition, page 50, 5-11.
[28] Id., page 71, 18-23.
[29] Id., page 73, 10-22.

EXPERT REPORT OF KEN SPONSLER

professional and consistent voice. That capability was important when agents spoke English as a second language and spoke with a noticeable foreign accent." I asked Mr. Albright about the manual dial aspects of the software. In relevant part, Mr. Albright said, "The system can only operate as a manual dial system and can only dial one (1) telephone number at a time. Agents hear the telephone ringing, busy signal, person answering, or an answering machine." Mr. Albright also confirmed that agents could "go live" at any point and immediately accept a DNC request.

35.     The VVT software technology could be accessed by entering a URL in a Web browser, then typing in the user name and password as assigned by Cliff Albright.[30] The VVT main screen would appear. The screen had a dial-next button and a group of voice prompt buttons. When the agent pressed the dial-next button, the phone rang. When a person answered the telephone, the user would select the first recording, which is the hello greeting, and would continue to select the appropriate and required prompts from approximately 40 various audio files for various responses. The user would select the appropriate prompt to generate the interest of the person who had answered the phone, get him or her qualified and transfer the call.[31] If the person, who received the call was not interested, the number was taken off the calling list.[32] This is, of course, done to accommodate the wishes of the consumer but it also makes no sense for a company to continue to call, and probably annoy, a consumer who expressed the he or she has no interest in the product or service the company offers.

36.     None of these actual steps of VVT match the dictionary's "robocall" definition referenced above in par. 17, and as I also stated, to the best of my knowledge to date there is no legal definition of what constitutes a "robocall." The relevant calls made by VVT agents did not originate from an automated source because each call was manually dialed, one call at a time, by a live agent. There was not one prerecorded message as I understand its definition under the TCPA that was delivered to a large number of people because every single call was manually dialed by an agent and the agent stayed on the call, exactly like two parties during any other telephone conversation. No prerecorded message was ever sent by VVT, instead the fitting audio snippet would be chosen by the agent to conduct a two-way conversation in a coherent fashion. The

---

[30] Id., page 74, 9-17.
[31] Id., page 75, 7-11, 15-23.
[32] Id., page 78, 24-25.

conversation started with the agent selecting the greeting because no automatic greeting was played when a person answered the agent's call.[33]  If there was no audio snippet that fit into the conversation, the agent could at any time simply unmute the call and continue the conversation in his or her natural voice.  At the end of each and every call, the agent was required to manually disposition the call in the CRM system before it was even possible for the agent to initiate another call. Of course, this fact mirrors that of traditional live-agent calls and is opposite of prerecorded message blast calls.

## III.  The VVT System Does Not Encroach Upon the TCPA Regulations and the FCC Concerns Regarding Prerecorded Messages.

37.  In October of 2013, Becca J. Wahlquist crafted a paper on behalf of the Institute for Legal Reform entitled "The Juggernaut of TCPA Litigation".  In relevant part, she wrote: *"The year 1991 was a very different technological era and is now more than twenty years removed from present-day calling and faxing technologies.  The telemarketing calls and faxes that the TCPA was designed to curtail were being made by aggressive telemarketers employing tactics such as random number generation or sequential dials that worked through every possible number in an area code.  Facsimile machines required expensive thermal paper; cellular phones were extremely uncommon (and very bulky) with expensive usage costs—thus, special protections were put in place for calls made to cell phones and for faxes."*[34]

38.  Based on my almost twenty years of experience in the industry and a lot of ongoing research, in addition to the documents I have reviewed for this report, I have come to the conclusion that the VVT at issue in this matter is not what Congress had in mind when it passed the original statute to regulate computerized calls it considered the scourge of modern civilization in 1991.

