IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ANGEL BAKOV and JULIE
HERRERA, individually and on
behalf of all others
similarly situated,

                Plaintiffs,

          v.

CONSOLIDATED WORLD TRAVEL,
INC. d/b/a HOLIDAY CRUISE
LINE, a Florida Corporation,

                Defendant.

Case No. 15 C 2980

Judge Harry D. Leinenweber

## MEMORANDUM OPINION AND ORDER

In this class action lawsuit, Plaintiffs Angel Bakov, Julie Herrera, and Kinaya Hewlett (collectively, the "Plaintiffs") allege that Defendant Consolidated World Travel Inc., d/b/a Holiday Cruise Line, Inc. ("Defendant"), directed an Indian company called Virtual Voice Technologies Pvt. Ltd. to place phone calls to Plaintiffs and potential class members without prior express written consent in violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq*. Plaintiffs now seek class certification under Federal Rule of Civil Procedure 23(b)(3), and also move to exclude the expert opinion testimony of Kenneth R. Sponsler. Defendant responds that the Court lacks jurisdiction over a nationwide class, and that Plaintiffs have failed to meet

the requirements of Rule 23(a) and 23(b)(3). Defendant also moves to exclude the expert opinion testimonies of Colin Weir, Randall Snyder, and Christina Peters-Stasiweicz. For the reasons stated herein, Plaintiffs' Motion for Class Certification (Dkt. No. 165) is granted in part and denied in part. The Court certifies the class as to the claims of the Illinois residents, but lacks jurisdiction over Defendant as to the claims of the nonresident, proposed class members. Plaintiffs' Motion to Exclude the Testimony of Kenneth R. Sponsler (Dkt. No. 169) is denied. Defendant's Motion to Exclude the Testimony of Randall Snyder (Dkt. No. 172) is granted. Defendant's Motions to Exclude the Testimonies of Colin Weir (Dkt. No. 170) and Christina Peters-Stasiweicz (Dkt. No. 171) are denied.

## I. __STATEMENT__

### A.  The Telephone Consumer Protection Act

The Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, is a consumer protection statute designed to prohibit a business's use of automated technologies or prerecorded telephone calls. Pub. L. No. 102-243, 105 Stat. 2394. Congress found that such a general prohibition was "the only effective means of protecting telephone consumers from this nuisance and privacy invasion." *Id.* Specifically, the TCPA bans use of prerecorded messages:

> It shall be unlawful for any person within the United States . . .
>
> (A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using . . . *prerecorded voice* . . . (iii) to any telephone number assigned to a . . . cellular telephone service . . .
>
> (B) to initiate any telephone call to any residential telephone line using . . . *prerecorded voice* to deliver a message without the prior express consent of the called party[.]

47 U.S.C. § 227(b)(1)(A)-(B) (emphasis added). Pursuant to Section 227(b)(1)(B), the Federal Communications Commission ("FCC") promulgated a comprehensive set of rules governing telemarketing and telephone solicitation, including 47 C.F.R. § 64.1200, which requires "prior express written consent" for such calls. The phrase "prior express written consent" is defined as follows:

> [A]n agreement, in writing, bearing the signature of the person called that clearly authorizes the seller to deliver or cause to be delivered to the person called advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice, and the telephone number to which the signatory authorizes such advertisements or telemarketing messages to be delivered.

47 C.F.R. § 64.1200(f)(8).

There are limits to the TCPA and FCC's ban on the use of prerecorded voice messaging in telemarketing, but those limits

must be raised as affirmative defenses for which defendants bear the burden of proof. *See Blow v. Bijora, Inc.*, 855 F.3d 793, 803 (7th Cir. 2007). When no exceptions apply, the TCPA grants consumers a private right of action to seek injunctive relief and a minimum of $500 in damages for each violation of the statute or FCC regulation. 47 U.S.C. § 227(b)(3). If the defendant knowingly and willfully violates the TCPA, a court has the discretion to award treble damages. *Id.* With this backdrop in mind, the Court proceeds with the facts of the case.

### B. Factual Background

From December 29, 2014, through March 20, 2016 (the "Class Period"), Defendant Consolidated World Travel, Inc. ("CWT" or "Defendant") employed an Indian company called Virtual Voice Technologies Pvt. Ltd. ("VVT") to call millions of people in the United States and offer anybody who was interested "a free cruise simply to show you a great time." (Consol. Class Action Compl. ("Compl.") ¶ 1, Dkt. No. 31; VVT Prompts at VOGEL-0011, Ex. 1 to Pls.' Mot. for Class Cert., Dkt. No. 165-1.) The vacation package included a supposedly free two-night cruise for two aboard the Grand Celebration cruise liner to be purchased for the cost of the port fees ($59.00 per person). (*See* Julie Herrera Email, Ex. 5 to Pls.' Mot. for Class Cert., Dkt. No. 165-5.) VVT's calls all began with the same introduction: "Hi, this is Jennifer with Holiday

- 4 -

Cruise Line on a recorded line. Can you hear me okay?" (*Id.*) Jennifer, however, was not a real person speaking in real time on the other end of the phone call. Instead, VVT agents utilized software to play recordings of a professional voice actor reading from a script approved by CWT.

### 1. VVT Software

VVT call centers used a type of "soundboard" telemarketing technology called Virtual Voice Technology software ("VVT Software") to play "voice-assisted prompts that were scripted out and recorded prior." (Jennifer Poole Dep. 70:12-7:12, Ex. 14 to Pls.' Mot. for Class Cert, Dkt. No. 165-14.) "That capability was important when agents spoke English as a second language and spoke with a noticeable foreign accent." (Kenneth Sponsler Report, Ex. 22 to Pls.' Mot. for Class Cert., Dkt. No. 165-22; *see also* Vance Vogel Dep. 117:17-19, Ex. 15 to Pls.' Mot. for Class Cert., Dkt. No. 165-15 (agreeing that VVT agents had heavy Indian accents).) VVT agents accessed the VVT Software like a regular web page. (Clifford Albright Dep. 31:12-32:1, Ex. 16 to Pls.' Mot. for Class Cert., Dkt. No. 165-16.) They entered their username and password, which directed VVT agents to the main screen from which they could make and transfer calls:

> It's a screen that has a dial next button on it, and then it has a bunch of voice prompt buttons. And then so you dial next, the phone rings. When the person answers,

> you hit the first recording which is the hello greeting,
> and then you go down to the required prompts. There's
> about 40 of them, various ones to use for various
> responses, and you click on the prompts to generate the
> customer's interest and get them qualified, and then you
> transfer the call.

(Vogel Dep. 75:7-23.) The Software is "self-explanatory" and "designed in a way to be pretty much idiot proof . . . press button 1, then go to button 2, dial next button 3, dial next—there's not really a lot of training involved." (Vogel Dep. 62:6-8.)

VVT agents could choose between forty-seven different voice messages on the main screen. (*See generally* VVT Prompts.) The messages vary from an initial greeting ("Hi, this is Jennifer . . .") to inquiring about the caller's interest (". . . wouldn't you be interested in a free cruise to the Bahamas?") to completing a final transfer to CWT ("This looks really good. Congratulations you do qualify for the free cruise . . . But I just want to tell you that there is nothing like a cruise to the Bahamas. So I am going to place you on a brief hold to connect you to the cruise specialist."). (VVT Prompts at VOGEL-0011.) The messages also include basic interjections ("Hold on" and "could you repeat that?") and other discrete disclosures ("you should know that I'm not selling anything," "I'm a real person," and "I'm assisted by prerecorded audio."). (VVT Prompts at VOGEL-0011-13.)

### 2. *VVT Calls*

The record shows that VVT agents could make multiple calls simultaneously. Clifford Albright, who created the VVT Software, posits that VVT agents can make such calls by logging into two different computers at the same time and by wearing two headsets. (Albright Dep. 48:1-12, 5015-22.) Vance Vogel, who assisted Albright in training VVT agents to use the Software, agreed. (Vogel Dep. 88:1-11 ("Q: Is it possible using the VVT software for one agent to make two calls at the same time? . . . A: Yes.").) Albright and Vogel also agreed that VVT agents did, in fact, make such simultaneous calls with consumers. (Albright Dep. 48:13-49:4; Vogel Dep. 88:11-89:13.) As part of an onboarding process for new call centers, Albright and Vogel oversaw and fulfilled VVT's requests for multiple logins per agent. (Vogel Dep. 89:17-90:11.) Apparently, these multiple login requests signified to Albright and Vogel that VVT agents were making more than one call at a time. (*Id.*) CWT's expert Kenneth Sponsler asserts, however, that Albright and Vogel denied VVT agents were making calls in such a manner. (*See* Sponsler Supp. Decl., Ex. D to Def.'s Resp. to Pls.' Mot. to Strike, Dkt. No. 187-4.) The Court will discuss the conflicting evidence when appropriate in its analysis but recites the conflict here for convenience of the reader.

VVT agents also could—and from time to time did—unmute the VVT System and use their own voices to speak with consumers. (Kenneth Sponsler Dep. 52:11-22, Ex. B to Def.'s Resp. to Pls.' Mot for Class Cert., Dkt. No. 180-2.) Though, it seems, they rarely did this for lack of authorization. Pursuant to their agreement with CWT (*See* Advertising Agreement, Ex. 3 to Pls.' Mot for Class Cert., Dkt. No. 165-3), VVT agents were required to stick to the script they were provided (*See* Poole Dep. 84:11-16) ("Q: And VVT was not allowed to improvise, they were not allowed to say anything on the phone that Holiday Cruise Line didn't already approve in writing; is that correct? A: Correct.")). VVT agents were instructed to play the first prerecorded prompt when the consumer picked up the phone. (*See* Vogel 75:17-20 ("When the person answers, you hit the first recording which is the hello greeting, and then you go down to the required prompts.").) Moreover, the agents were required to play certain prompts in order to transfer the call to CWT, which would secure their commission. (*See* Albright 53:6-9 ("Q: So there's certain prompts they have to go through for each call before they're allowed to transfer? A: Yes.").)