39.  VVT is a completely different technology.  I am not an attorney but my understanding of the statute does not preclude the simple use of audio files by a live agent, in real time to conduct a live, two-way, human-to-human conversation while the human agent controls the call from beginning to end, including the content of every call, with the option to continue the

---

[33] Clifford Albright deposition, page 46, 14-21.
[34] Becca J. Wahlquist, *The Juggernaut of TCPA Litigation* (prepared for the U.S. Chamber Institute for Legal Reform) at 9, 8 (Oct. 2013), p. 8.

conversation with his or her own words at any time. Throughout the entire call, from dialing to hanging up, the agent is listening, evaluating the consumer's comment or question, then deciding whether to use an appropriate audio file in response or his or her own voice. In other words, there is basically only a negligible difference between VVT and a live agent reading from a script. In fact, on September 11, 2009 Lois Greisman, Associated Director of the Division of Marketing Practices of the Federal Trade Commission, commented in a letter to Mr. Michael Bills, CEO of Call Assistant, LLC in response to his petition that the "Echo" technology (virtually the same as VVT) did not constitute the delivery of a "prerecorded message." In relevant part, Ms. Greisman wrote, *"Consequently, in Staff's view, the concerns about prerecorded messages addressed in the 2008 TSR amendments do not apply to the calls described above, in which a live human being continuously interacts with the recipient of a call in a two-way conversation, but is permitted to respond by selecting recorded statements."*[35]

40.     Back in 1991, the autodialers that played prerecorded messages would dial telephone numbers that a computer program generated sequentially or at random. This kind of dialing could potentially tie up every phone line of a business because business phone numbers are frequently the entity's main number and then a "plus one," e.g., (111) 222-1000 is the main number to the front desk with a live receptionist most likely at that time. Extensions would then be numbered (111) 222-1001, (111) 222-1002, and so on. An ATDS dialing sequentially would keep every single line busy and block legitimate incoming calls. VVT software never incorporated a random number generator. VVT did not have a sequential number generator.[36] If the random number generator and/or sequential number generator functionality would have been desired, the code could not have been simply altered but would have had to be re-written entirely.[37]

41.     Another frequent complaint was, "Autodialers have grown in use because, as a New York Times story put it, 'they don't eat, they don't sleep and their feelings never get hurt when people curse them or hang up on them. They just call and call and call-each one up to 1,500 times

---

[35] Letter from Lois Greisman, Associate Director, Division of Marketing Practices, Federal Trade Commission, dated September 11, 2009 to Mr. Michael Bills, CEO, Call Assistant, LLC, page 2 of 3, 2nd to last paragraph.
[36] Clifford Albright deposition, page 51, 23-25 and page 52, 1-3.
[37] Id., page 52, 4-10.

EXPERT REPORT OF KEN SPONSLER

a day.'"[38] The agents, who initiated the calls at issue in this matter are human beings and therefore, eat, sleep, their feelings may get hurt when people curse them or hang up on them. They do not just call and call and call. VVT's use was not essentially different than a regular telephone conversation. Instead of the caller using his or her voice, the caller selected and then played scripted audio files that were recorded in accent-free, easy-to-understand American English. All the legally required disclosures that needed to be made for compliance reasons were present. Every single one of these calls was a real human-to-human conversation. If agents determined that there was no suitable recorded snippet, they could, without delay or any technical effort, simply unmute the call at any time and continue the conversation with the call recipient in their own voice and words because each agent was logged into one terminal with one log-in at a time and, therefore, was having a dialogue from beginning to end on each call.

42. In 2003, in its first TCPA-related order regarding an ATDS, the FCC determined a 'predictive dialer' to be an ATDS, in spite of many arguments that predictive dialers do not dial numbers randomly or sequentially, but instead store preprogrammed numbers or receive numbers from a computer database and then dial those numbers in a method that maximizes efficiency. Reaching this conclusion regarding the classification of a predictive dialer as an ATDS, the FCC stated: "The legislative history also suggests that through the TCPA, Congress was attempting to alleviate a particular problem — an increasing number of automated and prerecorded calls to certain categories of numbers. The TCPA does not ban the use of technologies to dial telephone numbers. It merely prohibits such technologies from dialing emergency numbers, health care facilities, telephone numbers assigned to wireless services and any other numbers for which the consumer is charged for the call. Such practices were determined to threaten public safety and inappropriately shift marketing costs from sellers to consumers. Coupled with the fact that autodialers can dial thousands of numbers in a short period of time, calls to these specified categories of numbers are particularly troublesome. Therefore, to exclude from these restrictions equipment that use predictive dialing software from the definition of 'automated telephone dialing equipment' simply because it relies on a given set of numbers would lead to an unintended result.