### 3. *Plaintiffs and the Class Members*

Plaintiffs' records show that they received the allegedly prerecorded calls from VVT agents during the Class Period. (*See* Angel Bakov Decl. ¶¶ 4-5, Ex. 29 to Pls.' Mot for Class Cert.,

Dkt. No. 165-29; Julie Herrera Decl. ¶ 6, Ex. 30 to Pls.' Mot for Class Cert., Dkt. No. 165-30; Kinaya Hewlett Decl. ¶¶ 3-4, Ex. 31 to Pls.' Mot for Class Cert., Dkt. No. 165-31.) Their records also show that they each answered those calls. (*See* Bakov Decl. ¶¶ 4-8; Herrera Decl. ¶¶ 6-7; Hewlett Decl. ¶¶ 3-4, 6-8.) None of the Plaintiffs provided consent for CWT, through the VVT agents, to call them. (*See* Bakov Decl. ¶ 10; Herrera Decl. ¶ 12; Hewlett Decl. ¶ 9.)

During the Class Period, VVT apparently transferred 1,649,312 calls to CWT's call center in exchange for commission. Plaintiffs' Expert Colin Weir analyzed call records obtained from telephone carriers for CWT's call centers and identified unique telephone numbers for 928,023 of those transferred calls. (Colin Weir Decl. ¶ 9, Ex. 18 to Pls.' Mot. for Class Cert., Dkt. No. 165-18.) The overall number of outbound calls VVT made is unknown, but that number is sure to be much higher than the number of calls VVT transferred. (*See* Vogel Dep. 126:4-5 ("The vast majority of people aren't interested[.]").) As was the case for the individual Plaintiffs, the record fails to show that CWT obtained any form of consent from the proposed class members for VVT to make such calls.

As a result of the foregoing, Plaintiffs brought the instant suit, seeking various forms of relief, including an injunction requiring CWT to "cease all unsolicited calling activities," and

an award of statutory damages and trebled actual damages to the class members under the TCPA. (Compl. ¶ 4.) Plaintiffs now move to certify the following class:

> All persons in the United States (1) who VVT called from December 29, 2014 through March 20, 2016, to market a cruise aboard the Grand Celebration cruise liner sold by CWT, and (2) who answered such calls.

(Pls.' Mot. for Class Cert. at 2.) Plaintiffs also move to strike the expert opinion testimony of Kenneth R. Sponsler, and CWT moves to strike the expert opinion testimonies of Colin Weir, Randall Snyder, and Christina Peters-Stasiweicz. In its opposition to Plaintiffs' Motion for Class Certification, CWT also raises a jurisdictional challenge. For sake of clarity and analytical development, the Court will consider first the admissibility of the expert opinion testimonies, then CWT's jurisdictional objection, and finally the merits of class certification.

## II. <u>DISCUSSION</u>

### A. **Expert Opinion Testimony**

The Court considers first the admissibility of expert opinion testimony, including that of CWT's expert Kenneth R. Sponsler, and that of Plaintiffs' experts Colin Weir, Randall Snyder, and Christina Peters-Stasiweicz. Exclusion of expert testimony is governed by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Rule 702 provides

that a qualified witness—one with the appropriate knowledge, skill, experience, training, or education—may testify in the form of an opinion if "(a) the expert's scientific, technical, or otherwise specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." FED. R. EVID. 702. To determine whether the opinion is admissible under this Rule, the Court must consider whether (1) the witness is qualified; (2) the expert's methodology is reliable; and (3) the testimony will assist the trier of fact to understand the evidence or determine a fact in issue. *Myers v. Ill. Cent. R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010).

It bears emphasizing that Rule 702 is "flexible." *Daubert*, 509 U.S. at 594. The Court must make sure not to abrogate the role of the jury as it examines the admissibility of the evidence. *See Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 894 (7th Cir. 2011). In particular, "[t]he soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th

Cir. 2000). In other words, "[d]eterminations on admissibility should not supplant the adversarial process; 'shaky' expert testimony may be admissible, assailable by its opponents through cross-examination." *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010). Finally, the proponent of testimony bears the burden of persuading the Court that the proffered testimony should be admitted. *Lewis v. CITGO Petroleum Corp.*, 461 F.3d 698, 705 (7th Cir. 2009).

### 1. *Testimony of Kenneth R. Sponsler*

Kenneth R. Sponsler ("Sponsler") is CWT's TCPA compliance expert. Sponsler's report asserts several opinions, which include: (1) CWT was not delivering robocalls or prerecorded message blasts; (2) the VVT Software is not "akin to the technology" that the TCPA sought to eliminate; (3) Plaintiffs' expert Randall Snyder proffered erroneous testimony; (4) the VVT Software does not "encroach upon" TCPA regulations and FCC concerns regarding prerecorded message; and (5) the VVT Software requires significant human intervention. (Sponsler Report ¶ 1.) Plaintiffs move to exclude Sponsler's testimony on two grounds: First, they assert Sponsler's opinions are not based on sufficient facts and, second, they contend his opinions are contrary to the law. The Court will address each argument separately.

- 12 -

Plaintiffs first argue that Sponsler did not base his opinions on the purported fact that "VVT agents were making *multiple* calls at the same time." (Pls.' Mot. to Strike Sponsler Test. at 5-10, Dkt. No. 169.) Plaintiffs rely on the testimony of two independent contractors—Vance Vogel and Clifford Albright—who trained VVT agents to use the VVT Software that facilitates the calls at issue. Vogel and Albright testified that it was possible that VVT agents could conduct two calls at the same time using the Software. (*See* Vogel Dep. 88:1-11; Albright Dep. 29:1-12.) They also testified that VVT agents actually did run two calls with consumers at the same time. (*See* Vogel Dep. 88:11-89:13; Albright Dep. 48:13-49:4.) Nevertheless, Plaintiffs contend Sponsler's opinion rests on the assumption that VVT agents were making only one call at a time and that it was impossible for one agent to make more calls simultaneously. CWT responds by pointing to a series of statements within Vogel and Albright's testimony that it contends contradicts Plaintiffs' argument. CWT also submits Sponsler's Supplemental Declaration, which purportedly shows that Sponsler asked Albright if agents were making multiple calls at the same time and Albright answered in the negative. (*See* Sponsler Supp. Decl.) The Court need not delve deep into the factual morass the parties present, however, because it finds that whether VVT agents were making more than one call at a time is a factual dispute better left for the

jury. Cross-examination can better serve the jury in understanding the various characterizations of the facts and opinions derived from them. Moreover, this type of dispute goes to the weight and not the reliability of Sponsler's testimony under *Daubert*. *See In re Fluidmaster, Inc., Water Connector Components Prod. Liabl. Litig.*, No. 14-CV-5696, 2017 WL 1196990, at *23 (N.D. Ill. Mar. 31, 2017) (citing *Smith*, 215 F.3d at 718). Accordingly, Plaintiffs' first argument fails.

Plaintiffs next argue that Sponsler's testimony should be excluded because he relies on a series of mistaken assumptions regarding the applicable law. Sponsler derived his opinion based on his review of the TCPA's legislative history, the state of technology at the time Congress passed the TCPA and how technology has developed since then, and developments in the law interpreting the TCPA and similar provisions, including FCC and FTC rulings. (*See generally* Sponsler Report.) Plaintiffs first attack Sponsler's reliance on a September 11, 2009, opinion letter issued by the Federal Trade Commission (the "2009 FTC Letter"). They assert that the 2009 FTC Letter did not address TCPA enforcement, nor was it issued by the government body that enforces and interprets the TCPA (which is the FCC). Plaintiffs are correct; however, these assertions should not preclude Sponsler from considering the 2009 FTC Letter in his analysis. The FTC enforces

- 14 -

and interprets the Telemarketing Sales Rules ("TSR"), which govern the permissibility of prerecorded telemarketing messages. FTC guidelines regarding such Rules are not in conflict with the FCC and "entities subject to the authority of both agencies need only comply with the FTC's more restrictive requirements to ensure compliance with both agencies' rules." In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 27 F.C.C. Rcd. 1830, 1836 (2012) (citing Telemarking Sales Rule, Final Rule Amendments, 73 Fed. Reg. 51164, 51172 n.104 (2008)). Sponsler's expertise covers both the TCPA and TSR, so his consideration of the TSR and 2009 FTC Letter is neither misplaced nor unfounded. Plaintiffs' argument misses the mark.

Plaintiffs next contend that Sponsler's analysis of the capacity of the VVT Software "to deliver a prerecorded voice message without 'human intervention'" and "to deliver a large number of calls in a short period" are irrelevant because capacity and human intervention "relate exclusively to autodialers." (Pls.' Mot. to Strike Sponsler Test. at 12.) They also argue that Sponsler's use of the term "robocall" constitutes a mistake of law. But, again, whether or not these assertions are accurate is a process better left for trial. Plaintiffs can press these points when cross-examining Sponsler to better evaluate the weight of his opinion. For present purposes, Plaintiffs' arguments are

- 15 -

effectively a disagreement with Sponsler's conclusions, which is not a basis for exclusion. *See In re Fluidmaster, Inc., Water Connector Components Products Liability Litigation*, 2017 WL 1196990, at *23 ("[A]n opinion is not inadmissible simply because defendants disagree with its conclusion.") (quoting *Paul v. Holland Am. Line, Inc.*, No. C05-2016RSM, 2006 WL 3761368, at *3 (W.D. Wash. Dec. 21, 2006)).