43. The VVT platform at issue did not and could not dial thousands of numbers in a short period of time, instead one agent with one log-in was on one call with one customer at a time.

---

[38] 137 Cong. Rec. S18785-01, 137 Cong. Rec. S18785-01, S18786, 1991 WL 252593, 3.

VVT was specifically designed in that it requires a live agent, a human being, every step from dialing the telephone number to initiate the call all the way to disconnecting the call.[39] The agent initiated each and every call, and the only way an agent could initiate a call was to move his mouse and click on the call button; it was impossible for the VVT software to initiate any calls automatically.[40] The agent heard the telephone ring, conducted the conversation, and was able to accept an immediate Do Not Call ("DNC") request at any time. The agent manually had to move his or her computer mouse to select the appropriate audio-snippet, which replied in a logical fashion, in accordance with CWT's guidelines, each and every time – as opposed to an agent, who can only read from a script and may veer off it, skipping over or forgetting portions of the script, etc. The live agent using VVT decided which message to select during the entire telephone conversation, VVT platform at no point made any decision when to start or end the call, which audio segment to activate. Based on the documents I have reviewed, it is my opinion that the technology did not have the capacity to perform as an ATDS under the TCPA and certainly possessed no capacity whatsoever to deliver hundreds or even thousands of unattended prerecorded message blasts.

## IV. The VVT System Was Vastly Different from Robocall Technologies.

44.     In order for VVT platform to do anything, a live agent had to log into a terminal, one at a time, and take action, thus controlling everything. Without a live agent doing something, VVT did nothing. During my detailed review and report of technology very similar to VVT, I determined that the technology not only does not deliver a robocall message and requires significant human intervention, it also supports compliance in ways much more efficiently than agents, who do not have access to this technological tool, can. The technology avoids many of the compliance issues introduced by rude or even threatening, abusive or intimidating[41] agent behaviors, failure to properly disclose required information, not following the required script and so on. VVT is not a prerecorded messaging platform, automated robocall system, or an automated solution that replaces "live agent" interaction with consumers. Instead, VVT allows an agent to converse with the consumer by selecting and substituting appropriate sound files for his/her own

---

[39] Vance Vogel declaration, ¶ 4. Deposition Clifford Albright, page 27, 25-page 29.
[40] Clifford Albright deposition, page 51, 17-23.
[41] 16 C.F.R. § 310.4, Abusive telemarketing acts or practices. (a)(1).

voice in such a way that the consumer experiences a natural conversation. The VVT agents converse with consumers throughout the entire call by listening to their comments, questions, and/or responses and responding to the same with compliant and well-scripted statements. Should an appropriate sound file be unavailable, agents can at any time speak directly with the persons called by pressing the unmute button. Thereafter, the agents could elect not to press the mute button and continue the conversation by choosing voice prompts and/or speak in their own voice.[42] In par. 17 of its 2015 Declaration and Order, the FCC emphasized human intervention, "How the human intervention element applies to a particular piece of equipment is specific to each individual piece of equipment, based on how the equipment functions and depends on human intervention, and is therefore a case-by-case determination." The VVT platform has significant human interaction and operates in a vastly different manner than robocalls.

45.     On Nov. 16, 2017, the FCC adopted new rules[43] to allow voice service providers to proactively block certain types of robocalls that are likely to be fraudulent because they come from certain types of phone numbers, including those that do not or cannot make outgoing calls. For example, perpetrators have used IRS phone numbers that do not dial out to impersonate the tax agency, informing the people who answer that they are calling to collect money owed to the U.S. government. Such calls appear to be legitimate to those who receive them and can result in fraud or identity theft. Service providers now can block such calls, as well as calls from invalid numbers, like those with area codes that don't exist, from numbers that have not been assigned to a provider, and from numbers allocated to a provider but not currently in use.[44] Calls placed with the VVT platform were legitimate calls made from legitimate telephone numbers, manually dialed[45] by live agents.