For the foregoing reasons, the Court finds that Sponsler's testimony is admissible under Rule 702.

### 2. *Testimony of Colin Weir*

Colin Weir ("Weir") is one of Plaintiffs' experts. Plaintiffs hired Weir to "aggregate and analyze" account invoices and call detail records that Plaintiffs received after subpoenaing telephone carriers servicing CWT. (Weir Decl. ¶¶ 6-8.) Weir used computer-assisted methods to report the number of calls and unique telephone numbers transferred to CWT's "point to" numbers—the phone numbers VVT agents used to transfer calls to CWT's call center—during the Class Period. (*Id.*) He also "validated and connected numbers to ensure that they comprise a valid US area code and Central Office code (NPA-NXX) pursuant to the North American Numbering Plan." (*Id.*) Weir concluded that "1,051,227 calls connected to the 'point to' number analyzed," or 959,609 calls when "[e]xcluding connected calls to the same telephone

- 16 -

number on the same day." (Weir Decl. ¶ 9.) Weir also found that during CWT's Holiday Cruise Line campaign, a total of 1,674,565 calls were transferred to CWT's call centers. (Weir Decl. ¶ 10.)

CWT moves to exclude Weir's testimony on two grounds: (1) Weir cannot be an expert witness because he did not rely on his expertise or qualifications in reaching his conclusions, and (2) Weir's method for collecting phone numbers was unreliable. Each argument will be discussed in turn.

Turning to the first argument, the Court notes that "[a]n expert's opinion is helpful only to the extent the expert draws on some special skill, knowledge, or experience to formulate that opinion; the opinion must be an expert opinion (that is, an opinion informed by the witness' expertise) rather than simply an opinion broached by a purported expert." *United States v. Benson*, 941 F.2d 598, 604 (7th Cir. 1991), *amended on other grounds,* 957 F.2d 301 (7th Cir. 1992). "[E]xpert testimony does not assist the trier of fact when the jury is able to evaluate the same evidence and is capable of drawing its own conclusions without the introduction of a proffered expert's testimony." *Aponte v. City of Chicago*, No. 09 C 8082, 2011 WL 1838773, at *2 (N.D. Ill. May 12, 2011). Here, CWT contends that Weir's testimony required no expertise because "he did nothing more than summarize, organize, and 'tabulate' phone

- 17 -

numbers." (Def.'s Mot. to Strike Weir Test. at 4, Dkt. No. 170.)
The Court disagrees.

Weir's aggregation and analysis of call data required a background in data analysis. In conducting his analysis, Weir explains that he took the following steps:

> Step 1 was to take this PDF document . . . and to translate that into a usable database, which I did using the statistical software package called Stata. That gave me a list in digital form of each point to number, the relevant carrier and the state and end date when calls to that number would be related to . . . this litigation. . . . Once the data was imported, the data was restructured to be in helpful and usable formats in a consistent way across all carriers and all datasets. And then . . . I use a database method called Merge that takes the sets of data and what we would do is take the point to number list . . . and merge that with each of the carrier dataset. And what we would get is a . . . flag in the database for any call that was placed to one of these point to numbers during the relevant time period . . . Once those flags are in place to identify calls that met the criteria . . . the database software can tabulate the number of unique end user telephone numbers that meet those criteria as well as the number of telephone calls that were transmitted to the various point to numbers.

(Colin Weir Dep. 59:1-60:20, Ex. 2 to Pls.' Resp. to Def.'s Mot. to Strike Weir Test., Dkt. No. 183-2.) Weir's "expertise in data analytics . . . allows for the manipulation of that data through database programs in order to tabulate the data." (Weir Dep. 20:3-10.) Without that background, an individual would be unable to

perform this process. As such, Weir serves as "an expert in how he *gathered* this information." *See U.S. v. Sears Hdg. Corp.*, No. 09-cv-588, 2013 WL 12291533, at *4 (S.D. Ill. Nov. 22, 2013) (finding individual that was "retained to review voluminous business records" was "an expert in how he gathered this information, which includes merging databases, making a master database, and making inquiries off of the database to draw out information that is relevant to the issues in this case") (emphasis added).

Moreover, Weir's testimony can assist the jury in understanding the complicated process of VVT calling and transferring calls to "point to" numbers belonging to CWT's call centers. *See U.S. v. Hall*, 93 F.3d 1337, 1342 (7th Cir. 1996) (finding that if "the expert testimony would be helpful and relevant with respect to an issue in the case, the trial court is not compelled to exclude the expert just because the testimony may, to a greater or lesser degree, cover matters that are within the average juror's comprehension"). It is unlikely that a jury will be able to draw its own conclusions from looking over the hundreds of thousands of call data without the assistance of Weir's testimony. *Aponte*, 2011 WL 1838773, at *2. Accordingly, the Court finds that Weir qualifies as an expert and that he relied on his expertise in reaching his conclusions.

CWT nevertheless argues that the information Weir relied on in reaching his conclusions was unreliable. District courts are given "wide latitude in performing [their] gate-keeping function and determining both how to measure the reliability of expert testimony and whether the testimony itself is reliable." *Bielskis*, 663 F.3d at 894 (citation omitted). Here, CWT asserts that Weir did not contact the subpoenaed service providers—Sprint, InContact, and Matrix Telecom—to verify the meaning of the terms in their records. (*See* Weir Dep. 67:11-2, 80:22-81:6; 94:6-16.) His failure to do so allegedly resulted in an unreliable assumption of the meaning of the terms in the records.

In conducting his analysis, Weir relied on four categories of data: "the [1] date and [2] time of the call as well as [3] the originating number, which indicates the party that was called by VVT, and then [4] the dialed number, which is an indicator of the point to number." (Weir Dep. 82:3-13.) These are the headings that CWT now assert Weir should have verified. It seems to the Court, however, that these headings speak for themselves. They are written in plain English and carry straightforward meanings. Weir found no reason to ask for additional clarification (*see* Weir Dep. 67:16-21), and CWT fails to give any reason why Weir's interpretation of such headings was false or competed with an alternative interpretation. Moreover, Weir has had extensive experience

working with similar phone records, which contributed to his understanding of these headings. (*See* Weir Dep. 66:2-9, 66:15-18.) Weir's interpretation of the carrier records is sufficient. *See Cage v. City of Chicago*, 979 F. Supp. 2d 787, 803 (N.D. Ill. 2013) ("[A]n expert witness may opine on the accepted meaning . . . of a word or phrase within a particular industry based on his or her experience or training."). CWT's argument fails.

For the foregoing reasons, the Court finds that Weir's expert opinion testimony is admissible under Rule 702.

### 3. *Testimony of Randall Snyder*

Randall Snyder ("Snyder") is Plaintiffs' telecommunication expert. Snyder offers two opinions: (1) the VVT calls at issue in this case were made using a prerecorded voice; and (2) the identities and contact information of consumers who VVT called "can be clearly and definitively determined based solely on a telephone number, and the ability to do so is a straightforward administrative task." (Snyder Decl. at ¶¶ 10-11, Ex. A to Def.'s Mot. to Strike Snyder Test., Dkt. No. 172-1.) CWT moves to exclude both of Snyder's opinions. The Court will discuss each opinion separately.

#### a. *Opinion 1: Prerecorded Voice*

As for Snyder's first opinion, CWT argues that (1) determining whether the calls were made using prerecorded voice is obvious and

does not require an expert opinion, and (2) Snyder's methodology for reaching that opinion was unreliable. The Court will address each argument in turn.

CWT first points to the fact that Snyder himself testified that an expert is not required to find "that a person in a studio making a recording and then playing it on a call constitutes a prerecorded voice." (Randall Synder Dep. 22:8-21, Ex. B to Def.'s Mot to Strike Snyder Test., Dkt. No. 172-2.) Snyder further stated: "I even recommended to plaintiffs' counsel, I'm not trying to gouge them for money and get paid for something I don't need to do, I even recommended that they don't need to hire me to write a report." (*Id.*) Finally, Snyder stressed that it was "evident" to him that the calls used prerecorded voices "based on the available testimony and documentation." (*Id.*)

CWT's argument on this subject is misguided. An expert's testimony is admissible "if it will assist the trier of fact to understand the evidence or to determine a fact in issue." *United States v. Curry*, 977 F.2d 1042, 1050 (7th Cir. 1992) (citing FED. R. EVID. 702). However, an expert "must testify to something more than what is 'obvious to the layperson' in order to be of any particular assistance to the jury." *Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 871 (7th Cir. 2001) (quoting *Ancho v. Pentek Corp.*, 157 F.3d 512, 519 (7th Cir. 1998)). Here, Snyder's opinion

that an expert is not required to determine that the calls were prerecorded is irrelevant. He is not serving as an expert for whether expert testimonies are obvious or not to a jury, or should or should not be admissible, and he was never retained for that purpose. It may well be that Snyder believes his opinion was derived from common sense, but what is common sense to him may not be common sense to someone else. The crucial point of inquiry is whether Snyder's opinion that the calls were prerecorded would be "obvious to the layperson," not a telecommunications expert like himself. *Dhillon*, 269 F.3d at 871. The Court need not determine whether Snyder's opinion is obvious to a layperson, however, because it finds CWT's second argument dispositive.