46.     VVT has nothing in common with "robo calling" or "robo dialing," which are methods of providing mass communication to automatically deliver prerecorded messages. This type of mass delivery of messages has among other terms also been referred to as "automated

---

[42] Clifford Albright deposition, page 52, 11-22.
[43] https://www.fcc.gov/document/fcc-adopts-rules-help-block-illegal-robocalls (last accessed February 27, 2018).
[44] https://www.fcc.gov/consumers/guides/stop-unwanted-calls-and-texts (last accessed February 27, 2018).
[45] Clifford Albright deposition, page 44, 17-20.

dialing," "automated calling services," "automated phone calls," "phone or call blast services," "automated call trees," or "phone calling systems." One of the many sellers in the marketplace states robo calling should be considered in any situation where a large number of outbound calls are necessary, especially when speed is critical. Its website advertises that its service delivers calls in seconds, not hours, so the time savings when compared to traditional communication methods is staggering.[46] VVT was used by live agents to conduct traditional, one-on-one conversations using audio files where the agent controlled each call from start to finish. The live agent controlled the content of each call in real time and at any and all times had the option to switch from selecting an audio file to using his or her own voice. VVT did not automatically deliver the same prerecorded message over and over to each number that was dialed by a dialer. Instead the agents manually dialed one number at a time and individually tailored the conversation live by evaluating which snippet to use in the context of the two-way phone call.[47] Unlike prerecorded messages, calls that utilized VVT were handled *entirely* by a live agent that remained on the call from start to finish and, therefore, calls could not be made at an excessive frequency. VVT also facilitated a real-time, two-way conversation between the consumer and an agent. Unlike one-way prerecorded messages, consumers were able to ask questions, voice their concerns, make a DNC request, and interacted with the agent at all times during the call. The VVT call was a conversation between the agent and the consumer. The fact that the agent utilized a recorded audio file to communicate with the consumer does not encroach on any privacy concerns because the two-way conversation is virtually indistinguishable from calls where the agent uses his/her voice throughout the entire call and is not much different from an agent, who is restricted to reading a script with his/her own

---

[46] http://www.onecallnow.com/terms-and-definitions/robo-call-service/ (last accessed February 28, 2018).

[47] Robocalls are very much a one-way transaction, similar to the junk mail in your mailbox that is addressed "To Current Resident." In other words, an organization had generic fliers or cards printed and sent via the US Postal Service to every street address in a certain area. As a recipient, if you are not interested, you can only throw it in the trash, and will likely continue to receive other mailers in periodic intervals in the future. VVT is nothing like this. If a consumer is not interested, he/she can request to be placed on the company-specific DNC list and a live agent responds appropriately that the DNC request was received and processed. After the call, the agent would disposition the call as a DNC. If interested, the consumer could continue the live dialogue with the live agent with a complete menu of options how the conversation might develop.

EXPERT REPORT OF KEN SPONSLER

voice. The chart below shows some of the many and the most glaring differences between these technologies.

| Prerecorded Messages / Automated Calls / Robocalls | VVT Platform |
|---|---|
| Capacity to "blast" thousands of prerecorded messages. | One agent initiates each call manually one at a time. |
| Consumers have no or limited opportunity to invoke a DNC request. | Agent can immediately, and at any time, accept a consumer's DNC request. |
| Robocalls are not dynamic or necessarily relevant to the consumer's wishes. | Agent controls the specific "conversation" based upon the consumer's responses to questions or statements. |
| Robocalls require no human intervention to be delivered. | Significant human intervention is required for each call and during each conversation. |
| Certain robocalls may require consumers to be placed "on hold" to speak with an agent. | Each answered call is immediately connected to the agent, who dialed the telephone number, and either selects the appropriate audio snippets or unmutes himself or herself to continue the conversation without the audio snippets. |
| Robocalls are often blasted to the same consumers over and over because there is no mechanism to accept a DNC request. | Consumers can immediately invoke a DNC request at any time during every call. |
| Robocalls are very low cost and can reach hundreds of thousands of consumers. | A paid agent employee is required for each and every call. The number of calls is limited to the number of agents able to place them. |
| Robocalls are a one-way message with no opportunity for consumer interaction. | Consumers experience a two-way conversation with the agent. |
| Robocalls can fill the entire storage capacity of an answering machine. | When reaching an answering machine or voicemail, agent stays on the line, listens to the entire voicemail, and at the prompt leaves an appropriate message. |
| | Agent hears the telephone ring. |
| | Agent hears busy signals. |
| | The software cannot be reconfigured to make calls automatically. The code would have to be re-written from scratch. |
| [A]utomated calls do not respond to human voice commands to disconnect the phone.[48] | The live agents are on the phone in real time the entire duration of the call, if the consumer requests to disconnect the call, the agents will do so by pressing the hang-up button.[49] |
| Autodialers (also known as robocalls) automatically deliver a prerecorded message | VVT only functions when activated and controlled by a human agent. |