CWT argues that Snyder's methodology in reaching his opinion was unreliable, and the Court agrees. Snyder only reviewed testimony and documents, he never observed nor listened to the so-called prerecorded calls, nor otherwise experienced the VVT Software. He stated the following as the basis for his opinion: "There was so much testimony of statements that said, 'Here's the prerecorded voice we would play on a call,' things like that, it was so evident.'" (Snyder Dep. 23:6-19.) An expert opinion that simply accepts and regurgitates facts without any testing, corroboration, or analysis is suspect and fails to satisfy Rule 702. *See Dixon ex rel. Dixon v. Cook Cty.*, No. 09 C 6976,

2012 WL 4464460, at *3 (N.D. Ill. Sept. 25, 2012) (finding that an expert who "merely state[s] a fact and then provide[s] a conclusion, without providing any analysis as to how [they] reached such a conclusion" fails to satisfy Rule 702 and the *Daubert* standard); *see also Lang v. Kohl's Food Stores*, 217 F.3d 919, 924 (7th Cir. 2004) ("[E]xperts' work is admissible only to the extent it is reasoned, uses methods of the discipline and is founded on data . . . [t]alking off the cuff—deploying neither data nor analysis—is not an acceptable methodology.").

Moreover, Snyder's opinion lacks the proper foundation. Snyder testified that he relied only on the text of the TCPA in reaching his conclusion. Unlike CWT's expert, Kenneth Sponsler, Snyder considered neither rulings by the FCC nor the TCPA's legislative history. This alone is not dispositive; however, the word "prerecorded" is a term of law under the TCPA that carries certain penalties. Snyder has concluded that VVT's calls were prerecorded without ever having listened to them and without thoroughly analyzing and understanding whether the TCPA's use of "prerecorded" carries a meaning other than the one he bestowed upon it. Snyder even testified that his opinion is not framed by any expert experience or knowledge of the TCPA. (Snyder Dep. 23:20-24-4, 13:6-16.) Rather, his opinion is solely whether the calls were prerecorded as a matter of fact, not law. (Snyder Dep. 15:19-

16:20.) The jury can review the same documents that Snyder reviewed and even listen to the calls themselves to reach that same conclusion. Accordingly, Snyder's first opinion—that the calls were prerecorded—is inadmissible for lack of sound methodology and its unlikelihood to assist the jury in reaching a similar conclusion.

### b. Opinion 2: Identification of the Class

Snyder's second opinion—that the identities and contact information of consumers who CWT called "can be clearly and definitively determined based on a telephone number"—fares no better. Snyder derived this opinion through his exposure to and observance of a process utilized by Class Experts Group LLC ("CEG"), which Plaintiffs retained to identify class members. CWT argues that Snyder's second opinion should be stricken because (1) Snyder is not qualified to give it, and (2) his methodology is unreliable.

"Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Carrol v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990) (citation omitted). A court need not let an expert testify if it is not persuaded that the "expert has

genuine knowledge that can be genuinely helpful to the jury." *Wilson v. City of Chicago*, 6 F.3d 1233, 1238-39 (7th Cir. 1993).

Plaintiffs sought out Snyder to serve as their telecommunications expert. Snyder considers himself a "technology expert" in the telecommunications industry. (Snyder Dep. 10:21-24.) As such, CWT contends that it is not within Snyder's expertise to pontificate on the ability of the parties or this Court to identify class members by telephone numbers through the CEG method. CWT points to several of Snyder's statements: (a) "I'm not an expert in data analysis for the administration of class action lawsuits"; (b) CEG "is better qualified to render" opinions regarding "the process by which individuals would be identified using their telephone numbers" than he is; (c) CEG "are the true experts that perform this function"; (d) while he has "a general understanding" of CEG's process, "I'm not an expert in this area." (Snyder Dep. 47:1-18; 51:21-53:13, 95:17-96:1.) Based on Snyder's testimony, CWT contends that Snyder is not qualified to give his opinion on CEG's process of identifying class members through their telephone numbers.

The Court is inclined to agree. Snyder has never identified class members through their telephone numbers, claims not to fully understand the process for which it is done, and repeatedly states that he lacks the expertise on this subject generally.

- 26 -

Nevertheless, Plaintiffs argue that "Snyder is qualified to opine generally regarding whether class members can be identified with solely a telephone number . . ." and that "general opinions regarding this process are enough . . ." (Pls.' Resp. to Def.'s Mot. to Strike Snyder Test. at 9, Dkt. No. 181.) This argument is without teeth. To admit expert testimony, the expert must have specific, specialized knowledge of the subject matter, not a general understanding. *See Sports Arena Management, Inc. v. K&K Ins. Group, Inc.*, No. 06 C 6290, 2008 WL 4877452, at *3 (N.D. Ill. June 26, 2008) (excluding opinion from insurance claims expert testifying on insurers' underwriting practices, despite having a general understanding of such practices, because his "experience in the insurance industry was in claims, not underwriting"); *see also Higgins v. Koch Dev., Inc.*, 794 F.3d 697, 705 (7th Cir. 2015) (holding a treating physician was not qualified to testify as to effects of chlorine gas exposure). The record shows that Snyder does not have the expertise required to offer his opinion.

Moreover, even if Snyder was qualified to give such an opinion, the Court finds his methodology unreliable. Snyder relied on his experience with and observation of others performing the CEG process. (*See* Snyder Dep. 48:6-11; *see also* 106:6-19 ("I don't perform that task, [CEG] are the ones that do, they are the actual experts. What I'm opining on here again is from my personal

experience, my understanding of the methodology.").) Yet he is unable to testify as to the steps or details of the process. (Snyder Dep. 107:25-108:6, 111:16-19.) In fact, Snyder's testimony is replete with concessions that he cannot speak of the methodology used to identify class members in detail and lacks the expertise to conduct the process himself. At most, Snyder was exposed to others conducting this process of identification through his role overseeing others perform the process. (Snyder Dep. 54:8-55:4.) Since Snyder's opinions "are based solely on his own, admittedly tangential, experience, they are not sufficiently reliable to be admitted in this case." *Sports Arena Management*, 2008 WL 4877452, at *3.

For the foregoing reasons, the Court finds that Snyder's expert opinion testimony is inadmissible under Rule 702.

### 4. *Testimony of Christina Peters-Stasiweicz*

Plaintiffs secured Christina Peters-Stasiweicz as an expert to testify that it is possible to identify reliably class members by cross-referencing their phone numbers against multiple public and private data sources. Snyder first opined on the reliability of this process, but, as explained above, the Court excludes his opinion for lack of expert qualifications and unreliable methodology. Before deposing Snyder, however, CWT secured expert Margaret Daley to contradict Snyder's testimony. Daley testified

that Plaintiffs' proposed process of identifying class members was not reliable. To rebut Daley's opinion, Plaintiffs then secured the testimony of Peters-Stasiweicz, which is now at issue.

Peters-Stasiweicz is the Vice President of Class Experts Group, LLC ("CEG"), which provides litigation support services with a primary focus on data management and data analysis. (Christina Peters-Stasiweicz Decl. ¶ 1, Ex. A to Def.'s Mot. to Strike Peters-Stasiweicz Test., Dkt. No. 171-1.) She routinely analyzes call records to identify class members in TCPA cases. (Peters-Stasiweicz Decl. ¶ 3.) The process CEG uses, and Snyder opined about, identifies users of a given telephone number for a given timeframe and provides a current address for that person based upon their address history. (Peters-Stasiweicz Decl. ¶¶ 11-12.) That information is derived from data vendors, such as TransUnion, LexisNexis, Experian, Microbilt, and others. (Peters-Stasiweicz Decl. ¶ 13.) The data vendors access their database of public and private information to produce the relevant identification information. (Peters-Stasiweicz Decl. ¶ 14.) Peters-Stasiweicz draws from her experience utilizing this process to rebut Daley's opinion that the process is unreliable.

In its motion, CWT argues first that Peters-Stasiweicz's reply testimony should be excluded as an improper rebuttal. In the alternative, CWT contends that the Peters-Stasiweicz utilized an

unreliable methodology to derive her opinion, which inadmissible under Rule 702 and *Daubert*. The Court will consider each argument separately.

### a. *Improper Rebuttal*

To start, the Court notes that Plaintiffs and CWT agreed to an informal discovery schedule, which CWT itself proposed and which included an opportunity for Plaintiffs to serve their rebuttal expert disclosures in response to CWT's expert disclosures. *See* FED. R. CIV. P. 26(a)(2). "If, as here, the court's scheduling order permits rebuttal experts and opinions, a party may submit an expert rebuttal witness who is limited to contradicting or rebutting evidence on the same subject matter identified by another party in its expert disclosures." *See Cage*, 2012 WL 5557410, at *2 (internal quotation marks and citation omitted). Procedurally, the rebuttal was appropriate. Plaintiffs disclosed Peters-Stasiweicz as an expert at the appropriate time and in compliance with that joint and agreed to discovery schedule. (*See* Ex. 9 to Pls.' Resp. to Def.'s Mot to Strike Peters-Stasiweicz Test., Dkt. No. 182-9.)

CWT nevertheless asserts that Peters-Stasiweicz's testimony is an improper rebuttal because it contains "information that was required to be included in an initial expert report from Plaintiffs." (Def.'s Mot. to Strike Peters-Stasiweicz Test. at 4, Dkt. No. 171.) The Court disagrees. The proper function of rebuttal

evidence is "to contradict, impeach or defuse the impact of the evidence offered by an adverse party." *Peals v. Terre Haute Police Dep't*, 535 F.3d 621, 630 (7th Cir. 2008). The "focus is not on the similarity between the initial and rebuttal reports, but rather on whether the opinions expressed in a rebuttal report rebut the same subject matter identified in the other party's expert report." *Green v. Kubota Tractor Corp.*, No. 09 CV 7290, 2012 WL 1416465, at *5 (N.D. Ill. Apr. 24, 2012). Moreover, "Rule 26 does not automatically exclude evidence that an expert could have included in his original report as such a rule would lead to the inclusion of vast amounts of arguably irrelevant material in an expert's report on the off chance that failing to include any information in anticipation of a particular criticism would forever bar the expert from later introducing relevant material." *City of Gary v. Paul Shafer*, No. 2:07 CV 56, 2009 WL 1370997, at *5 (N.D. Ind. May 13, 2009) (internal quotation marks and citation omitted).