---

[48] S. REP. 102-178, 2, 1991 U.S.C.C.A.N. 1968, 1969 (listing common consumer complaints).
[49] Clifford Albright deposition, page. 46, 22-24.

| Prerecorded Messages / Automated Calls / Robocalls | VVT Platform |
|---|---|
| to a list of telephone numbers, and thus remove the need for human representatives.[50] | |
| Robocalls calls will not disconnect the line for a long time after the called party hangs up. | VVT agents can hang up at any time during the call by pressing the hang-up button, then they must manually disposition the call accordingly before they can select another number to dial.[51] |
| Robocalls abandon each and every call | Calls are never abandoned with the VVT system. |

47.     The concerns voiced by the FTC in its November 10, 2016 letter to Michael Bills regarding the September 11, 2009 Staff Opinion Letter on Soundboard Technology are not applicable to the way the VVT platform was used in the matter at issue.  As a matter of fact, VVT displayed the exact advantages the FTC stated in its 2009 letter that opined that Call Assistant's soundboard technology allowed a live agent to communicate with a call recipient by playing recorded audio snippets instead of using his or her own live voice.  A single live agent stays with the call from beginning to end, listens to every word spoken by the call recipient, determines what is heard by the call recipient, and has the ability to interrupt recordings and use his or her own voice to communicate with the call recipient if needed.  This led the FTC to conclude that these features made the calls "virtually indistinguishable" from normal two-way conversations with live operators and placed them outside the scope of the Telemarketing Sales Rule's ("TSR") prerecorded message provisions.  Due to complaints about bad actors incorrectly using this type of technology, the FTC – over the objections of PACE and Soundboard Association representatives – changed its mind and decided that outbound calls made using soundboard technology are subject to the provisions of 16 C.F.R. § 310.4(b)(1)(v).  It was noted that the views expressed in this letter are those of the FTC staff, subject to the limitations in 16 C.F.R. § 1.3 and

---

[50] Spencer Weber Waller et. al., The Telephone Consumer Protection Act of 1991: Adapting Consumer Protection to Changing Technology, 26 Loy. Consumer L. Rev. 343, 352 (2014) (discussing the history of the TCPA).
[51] Clifford Albright deposition, page. 46, 22-25; page 47, 1-2 and 11-19.

that they have not been approved or adopted by the Commission, and they are not binding upon the Commission.[52]

## V.    Reservation of Right to Amend.

48.    I declare under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct to the best of my knowledge.


Executed in Beverly Hills, Florida on March 7, 2018.


_____

Ken Sponsler

---

[52] FTC letter to Michael Bills, dated Nov. 10, 2016, re: September 11, 2009 Staff Opinion Letter on Soundboard Technology.

# EXHIBIT A

# EXHIBIT A

EXPERT REPORT OF KEN SPONSLER

**Exhibit A: Materials reviewed and relied upon by Ken Sponsler**

1) Telephone Consumer Protection Act 47 U.S.C. § 227

   http://transition.fcc.gov/cgb/policy/TCPA-Rules.pdf (last accessed February 22, 2018).

2) Consolidated Class Action Complaint (doc. # 31).

3) First Amended Complaint, case 2:16-cv-00713 (doc. # 14).

4) Vance L. Vogel deposition transcript.

5) Clifford Albright deposition transcript.