Here, Peters-Stasiweicz's testimony was offered to rebut Daley's testimony, specifically to challenge any notion that the process used to identify class members was unreliable. It also explained that information supplied by public and private data sources is routinely used in the context of TCPA class actions to identify class members. Finally, and most importantly, she testified that in her experience and to her personal knowledge,

the process itself and the data that is retrieved from it are reliable and accurate. "This is the very purpose of a reply report: to refute a defendant's expert's arguments and to provide further support, rather than abandoning, one's initial opinions." *Kleen Prod. LLC v. Int'l Paper*, 306 F.R.D. 585, 592 (N.D. Ill. 2015). Accordingly, CWT's argument fails.

### b. Methodology

CWT nevertheless argues that even if Peters-Stasiweicz's testimony is not considered an improper rebuttal, it must be excluded for lack of reliable methodology. In assessing the reliability of expert testimony, the Court looks to several factors such as whether the proffered theory can be and has been tested; whether the relevant expert community has accepted the theory; and whether the testimony relates to matters growing naturally and directly out of research conducted independently from the instant litigation. *Am. Honda Motor Co., Inc. v. Allen*, 600 F.3d 813, 817 (7th Cir. 2010).

Peters-Stasiweicz's proffered methodology for identifying class members in TCPA lawsuits has been tested, and courts in this District and around the country have found the method acceptable. *See Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. 240, 247 (N.D. Ill. 2014) (approving methodology using "the records of third-party phone carriers and third-party database providers" by

Peters-Stasiweicz's prior company for class member identification in TCPA case), *aff'd,* No. 17-1626, 2018 WL 3545146 (7th Cir. July 24, 2018); *see also Reyes v. BCA Fin. Servs., Inc.*, No. 16-cv-24077, 2018 WL 3145807, at *13 (S.D. Fla. June 26, 2018) (finding that Peters-Stasiweicz's prior company "employed generally reliable methodologies which entail, *inter alia*, performance of detailed statistical analysis and utilization of LexisNexis data that has been independently verified by [that] company"); *Abante Rooter & Plumbing, Inc. v. Alarm.com Inc.*, No. 15-cv-6314, 2017 WL 1806583, at *4 (N.D. Cal. May 5, 2017) (approving Peters-Stasiweicz's prior company's "use of Lexis Nexis" to identify class members); *Shamblin v. Obama For Am.*, No. 13-cv-2428, 2015 WL 1909765, at *3 (M.D. Fla. Apr. 27, 2015) (same); *Krakauer v. Dish Network, L.L.C.*, 311 F.R.D. 384, 391 (N.D.N.C. 2015) (approving use of "Lexis data to obtain the names and addresses of most persons associated with these numbers during the class period"). Those courts found that this methodology was reliable and "satisfied the strictures of *Daubert*." *Reyes*, 2018 WL 3145807, at *13. The Court finds this precedent persuasive.

CWT nevertheless contends that the reverse append process is "notoriously inaccurate, with rates of 41% or lower." (Def.'s Mot. to Strike Peters-Stasiweicz's Test. at 10; *see* Daley Decl. at ¶¶ 38-39.) In her deposition, Peters-Stasiweicz disagreed with

this finding, asserting that in her experience the process is approximately 84-86% accurate. (*See* Peters-Stasiweicz Dep. 25:6-26:14, Ex. 2 to Pls.' Resp. to Def.'s Mot. to Strike Peters-Stasiweicz's Test., Dkt. No. 182-2.) The disparity between those two numbers at first glance is concerning. Other courts have considered this issue, however, and have accepted an accuracy rate similar to Peters-Stasiweicz's figure. *See, e.g.*, *Abante Rooter*, 2017 WL 1806583, at *4 (finding that the process has a "14% error rate"); *Krakauer*, 2015 WL 5227693, at *9 (same). This Court will thus accept Peters-Stasiweicz's alleged rate of accuracy.

CWT also argues that Peters-Stasiweicz's opinions are unreliable because she has not substantiated her assertions that the data sources, such as LexisNexis data, are reliable and accurate. As Plaintiffs correctly point out, this argument goes to the weight and not admissibility of Peters-Stasiweicz's testimony. For purposes of admissibility, reliability "is primarily a question of validity of the methodology employed by an expert, not the quality of the data used in applying the methodology or conclusion produced." *Manpower, Inc. v. Insurance Co. of Penn.*, 732 F.3d 796, 806 (7th Cir. 2013). "The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on

summary judgment." *Id.* (quoting *Smith,* 215 F.3d at 718). Accordingly, an expert's reliance on allegedly faulty information is a matter to be explored on cross-examination. *Id.* at 809. CWT's argument fails.

For the foregoing reasons, the Court finds that Peters-Stasiweicz's expert opinion testimony is admissible under Rule 702.

### B. Class Certification

Class certification is appropriate where a plaintiff meets the four requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy of representation. FED. R. CIV. P. 23(a). Additionally, a plaintiff must satisfy one of three alternatives in Rule 23(b). FED. R. CIV. P. 23(b); *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012) (citation omitted). Here, Plaintiffs seek certification under Rule 23(b)(3), which requires them to prove that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3). Finally, a plaintiff must prove the proposed class is "ascertainable," meaning that the class is clearly defined, and its parameters is based on objective

criteria. *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 659 (7th Cir. 2015).

The Court has broad discretion in deciding whether it should certify a proposed class. *Keele v. Wexler*, 149 F.3d 589, 592 (7th Cir. 1998). The party seeking certification bears the burden of demonstrating that certification is appropriate by a preponderance of the evidence. *Messner*, 669 F.3d at 811. The Court must conduct a "rigorous analysis," resolving material factual disputes when necessary. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011). But in conducting such an analysis, the Court "should not turn the class certification proceedings into a dress rehearsal for the trial on the merits." *Messner*, 669 F.3d at 811.

### 1. *Personal Jurisdiction*

As a preliminary matter, the Court considers whether it has personal jurisdiction over CWT to certify a nationwide class. Personal jurisdiction may be "general" or "specific." General jurisdiction exists where the defendant has "continuous and systematic" contacts with the forum state. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415-16 (1984). This form of jurisdiction over a corporation is generally limited to its place of incorporation and/or principal place of business. *Leibovitch v. Islamic Republic of Iran*, 188 F. Supp. 3d 734, 746 (N.D. Ill. 2016) (citing *Daimler AG v. Bauman*, 134 S. Ct. 746, 761

n.19 (2014), *aff'd*, 852 F.3d 687 (7th Cir. 2017). In contrast, specific jurisdiction exists where "(1) the defendant has purposefully directed his activities at the forum state or purposefully availed himself of the privilege of conducting business in that state, and (2) the alleged injury arises out of the defendant's forum-related activities." *Tamburo v. Dworkin*, 601 F.3d 693, 702 (7th Cir. 2010) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)).

The Court lacks general personal jurisdiction over CWT. CWT is incorporated under the laws of the State of Florida, has its principle place of business in Florida, and lacks systematic contacts in Illinois. (*See* Ex. F to Def.'s Resp. to Pls.' Mot. for Class Cert., Dkt. No. 180-6.) Therefore, any finding of jurisdiction must be specific. Specific jurisdiction rests on the Supreme Court's ruling in *Bristol-Myers Squibb Co. v. Superior Court of California*, 137 S. Ct. 1773, 1783-84 (2017). In that case, the Supreme Court considered the compatibility of the state court's exercise of jurisdiction with the Fourteenth Amendment's due process clause and held that the state court lacked specific jurisdiction over the defendant as to the nonresident plaintiffs' claims. *Id.* at 1779, 1783-84. While that decision was limited to state court jurisdiction, this Court previously found that its holding applies to federal courts, especially where, as here, the

court sits in diversity jurisdiction and accordingly looks to Illinois state law. *See Am.'s Health and Res. Ctr., Ltd. v. Promologics, Inc.*, No. 16 C 9281, 2018 WL 3474444, at *2 (N.D. Ill. July 19, 2018) (collecting cases). Moreover, this Court has previously held that *Bristol-Myers Squibb*'s jurisdictional rule applies in the class action context, *see id.*; *see also DeBernadis v. NBTY, Inc.*, No. 17 CV 6125, 2018 WL 461228, at *2 (N.D. Ill. Jan. 18, 2018), which comports with the position taken by other courts in this District, *see McDonnell v. Nature's Way Prods., LLC*, No. 16 CV 5011, 2017 WL 4864910, at *4 (N.D. Ill. Oct. 26, 2017); *Green v. Mizuho Bank, Ltd.*, 289 F. Supp. 3d 870, 874 (N.D. Ill. 2017). Therefore, the Court lacks personal jurisdiction to certify a nationwide class.

Plaintiffs nevertheless contend that CWT waived its ability to object to personal jurisdiction for several reasons: (1) CWT conceded in its earlier motion to dismiss that it "does not challenge the Court's personal jurisdiction over it" (*see* Def.'s Mot. to Dismiss at 7 n.1, Dkt. No. 46); (2) CWT stipulated to transfer the putative nationwide class action to this Court; and (3) the parties have already completed fact and expert discovery in this case. Generally, defendants must assert personal jurisdiction challenges in their first responsive pleading, or else waive them. FED. R. CIV. P. 12(b)(2), (h)(1); *see Ins. Corp of*

*Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 705 (1982). CWT failed to raise such a challenge when it earlier filed its motion to dismiss. (Def.'s Mot. to Dismiss, Dkt. No. 46.) In doing so, CWT waived any objections it had to personal jurisdiction.