6) Declaration of Vance L. Vogel (redacted), marked Exhibit 8, 8/24/17.

7) Declaratory Ruling and Order, FCC 15-72, adopted June 18, 2015.

8) Public Notice by the FCC, DA 14-1700, CG Docket No.; 02-278, WC Docket No. 07-135, released November 24, 2014.

9) Popular Mechanics 1942 "Phone Does Its Own Dialing When Lever Is Pushed", https://books.google.com/books?id=stYDAAAAMBAJ&pg=PA70&dq=popular+Mechanics+1942+Short&hl=en&ei=SnahTLSMIoifnQfxu6SJBA&sa=X&oi=book_result&ct=result&resnum=7&ved=0CEIQ6AEwBg#v=onepage&q=popular%20Mechanics%201942%20Short&f=true.

10) https://www.merriam-webster.com/dictionary/robocall.

11) https://www.prnewswire.com/news-releases/scams-rising-as-consumers-hit-by-nearly-25-billion-robocalls-nationwide-300557597.html.

12) https://www.consumer.ftc.gov/blog/2015/08/whats-deal-rachel-card-services-your-top-3-questions-answered.

13) H.R. REP. 102-317, 6.

14) 16 C.F.R. § 310.4 Abusive telemarketing acts or practices. Effective June 13, 2016.

15) S. Rep. No. 102-178, 102d Cong., 1st Sess. (1991).

16) Becca J. Wahlquist, *The Juggernaut of TCPA Litigation* (prepared for the U.S. Chamber Institute for Legal Reform) at 9, 8 (Oct. 2013).

17) 137 Cong. Rec. S18785-01, 137 Cong. Rec. S18785-01, S18786, 1991 WL 252593, 3.

18) https://www.fcc.gov/document/fcc-adopts-rules-help-block-illegal-robocalls.

19) https://www.fcc.gov/consumers/guides/stop-unwanted-calls-and-texts.

20) http://www.onecallnow.com/terms-and-definitions/robo-call-service/.

21) Spencer Weber Waller et. al., The Telephone Consumer Protection Act of 1991: Adapting Consumer Protection to Changing Technology, 26 Loy. Consumer L. Rev. 343, 352 (2014).

22) Letter from Lois Greisman, Associate Director, Division of Marketing Practices, Federal Trade Commission, dated November 10, 2016, to Mr. Michael Bills, CEO, Call Assistant, LLC.

23) Letter from Lois Greisman, Associate Director, Division of Marketing Practices, Federal Trade Commission, dated September 11, 2009, to Mr. Michael Bills, CEO, Call Assistant, LLC.

24) Telemarketing Sales Rule ("TSR"), 73 FR 51164-01, Friday, August 29, 2008, page 5, Section 2.

25) 137 Cong. Rec. H11307-01 (1991), Tuesday, November 26, 1991, page 15.

# EXHIBIT B

# EXHIBIT B



# Curriculum Vitae

**Kenneth R. Sponsler, CECP, CIPP/US**
**CompliancePoint, Inc.**
**4400 River Green Parkway, Suite 100**
**Duluth, GA 30096**
**(770) 255-1020**
**www.compliancepoint.com**
ksponsler@compliancepoint.com

**Current Employment:**

Senior Vice President of CompliancePoint, Inc., a global professional services firm specializing in consulting and audit services.

**Education:**

120 hours of undergraduate study; 4.0 GPA (no degree conferred) University of Maryland; Troy University; City College of Chicago; Park University.

**Registrations, Licenses, Certifications:**

- Customer Engagement Certified Professional (CECP) by the Professional Association for Customer Engagement (PACE)
- Certified Information Privacy Professional (CIPP/US) by the International Association of Privacy Professionals (IAPP)
- Certified American Teleservices Association Self-Regulatory Organization Auditor (ATASRO)

**Specialized Training:**

- U.S. Army Command Sergeant Major Course; First in Class
- Advanced Non-Commissioned Officers' Course; Distinguished Graduate