Nevertheless, the Court will excuse CWT's failure to raise this jurisdictional objection. Lower courts "'retain[ ] the independent power to identify and apply the proper construction of governing law,' even where the parties 'fail[ ] to advert' to the applicable rule in their own briefing." *Greene,* 289 F. Supp. 3d at 877 (quoting *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991) (excusing forfeiture of *Bristol-Myers* jurisdiction challenge)); *see also ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548, 551 (7th Cir. 2001) (excusing forfeiture and remarking that "[f]ederal courts are entitled to apply the right body of law, whether the parties name it or not"), *as amended* (July 2, 2001); *Mussat v. IQVIA Inc.*, No. 17 C 8841, 2018 WL 5311903, at *2 (N.D. Ill. Oct. 26, 2018) (finding that the defendant did not forfeit or waive personal jurisdiction defense when controlling precedent previously foreclosed it) (citing *Hawknet, Ltd. v. Overseas Shipping Agencies*, 590 F.3d 87, 92 (2d Cir. 2009)). As this Court previously emphasized, "[t]he Supreme Court made clear in *Bristol-Myers* what standard to apply in scrutinizing personal

jurisdiction as to the claims of nonresident plaintiffs." *Promologics, Inc.*, 2018 WL 3474444, at *3 (citing *Practice Mgmt. Support Servs., Inc. v. Cirque du Soleil, Inc.*, 301 F. Supp. 3d 840, 864 (N.D. Ill. 2018), *class decertified on other grounds,* No. 14 C 2032, 2018 WL 3659349 (N.D. Ill. Aug. 2, 2018)). This Court will continue to follow that direction. *Id.*

In sum, the Court lacks jurisdiction over CWT as to the claims of the nonresident, proposed class members. Therefore, those proposed class members who are not Illinois residents and who allegedly received VVT's prerecorded calls outside of this state's borders cannot be party to this case. Accordingly, the Court will consider Plaintiffs' motion for class certification only as it pertains to Illinois residents.

### 2. Class Scope

To address another threshold matter, the Court considers CWT's challenge against Plaintiffs' proposed class definition. As recited above, Plaintiffs propose the following class in their motion:

> All persons in the United States (1) who VVT called from December 29, 2014 through March 20, 2016, to market a cruise aboard the Grand Celebration cruise liner sold by CWT, and (2) who answered such calls.

(Pls.' Mot. for Class Cert. at 2.) CWT contends that Plaintiffs impermissibly expanded the class definition to include consumers

who received calls from CWT on landline telephones in addition to those who received the calls on their cell phone. (*See* Compl. ¶ 130 (providing the following class definition: "All individuals in the United States whose *cellular* telephone number [CWT], or someone on [CWT's] behalf, called . . ."). CWT seeks to proceed with the prior, limited class definition. The Court declines this request.

The Seventh Circuit has determined that a "complaint must contain three things: a statement of subject-matter jurisdiction, a claim for relief, and a demand for a remedy." *Chapman v. First Index, Inc.*, 796 F.3d 783, 785 (7th Cir. 2015) (citing FED. R. CIV. P. 8(a)). "Class definitions are not on that list. Instead the obligation to define the class falls on the judge's shoulders under FED. R. CIV. P. 23(c)(1)(B)." *Id.* (citing *Kasalo v. Harris & Harris, Ltd.*, 656 F.3d 557, 563 (7th Cir. 2011)). Finally, "[t]he judge may ask for the parties' help, but motions practice and a decision under Rule 23 do not require the plaintiff to amend the complaint." *Id.*

Plaintiffs are not required to amend their Complaint prior to filing for class certification to delineate the exact contours of their class. *See Griffith v. ContextMedia, Inc.*, No. 16-cv-2900, 2018 WL 372147, at *2 (N.D. Ill. Jan. 11, 2018) ("[T]he law of this circuit does not mandate denial of certification on the principle that plaintiff must stick to the definition proposed in

her complaint."). This Court can consider "modifications" to the proposed class "at any time prior to final judgment." *Chapman v. Wagener Equities, Inc.*, No. 09-cv-7299, 2012 WL 6214597, at *5-6 (N.D. Ill. Dec. 13, 2012). Accordingly, the Court notes Plaintiffs' current proposed class definition and will proceed with that definition for purposes of class certification.

### 3. Rule 23(a) Requirements

The Court turns to whether the putative class satisfies the four prerequisites of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation.

#### a. Numerosity

Numerosity is satisfied where the proposed class is "so numerous that joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1). Plaintiffs need not show the exact number of class members "as long as a conclusion is apparent from good-faith estimates." *Barragan v. Evanger's Dog and Cat Food Co.*, 259 F.R.D. 330, 333 (N.D. Ill. 2009) (citation omitted). While there is no set number that serves as a bar or requirement to establish numerosity, "a class including more than 40 is generally believed to be sufficient." *Id.*

To approximate the number of class members, Plaintiffs rely on CWT's phone records. Those records show that VVT transferred to CWT 1,649,312 calls, of which 928,023 constituted unique U.S.

telephone numbers. (*See* Weir Decl. ¶ 9.) In addition, Plaintiffs assert that the total number of VVT's outbound calls—and thus the potential number of class members—albeit unknown, is likely many times the number of calls VVT transferred to CWT, since most individuals hung up on VVT, did not qualify for the vacation package, or were not transferred for some other reason. Based on the foregoing, Plaintiffs assert numerosity has clearly been met.

CWT nevertheless raises two arguments against finding numerosity: (1) Plaintiffs cannot show numerosity if the Court limits the class to Illinois residents, and (2) the list of numbers does not identify who *answered* a single call. As for the first argument, CWT contends that Plaintiffs' list of unique phone numbers does not identify the number of Illinois class members. Of the numbers provided in Plaintiffs' list, 39,969 unique phone numbers contained an Illinois area code. (Weir Decl. ¶ 3.) CWT argues, however, that individuals can have a phone number with an Illinois area code but no longer live in Illinois. That is correct, though individuals can also live in Illinois without having an Illinois area code and have received the calls at issue. Whatever the case, against this backdrop, it is highly unlikely that fewer than 40 Illinois residents received calls. CWT's first argument fails.

CWT's second argument fares no better. It contends that the list of phone numbers does not distinguish between inbound and outbound phone calls. In addition to making calls, VVT also answered calls, which are not at issue in this case. The record shows, however, that VVT was predominately making outbound calls. (*See* Vogel Dep. 35:21-22 ("VVT made outbound calls to generate transfers to Holiday Cruises."); Pool Dep. 68:7-8 ("VVT is a company, I believe, based out of India that was making outbound calls.").) Moreover, Plaintiffs' list of numbers was derived from records that came solely from VVT's outbound calls. (*See* Poole Dep. 56:17-22 ("Q: So calls being transferred from VVT were sent to different phone numbers than the numbers that were given directly to consumers on the radio and the mail and those other mediums, correct? A: That is correct.").) CWT's argument thus holds no water. Plaintiffs have met the requirement of numerosity.

### b.  *Commonality*

To establish commonality, Plaintiffs must show that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Commonality requires "not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Dukes*, 564 U.S. at 350. "A common nucleus of operative facts is usually enough to satisfy the commonality

- 44 -

requirement of Rule 23(a)(2)." *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998); *Puffer v. Allstate Ins. Co.*, 255 F.R.D. 450, 458 (N.D. Ill. 2009).

Plaintiffs bring only one claim—an alleged TCPA violation. As already explained, the TCPA prohibits (with certain exceptions) making calls using a "prerecorded voice" without the prior express consent of the called party. 47 U.S.C. § 227(b)(1)(A)-(B); 47 C.F.R. § 64.1200(a)(1)-(2). To prevail on this claim, Plaintiffs must show "that they received calls as part of this call campaign, and that every call included a prerecorded message." *Aranda v. Caribbean Cruise Line, Inc.*, 179 F. Supp. 3d 817, 825 (N.D. Ill. 2016), *aff'd*, No. 17-1626, 2018 WL 3545146 (7th Cir. July 24, 2018).

CWT raises a host of factual assertions, contending that numerous differences exist between the phone calls, which mandate individualized determinations. First, CWT points to the fact that VVT agents could "unmute" their microphones on the calls and use their own voices "[i]f a complex question was asked that was not covered in the 40 or so prompts." (Vogel Dep. 94:25-95:1.) Whether that is the case is beside the point. VVT played prerecorded voice messages from the very beginning of most, if not all, outbound calls it made. (*See* Vogel Dep. 75:17-20 ("When the person answers,

you hit the first recording which is the hello greeting, and then you go down to the required prompts.").)

Second, CWT contends that VVT agents had to decide whether to use the prerecorded voice prompts, insinuating that such prompts could not have been used at all. The record suggests otherwise. (*See* Poole Dep. 84:11-16 ("Q: And VVT was not allowed to improvise, they were not allowed to say anything on the phone that Holiday Cruise Line didn't already approve in writing; is that correct? A: Correct.").) In fact, VVT agents were required to play certain prerecorded prompts before they could transfer the call to CWT's call center. (*See* Albright Dep. 53:6-9 ("Q: So there's certain prompts they have to go through for each call before they're allowed to transfer? A: Yes.").) Moreover, CWT has proffered no evidence that VVT agents made calls to potential class members without using the prerecorded prompts. "Mere speculation" is insufficient to defeat commonality. *Karpilovsky v. All Web Leads, Inc.*, No. 17-cv-1307, 2018 WL 3108884, at *5 (N.D. Ill. June 25, 2018).