**Professional Experience:**

18 years of general consultation practice concerning U.S. federal and state telemarketing operational compliance with a variety of national and global companies. Provides regulatory and operational compliance consulting services for telemarketing, email, mail, fax, SMS/text communications, and debt collection matters. Ken Sponsler has been designated as an "expert" in U.S. Federal District Court and provided expert opinions in numerous TCPA and TSR-related matters. CompliancePoint specializes in seller and telemarketer compliance, call center operations, compliance assessments, audits, and forensic call and call abandonment

DECLARATION BY KEN SPONSLER

data analysis, with a focus on operational assessments, risk identification, gap analysis, and implementation of compliance policies, procedures and strategies. The consulting practice includes seller/service provider relations, contracting, record keeping, training, monitoring, and enforcement. Effective November 1, 2017 Ken serves as the Vice Chairman of the board and member of the Executive Committee of the National Board of Directors at PACE. Additionally, Ken has provided consulting services to government and military organizations implementing U.S. Army modularity design and organizational changes. A retired U.S. Army Command Sergeant Major, he concluded his career as the Senior Enlisted Leader of the 3rd Infantry Division, leading a 23,400-man elite combat team.

**Publications and Webinars (including CompliancePoint products):**
- *2016 Compliance Review - 2017 Forecast, Regulatory Updates, Feb 2017*
- *Text Message Compliance Webinar – September 2016*
- *2014 Compliance Review - 2015 Forecast, Regulatory Updates, Feb 2015*
- *2013 Compliance Review - 2014 Forecast, Regulatory Updates, Feb 2014*
- *Strategies For Compliance With New TCPA Requirements, March 2012*
- *Employment Placement Verification, February 2012*
- *2011 Compliance Legislation Review & 2012 Forecast, January 2012*
- *What Impacts Will The TCPA Changes Have On Your Business? Feb 2012*
- *Periodic Regulatory Information Charts*
- *Monthly Compliance Article for customer distribution (2007 – 2014)*


**Awards/Honors:**
- PACE 2016 Pioneer Award for the Difference Ken's Dedication and Support has made with PACE and the Industry, awarded by Professional Association of Customer Engagement
- PACE 2014 Chairman's Award for Distinguished Leadership and Service to the Industry
- Hewlett Packard Vendor of the Quarter Award (to CompliancePoint), 2007
- 18 separate personal awards by the US Army, including the Legion of Merit


**Memberships:**
- *American Teleservices Association* (now PACE)
  - Vice Chair and member of the Executive Committee
  - Member, Self-Regulatory Organization Trustee
  - Federal Legislative Committee Member
  - State Legislative Committee Member
  - "Do Not Call" Implementation Committee Member
  - Compliance Officer's Forum Member

DECLARATION BY KEN SPONSLER

- *International Association of Privacy Professionals*
  - Consumer Marketing Working Group
- *Direct Marketing Association*
  - Teleservices Committee Member


**Presentations and Colloquies**:

Frequent speaker at industry events, including PACE Annual Convention; Direct Marketing Association Teleservices Conference; College of Information Assurance Professional's Governance; Risk and Compliance Summit; Noble Users' Conference; and Quarterly Compliance Focused Webinar Presentations.

DECLARATION BY KEN SPONSLER

# EXHIBIT C

# EXHIBIT C



4400 River Green Parkway
Suite 100
Duluth, GA 30096
(800) 585-4888 *toll-free*
(770) 255-1094 *office - direct dial*
(770) 363-7149 *mobile*
ksponsler@compliancepoint.com
www.compliancepoint.com

February 2018

**Ken Sponsler - Rates**

| Service | Fee |
|---|---|
| Non-testifying expert consultant | $500 per hour |
| Expert witness, consulting | $500 per hour |
| Expert report, development, preparation, and review | $500 per hour |
| Deposition preparation and testimony at deposition | $700 per hour |
| Court room testimony, arbitration or trial | $1,000 per hour |
| Travel time in support of case-related requirements | $200 per hour |
| Administrative support and regulatory research | $100 per hour |
| Reasonable and required expenses incurred during the course of retention | Due upon receipt of invoice (issued at the end of each month). |
| Other expenses | As agreed during engagement. |
| Retainer | Not required |

DECLARATION BY KEN SPONSLER