Third, CWT argues that individualized questions exist as to whether VVT agents were making additional calls simultaneously while on the phone with each potential class member. Although CWT's expert Kenneth Sponsler opined that VVT's prerecorded calls used on an individual-to-individual basis do not violate the TCPA, such

an opinion is not dispositive of the merits of this case. Plaintiffs raised several objections that could potentially undermine the weight of Sponsler's opinion. This is an issue better determined at trial and after cross-examination. For present purposes, courts have already found commonality exists on the question of whether using soundboard technology to deliver prerecorded messages that requires human involvement—such as the VVT Software—violates the TCPA. *See Braver v. Northstar Alarm Servs., LLC*, No. CIV-17-0383-F, 2018 WL 6929590, at *6-7 (W.D. Okla. Oct. 15, 2018). That suffices. CWT's final argument fails.

The members of Plaintiffs' proposed class all received a call from VVT agents, who utilized the VVT Software to market the same vacation package by using prerecorded voice messages. This is a "common alleged injury presenting a common question." *Birchmeier*, 302 F.R.D. at 251 (finding similarly where class members "received the same calls offering a free cruise in exchange for a political or public opinion survey, made by or for one of the defendants, using the same artificial or prerecorded voice technology"); *see also Gehrich v. Chase Bank USA, N.A.,* 316 F.R.D. 215, 224 (N.D. Ill. 2016) (finding the commonality requirement satisfied in TCPA case where "[e]ach class member suffered roughly the same injury: receipt of at least one phone call . . . to her cell phone"). VVT's conduct "therefore raise[s] common questions, the truth or falsity

of which would resolve the claims in this case in one stroke." *Toney v. Quality Res., Inc.*, 323 F.R.D. 567, 584 (N.D. Ill. 2018). Accordingly, the Court concludes that Plaintiffs have satisfied Rule 23(a)(2)'s commonality requirement.

### c.  Typicality

A named representative's claims are typical of the proposed class if they "arise from the same events or course of conduct that gives rise to the putative class members' claims." *Beaton v. SpeedyPC Software*, 907 F.3d 1018, 1026 (7th Cir. 2018). "[T]he typicality requirement is liberally construed." *Gaspar v. Linvate Corp.*, 167 F.R.D. 51, 57 (N.D. Ill. 1996). Plaintiffs contend that their claims are typical of the class members in that they all arise from the same course of conduct—namely, CWT's use of VVT to call class members and play audio recordings marketing the Grand Celebration Vacation Package during the Class Period. They also pursue their claims based on the same legal theory of being subjected to unwanted prerecorded voice messages.

In response, CWT points to a series of inconsequential facts to argue that Plaintiffs' claims are not typical of the class. For example, CWT asserts that one of the named Plaintiffs, Julie Herrera, is likely not a member of the class because the only call she answered from VVT was not from a number used by VVT during the campaign. As Plaintiffs point out, however, VVT sent an email to

CWT confirming that it placed an outbound call to Herrera's phone number on May 4, 2015. (*See* Julie Herrera Email 2, Ex. 33 to Pls.' Mot. for Class Cert., Dkt. No. 165-33.) CWT next posits that another named Plaintiff, Angel Bakov, cannot recall whether he interacted with a VVT agent on any of the calls he claims to have answered from or dialed to VVT. Plaintiffs respond, however, that Bakov's call records show that he answered incoming calls from VVT that lasted for several minutes. (*See* Bakov Decl.) Then CWT contends that the third named Plaintiff, Kinaya Hewlett, experienced a series of back and forth calls with one male VVT agent, which resulted in their "cussing each other out." (Kinaya Hewlett Dep. 22:25-23:6, 102:10-18, Ex. E to Def.'s Resp. to Pls.' Mot. for Class Cert., Dkt. No. 180-5.) But regardless of the varying responses or reactions to VVT's calls, one factual allegation remains constant—VVT purportedly made outbound calls to Plaintiffs and the other proposed members of the class and played them audio recordings to market a cruise vacation. These facts make the Plaintiffs' claims typical of the class in a TCPA case. *See Birchmeier*, 302 F.R.D. at 251 ("[B]ecause the named plaintiffs received the same type of call as the other class members, their claims are typical of those of the class."); *see also Braver*, 2018 WL 2929590, at 7 (finding typicality where the plaintiff and the class members' claims "ar[o]se from the same operative allegation:

that without express written consent, a call was initiated, using a prerecorded voice, to [the plaintiff] and the class members' residential telephone lines, in an effort to market . . . home security systems, in violation of the TCPA"). Thus, the typicality requirement is satisfied.

### d. Adequate Representation

To ensure adequate representation, Plaintiffs must show that they "will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). Courts look to "the adequacy of the named plaintiffs as representatives of the proposed class's myriad members, with their differing and separate interests." *Gomez v. St. Vincent Health, Inc.*, 649 F.3d 583, 592 (7th Cir. 2011). The adequacy and typicality requirements "tend[ ] to merge." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 626 n.20 (1997). The Seventh Circuit has determined, however, that conflicts of interest and class representatives with credibility issues may negate a finding of adequacy. *See Johnson v. Meriter Health Servs. Emp. Ret. Plan*, 702 F.3d 364, 372 (7th Cir. 2012); *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 726 (7th Cir. 2011).

It appears to the Court that CWT does not take issue with the adequacy of class counsel. CWT has not identified any conflicts of interests, and none are apparent to the Court. Plaintiffs' counsel

has significant experience with class action TCPA litigation and has the resources to pursue this action. (*See* Firm Resumes, Exs. 24, 25 to Pls.' Mot. for Class Cert., Dkt. No. 165-24-25.) Moreover, as discussed above, Plaintiffs' claims are typical of the class, which lends to a finding of adequacy. *Toney*, 323 F.R.D. at 585 (finding "factual similarities" between named plaintiff and class members' claims means their "interests are sufficiently aligned and free of internal conflicts so that they do not pose any problems related to adequacy of representation"). As such, the Court agrees with Plaintiffs that the class representatives are adequate.

### *4. Ascertainability*

In addition to the four requirements of Rule 23(a), courts have consistently evaluated a fifth, implied requirement: that the membership of the class be sufficiently definite or ascertainable. *See Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 493 (7th Cir. 2012) ("[A] class must be sufficiently definite that its members are ascertainable.") "[T]o be ascertainable, a class definition must identify 'a particular group of individuals . . . harmed in a particular way . . . during a specific period,' and must not be 'defined in terms of success on the merits' to avoid a fail-safe problem." *Practice Mgmt. Supprt Servs., Inc.*, 301 F. Supp. 3d at 848 (quoting *Mullins*, 795 F.3d at 660-61.) The Court need not

ascertain "absent class members' actual identities . . . [i]t is enough that the class be ascertain*able*," with class members identified later in the claims administration process if the class proceeds. *Boundas v. Abercrombie & Fitch Stores, Inc.*, 280 F.R.D. 408, 417 (N.D. Ill. 2012).

CWT raises seven arguments against ascertainability. These arguments, in one form or another, all question the validity and reliability of Plaintiffs' proposed method for class member identification. At this stage, such arguments do not carry much weight. Ascertainability depends on "the adequacy of the class definition itself," not "whether, given an adequate class definition, it would be difficult to identify particular members of the class." *Mullins*, 795 F.3d at 658. Plaintiffs are not required to demonstrate that "there is a 'reliable and administratively feasible' way to identify all who fall within the class definition." *Id.* at 657–58. Nevertheless, the Court will provide a brief overview of CWT's objections and its responses to them as it deems appropriate.

First, CWT contends that "when dealing with a list of telephone numbers and no other identifying information, there is no accurate, reliable, and non-individualized way to identify to whom a wireless number belonged at the point in time when the call was made." (Def.'s Resp. to Pls.' Mot. for Class Cert. at 16.) As

discussed above, in considering the parties' *Daubert* motions, the methodology used to identify class members described in Peters-Stasiweicz's report is reliable and has been accepted by courts in this District and across the country. *See Birchmeier*, 302 F.R.D. at 247 (approving using "the records of third-party phone carriers and third-party database providers"); *see also Reyes*, 2018 WL 3145807, at *13 (approving same methodology, finding that it "employed generally reliable methodologies which entail, *inter alia*, performance of detailed statistical analysis and utilization of LexisNexis data that has been independently verified"); *Shamblin*, 2015 WL 1909765 (same); *Krakauer*, 311 F.R.D. at 391 (same). The reliability and acceptance of this methodology are beside the point, however. CWT's argument "misapprehends the law of the Seventh Circuit, which imposes no such burden to establish ascertainability." *Toney*, 323 F.R.D. at 582.

It is also worth mentioning that any difficulties CWT raises in identifying class members can be attributed to CWT's failure to keep records of the individuals it hired VVT to call. *See Mullins*, 795 F.3d at 668 (explaining that denying class certification based on difficulties in identifying class members "effectively immunizes defendants from liability because they chose not to maintain records of the relevant transactions"); *Salam v. Lifewatch, Inc.*, No. 13-cv-9305, 2016 WL 8905321, at *2 (N.D. Ill.

Sept. 6, 2016) (finding that "denying class certification because [the d]efendant is unable to provide [a] list of potential class members would encourage [the] defendant not to keep records, shielding themselves from liability"). For present purposes, Plaintiffs have proposed a method to identify class members that this Court finds reliable. This suffices.

Second, CWT asserts that Plaintiffs cannot distinguish outbound calls by VVT agents from inbound calls by other individuals. The proposed class only includes the former. Plaintiffs point out, however, that CWT's Rule 30(b)(6) witness testified that the numbers VVT agents used were not published in its advertisements. The only way for consumers to make such inbound calls was for them to have received an outbound call by VVT in the first place. (*See* Poole Dep. 56:17-22 ("Q: Okay. So calls being transferred from VVT [to CWT's call centers] were sent to different phone numbers than the numbers that were given directly to consumers on the radio and the mail and those other mediums, correct? A: That is correct.").) Moreover, Plaintiffs assert, and the Court agrees, that class members "can simply be asked to certify that they received and answered the call from 'Jennifer with the Holiday Cruise Line'" (Pls.' Reply to Def.'s Resp. to Pls.' Mot. for Class Cert. at 18, Dkt. No. 194), which is a method already endorsed by the Seventh Circuit, *see Hughes v. Kore of*

*Ind. Enter., Inc.*, 731 F.3d 672, 676-77 (7th Cir. 2013) (finding appropriate allowing class members to self-identify using affidavits, reasoning "[w]hen reasonable effort would not suffice to identify the class members, notice by publication, imperfect thought it is, may be substituted"). CWT's argument thus fails.

Third, CWT confines the ascertainability inquiry to whether Plaintiffs will be able to discern if class members were Illinois residents—given that the class is limited to Illinois residents for jurisdiction reasons—at the time they received calls by VVT. This too is an objective determination that does not implicate ascertainability. Nevertheless, to assuage CWT's concerns, the methodology Plaintiffs intend to use to identify members "provide[s] an address history for individuals as of a given time." (Peters-Stasiweicz Dep. 51:23-25.) It seems to the Court that this should assist with any difficulties discerning Illinois residents as members of the class.

The remainder of CWT's arguments—ascertaining who answered the call, who answered a call by a VVT agent making multiple calls, whether landline or cellular telephone numbers were used, and in which calls VVT agents used their own voices—fare no better. The Court already considered and responded to many of these concerns. For example, it has accepted Plaintiffs proposed class definition, which includes calls made to both landline or cellular telephone

numbers. It has also determined, when considering commonality, that whether VVT agents were making multiple calls simultaneously or later interjected the phone call to use their own voice are inquiries insufficient to deny certification. And in terms of ascertaining who answered the call, the Court has already deemed appropriate that class members can submit affidavits if necessary. CWT's arguments against ascertainability all fail.

Plaintiffs' proposed definition identifies a group of individuals harmed in a particular way during a specific period — individuals who, between December 29, 2014, through March 20, 2016, received calls by VVT, playing unwanted prerecorded messages marketing a vacation cruise. CWT and VVT maintained an exclusive relationship—VVT was the sole entity making outbound calls to market the vacation cruise and did not work for any other travel company. (*See* Advertising Agreement ¶ 4.) Based on the foregoing, the Court finds Plaintiffs have met the requirements of ascertainability.

### 5. Rule 23(b) Requirements

Plaintiffs seek certification under Federal Rule of Civil Procedure 23(b)(3), which requires they also show that (1) questions of law or fact common to the class members predominate over any questions affecting only individual class members, and (2) a class action is superior to other methods available to

adjudicate the controversy at issue. FED. R. CIV. P. 23(b)(3). The Court addresses each of these components in turn.

### a. Predominance

"There is no mathematical or mechanical test for evaluating predominance." *Messner*, 669 F.3d at 814. Predominance is satisfied when "common questions represent a significant aspect of [a] case and . . . can be resolved for all members of [a] class in a single adjudication." *Id.* at 815. "If, to make a prima facie showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question. If the same evidence will suffice for each member to make a prima facie showing, then it becomes a common question." *Id.* That does not mean that individual questions must be absent. *Id.* Rule 23(b)(3) contemplates such individual questions, but it "requires only that those questions not predominate over the common questions affecting the class as a whole." *Id.*

CWT argues that the proposed class is not manageable, but its argument rests on assertions it has already made, and the Court has already addressed. CWT contends that each class member must provide individualized evidence that they answered a call from VVT, heard a prerecorded message play, were Illinois residents, and so forth. (*See* Def.'s Resp. to Pls.' Mot for Class Cert. at

19.) The Court need not reiterate the reasons for which it found each of CWT's assertions without merit. Suffice it to say, Plaintiffs' case is susceptible to proof common to the class: "whether VVT called class members on CWT's behalf as part of the Grand Celebration marketing campaign and whether those calls included prerecorded messages." (Pls.' Mot. for Class Cert. at 17.) That definition "do[es] not leave much room for variation and [is] undoubtedly common to each class member[.]" *Birchmeier*, 302 F.R.D. at 253 (predominance satisfied where class defined by "offer of a free cruise; offer made in exchange for participation in a political or public opinion survey; use of a prerecorded or artificial voice; date of call; by, on behalf of, or for the benefit of defendants").

The question of appropriate remedies also is common to the class. *See Practice Mgmt. Supprt Servs., Inc.*, 301 F. Supp. 3d at 885 (citation omitted). Plaintiffs seek statutory damages, "which eliminates individual variations." *Id.* (finding "in TCPA case, defendants' contention about calculation of individual damages is a non-issue in terms of predominance") (internal quotation marks and citation omitted). They also seek treble damages, which presents a question common to the class. *See Toney*, 323 F.R.D. at 591 (finding that "whether or not [the d]efendants acted willfully or knowingly can be decided on a class-wide basis"). Finally, it

bears mentioning that this Court "has substantial latitude in the management of complex class-action litigation." *Kartman v. State Farm Mut. Auto Ins. Co.*, 634 F.3d 883, 888 (7th Cir. 2011). It will "have the ability to fashion a solution that fits the particular circumstances of this case . . ." *Birchmeier*, 302 F.R.D. at 254. Thus, the Court finds the class is manageable for present purposes and satisfies the requirements of predominance.

### b. Superiority

Superiority is comparative: The Court must consider the efficiency of a class action with an eye toward other available methods. *Mullins*, 795 F.3d at 664. Factors used to evaluate superiority include: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." FED. R. CIV. P. 23(b)(3).

Here, factors (A), (B), and (C) plainly weigh in favor of certification. Putative class members have "little economic incentive to sue individually based on the amount of potential recovery involved, there are no known existing individual lawsuits, and judicial efficiency is served by managing claims in

one proceeding." *Practice Mgmt. Supprt Servs., Inc.*, 301 F. Supp. 3d at 856; *see also Mussat v. Global Healthcare Res., LLC*, No. 11 C 7035, 2013 WL 1087551, at *7 (N.D. Ill. Mar. 13, 2013) (finding TCPA class superior given "fairly small potential for individual recovery" and lack of any "indication that other class members have commenced litigation against the defendants"). With regard to factor (D), for TCPA cases, "class member identification issues . . . [are] assessed in the context of 'the likely difficulties of managing a class action' prong of the superiority requirement, which involves a relative assessment of the 'costs and benefits of the class device.'" *Id.* at 857 (quoting *Mullins*, 795 F.3d at 657-58, 663). As this Court has already emphasized, however, manageability "is almost never a bar to class certification." *Id.* at 857 (internal quotation marks and citation omitted).

The central theme of CWT's opposition to class certification is questioning the validity of Plaintiffs' proposed method of class member identification. CWT contends that class members should not be allowed to self-identify through affidavit because "the absence of objective records that could be used to corroborate the contents of such affidavits . . . militates against a finding of superiority." (Def.'s Resp. to Pls.' Mot. for Class Cert. at 20.) As already discussed, the Seventh Circuit has determined that "courts should not decline certification merely because the

plaintiff's proposed method for identifying class members relies on affidavits." *Mullins*, 795 F.3d at 672. This too applies even in the absence of objective records. *See id.* (assuming that the defendant "will have no records" and the consumers will not "have kept their receipts").

In further support of superiority, Plaintiffs point out that they have adduced significant discovery relevant to class members including, but not limited to, (1) a list of calls transferred from VVT to CWT call centers during the Class Period, (2) call records from the carriers that handled a portion of those transferred calls, (3) Peters-Stasiweicz's expert opinion testimony that identifying class members through a given phone number is possible (Peters-Stasiweicz Decl. ¶ 12), and (4) a partial list of over 13,000 numbers VVT used during part of the Class Period (Exs. 20-21 to Pls.' Mot. for Class Cert., Dkt. No. 165-20-21). This discovery enables Plaintiffs to identify and send direct notice to a significant portion of the proposed class. Others may self-identify by submitting documentation that they received a call by VVT, such as a phone bill or affidavit. These methods for identification and notice are acceptable. *See Hughes*, 731 F.3d at 676-77; *Birchmeier*, 302 F.R.D. at 245-50. As a result of the foregoing, "[c]lass treatment will provide the fairest and most efficient adjudication of the alleged violations of the TCPA."

*Braver,* 2018 WL 6929590, at *12. Accordingly, the superiority requirement is satisfied.

In sum, after careful consideration, the Court finds that Plaintiffs have met the requirements of Rule 23(A) and Rule 23(b)(3). Accordingly, Plaintiffs' Motion for Class Certification is granted in so far as the class is limited to Illinois residents.

### III. <u>CONCLUSION</u>

For the reasons stated herein, Defendant's Motion to Exclude the Testimony of Randall Snyder (Dkt. No. 172) is granted. Plaintiffs' Motion to Exclude the Testimony of Kenneth R. Sponsler (Dkt. No. 169) and Defendant's Motions to Exclude the Testimonies of Colin Weir (Dkt. No. 170) and Christina Peters-Stasiweicz (Dkt. No. 171) are all denied. Plaintiffs' Motion for Class Certification (Dkt. No. 165) is granted in part and denied in part. The Court certifies the class as to the claims of the Illinois residents, but lacks jurisdiction over Defendant as to the claims of the nonresident, proposed class members.

**IT IS SO ORDERED.**

_____

Harry D. Leinenweber, Judge
United States District Court

Dated: 3/21/2019

- 62 -