**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **ANGEL BAKOV and JULIE HERRERA, individually and on behalf of all others similarly situated,** | |
| **Plaintiffs,** | **Case No. 15 C 2980** |
| **v.** | **Judge Harry D. Leinenweber** |
| **CONSOLIDATED WORLD TRAVEL, INC. d/b/a HOLIDAY CRUISE LINE, a Florida Corporation,** | |
| **Defendant.** | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Angel Bakov and Julie Herrera, as class representatives, allege that Defendant Consolidated World Travel, Inc. ("CWT"), d/b/a/ Holiday Cruise Line, Inc., directed a company called Virtual Voice Technologies Pvt. Ltd. ("VVT") to place phone calls to class members without prior express written consent in violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq*. The Court certified a class of Illinois residents who (1) VVT called from December 29, 2014, through March 20, 2016, to market a cruise aboard the Grand Celebration cruise liner sold by CWT; and (2) answered those calls. *Bakov v. Consolidated World Travel,* 2019 WL 1294659, at *4 (N.D. Ill. March 21, 2019) (certifying class). Parties now cross-move for summary judgment.

For the reasons stated herein, Defendant's Motion for Summary Judgment (Dkt. No. 228) is denied. Plaintiffs' Motion for Partial Summary Judgment (Dkt. No. 225) is granted.

## I.  BACKGROUND

### A.  Class Claims

The following facts are undisputed unless otherwise noted. Plaintiffs bring this class action suit against Defendant for violating the Telephone Consumer Protection Act ("TCPA"). The TCPA makes it illegal to call any cell phone "using . . . an artificial or prerecorded voice." 47 U.S.C. § 227(b)(1)(A)(i). Plaintiffs allege that Defendant violated the TCPA by calling class members using "prerecorded voice." From December 29, 2014, through March 20, 2016, Defendant Consolidated World Travel ("CWT"), a Florida company operating under the fictitious name "Holiday Cruise Line," employed an Indian company called Virtual Voice Technologies Pvt. Ltd. ("VVT") to call millions of people in the United States and offer anybody who was interested "a free cruise simply to show you a great time." *Bakov*, 2019 WL 1294659, at *2. VVT pitched the cruise to recipients as a trip to the Bahamas for two aboard the Grand Celebration Cruise Liner for the cost of the port fees ($59.00 per person). *Id.* VVT's calls all began with the same introduction: "Hi, this is Jennifer with Holiday Cruise Line on a recorded line. Can you hear me okay?" (Def.'s Resp. to Pls.' Stmt. of Material Facts ("PSOF") ¶ 17, Dkt. No. 244.) Jennifer was

not a real person speaking in real time on the other end of the line. Instead, VVT agents used software to play recordings of a professional voice actor reading from a CWT-approved script.

VVT call centers used a type of "soundboard" telemarketing technology called "Virtual Voice Technology Software" to play "voice-assisted prompts that were scripted out and recorded prior." (Jennifer Poole Dep. 70:16–17, Ex. C to Pls.' Stmt. of Material Facts, Dkt. 225-4.) VVT agents had 47 prompts to choose from, including introductory messages such as "the reason for my call is because we are looking for qualified travelers that would like to occupy unused cabin space aboard our magnificent cruise liner…" and "let me just ask you a couple of questions to make sure you qualify." (VVT Prompts, Ex. B to Pls.' Stmt. of Material Facts, Dkt. No. 225-3.) They also included basic interjections ("I understand," "Thanks," and "Hold on") and other discrete disclosures ("you should know that I'm not selling anything" and "I'm a real person"). (*Id.*) They also included the prompt: "I'm assisted by prerecorded audio." (*Id.*) VVT's employees, known as "live agents," used VVT's software through a web page on a computer. (Pls.' Resp. to Def.'s Stmt. of Material Facts ("DSOF") ¶ 9, Dkt. No. 247-1.) Live agents pressed a button to place each call manually. (DSOF ¶ 12.) After placing the call, the voice assistance prompts showed up on the agent's screen. (DSOF ¶ 10.) The VVT platform did not automatically deliver messages or prompts

when calls were answered. (DSOF ¶ 17.) If the consumer answered the phone, the live agent would play the first prompt, the "hello" greeting. (DSOF ¶ 16.) The live agents then chose whether and how to respond to a person who answered by clicking one of the audio prompts on his or her screen or by unmuting the system and using their own voice to speak. (DSOF ¶ 15.) CWT did not take steps to confirm that consumers VVT called provided consent. (PSOF ¶ 34.)

Two independent contractors named Vance Vogel and Clifford Albright developed this software for CWT and trained VVT agents to use it. *Bakov*, 2019 WL 1294659, at *5. Albright coded and developed the VVT platform. (DSOF ¶ 7.) Albright testified that, as a technical matter, it was not possible to transfer calls from VVT to CWT until agents played a certain set of prompts. (Albright Tr. 53:6–54:6, Ex. F to Pls.' Stmt. of Material Facts, Dkt. No. 225-7).

Defendant's and VVT's relationship was governed by an Advertising Agreement (the "Agreement"). (Agreement, Ex. N to Sealed Document, Dkt. No. 226-3). The Agreement provided in part that Defendant had sole control over the script VVT would use and that Defendant could alter the script at any time. (*Id.*) The Agreement also provided that VVT was responsible for following all applicable laws, including the TCPA. (*Id.*) The Agreement prohibited VVT from making any modifications to or deviating from the script without CWT's prior approval. (*Id.*) VVT earned its money

through commission: Defendant paid VVT $3.50 for each "qualified transfer," defined in the parties' contract as a customer who agreed to be transferred from VVT to Defendant and who stayed on the line afterward for at least 60 seconds. (Agreement.)

Plaintiffs move for partial summary judgment on their class claims against Defendant. To hold Defendant liable to the class for violating the TCPA, Plaintiffs ask the Court to find that: (1) VVT used "prerecorded voice" within the meaning of the TCPA in every call to class members; (2) Defendant is vicariously liable for those calls by VVT; (3) Defendant cannot prove its affirmative defense of consent as to any class member; and (4) Defendant's conduct was "willful" or "knowing" under the TCPA.

Defendant cross-moves for summary judgment on all of Plaintiffs' claims. In the alternative, the Defendant asks the Court to reduce the class by one named Plaintiff, Julie Herrera, contending that Herrera is not properly a member of the class because she did not answer a call from VVT.

## II.  <u>STANDARD</u>

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *see also Liu v. T&H Mach., Inc.*, 191 F.3d 790, 794 (7th Cir. 1999) (citation omitted). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for

the nonmoving party." *Pugh v. City of Attica*, 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When cross-motions for summary judgment are filed, courts "look to the burden of proof that each party would bear on an issue of trial," and require that party to "establish a genuine issue of material fact." *Santaella v. Metropolitan Life Ins. Co.*, 123 F.3d 456 (7th Cir. 1997).

## III.  DISCUSSION

### A.  Prerecorded Voice

The TCPA prohibits initiation of "any telephone call . . . using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party." 47 U.S.C. § 227(b)(1)(B). Plaintiffs argue VVT used "prerecorded voice." Defendant contends it did not.

The parties offer competing interpretations of the word "prerecorded." Plaintiffs urge the Court to interpret "prerecorded" by its plain meaning. Defendant argues against Plaintiff's plain-meaning interpretation and urges that the overall statutory text and legislative history of the TCPA makes clear that the TCPA regulates "only telephone calls that deliver a *single, monolithic message* that is **"blasted"** to many recipients at the same time, without any variation." (Def.'s Reply at 4, Dkt. No. 250) (emphasis in original). Defendant further argues that this Court found that "the word 'prerecorded' is a term of law

- 6 -

under the TCPA . . ." and that therefore a definition of "prerecorded" other than its plain meaning should apply. *See Bakov*, 2019 WL 1294659, at *9. Finally, Defendant claims that if the Court granted summary judgment for Plaintiffs on the meaning of "prerecorded," it would "likely subject millions of people to liability under the TCPA every time they send a recorded message" (Def.'s Resp. at 5, Dkt. No. 243), and argues the Court has an obligation to avoid interpreting the statute in a way that leads to an absurd result.

Section 227 does not define "prerecorded voice." In the absence of a statutory definition, courts must start with "the language employed by Congress" and assume that the "legislative purpose is expressed by the ordinary meaning of the words used." *I.N.S. v. Phinpathya*, 464 U.S. 183, 189 (1984). Statutory interpretation begins with the plain language of the statute. *United States v. Berkos*, 543 F.3d 392, 396 (7th Cir. 2008). Although the language and design of the statute as a whole may also provide guidance in determining the plain meaning of its provisions, absent clearly expressed Congressional intent to the contrary, the plain language should be conclusive. *Id.*

The definition of "prerecorded" is simply: "recorded in advance." *Prerecorded,* MERRIAM-WEBSTER'S DICTIONARY (2019). There is no other language in the TCPA that provides any clues or offers contrary evidence as to the meaning of "prerecorded." Rather, the

evidence demonstrates that the plain meaning should control. The statute defines other terms that appear. For example, it is unlawful to make any call using an "automatic telephone dialing system." 47 U.S.C. 227(b)(1)(A). A separate TCPA subsection defines "automatic telephone dialing system." *See* 47 U.S.C. § 227(a)(1). Similarly, the TCPA defines "established business relationship," "telephone facsimile machine," "telephone solicitation," and "unsolicited advertisement." *See* 47 U.S.C. § 227(a)(2)–(5). The failure to define "prerecorded" differently from its plain meaning while giving a special definition for other terms that appear in the statute is evidence that Congress intended for the plain meaning of the word to control.

Defendant is correct that, in a prior opinion in this case, the Court noted, "'prerecorded' is a term of law under the TCPA that carries certain penalties." *Bakov*, 2019 WL 1294659, at *9. Defendant takes this sentence out of context. That sentence was taken from the Court's decision to exclude an expert witness because the expert lacked proper foundation to give an opinion. The witness had not listened to recordings of the calls at issue in this case and was not capable of "thoroughly analyzing and understanding whether the TCPA's use of 'prerecorded' carries a meaning other than the one he bestowed upon it." *Id.* That observation was not a ruling on the meaning of "prerecorded," nor was it a conclusion that "prerecorded" is a term of art whose

definition cannot simply be its plain meaning. Thus, Defendant placed undue weight on a sentence in a previous ruling excluding an expert witness.

Defendant uses the TCPA's legislative history to argue that "prerecorded" should be defined in some other way than by its plain meaning. The legislative history, Defendant argues, clearly shows that Congress did not intend to regulate the kinds of calls VVT made. But a statute's language is the most reliable indicator of Congressional intent. *Monterey Coal Co. v. Federal Mine Safety and Health Review Commission*, 743 F.2d 589, 595–96 (7th Cir. 1984.) Defendant put itself in a difficult spot by providing VVT agents with a prompt that said, "I'm assisted by prerecorded audio," and it is clear why Defendant argues that "prerecorded" carries some legal meaning somehow distinct from its dictionary definition. But, as explained above, had Congress meant to bestow "prerecorded" with a different definition, it could have and would have done so. "[T]here is no need to refer to the legislative history when the statutory language is clear." *Ex parte Collett*, 337 U.S. 55, 61 (1949). Because the statute is clear, there is no need to consult the legislative history.

Finally, Defendant's argument that interpreting "prerecorded" literally would produce absurd results is meritless. Defendant claims that "Plaintiffs' hyper-literal interpretation would place within the scope of the TCPA millions of voice messages made in a

host of contexts . . . on a daily basis." (Def.'s Reply at 2.)
Defendant argues that any voice message sent from one family member
to another through a smartphone app would be liable if the Court
ruled for the Plaintiffs. Strangely, Defendant also suggests that
a ruling for the Plaintiffs on this point would have even placed
the late Stephen Hawking at risk of a TCPA violation because he
spoke with the assistance of a computerized voice. Defendant's
urging that the Court could inadvertently subject millions of
innocent people to TCPA liability is unavailing and frivolous. The
statute itself creates a mechanism to avert this outcome.
Section 227(b)(2)(B)(i) allows the Federal Communications
Commission to "by rule or order, exempt from the requirements . . .
calls that are not made for a commercial purpose . . ." 47 U.S.C.
§ 227(b)(2)(B)(i). Thus, a ruling by this Court that "prerecorded"
should be interpreted pursuant to its plain meaning will not, as
Defendant argues, produce an absurd result and subject millions of
people to TCPA liability. The TCPA is meant to regulate calls made
by telemarketers, not communications between friends, family, and
acquaintances, and the statutory language clearly reflects that
intent.

Because the statute compels a plain-meaning interpretation
and because it will not produce an absurd result, "prerecorded"
means "recorded in advance." And because Defendant concedes that
"VVT technology involves the use of recorded audio snippets of an

actor's voice," there is no genuine dispute of material fact as to whether VVT used prerecorded voice in making its calls under the TCPA. (*See* Def.'s Mot. for Summ. J. at 9-10, Dkt. No. 228).

The Court now turns to whether VVT used prerecorded voice on every call to class members. 47 U.S.C. § 227(b)(1)(B). Several pieces of evidence further confirm that VVT agents delivered a message on every call. First, Vogel, one of the VVT software designers, confirmed in a deposition that agents were instructed to begin every call with the "hello" greeting ("Hi, this is Jennifer…"). (Vogel Tr. 81:1-11, Ex. E to Pls.' Stmt. of Material Facts, Dkt. No. 225-6.) Second and most importantly, Albright testified that VVT agents were required to play certain prompts before they were able, as a technical matter, to transfer calls. (Albright Tr. 53:6-54:6.) That is, VVT's very compensation model was based on commission it earned by transferring calls, and the software would not allow agents to transfer calls until they placed certain required prerecorded prompts.

This is enough to establish a TCPA violation on the calls VVT made to class members. There is no genuine dispute of material fact that on every answered call, VVT agents used prerecorded voice in violation of 47 U.S.C. § 227.

## B. Vicarious liability

Plaintiffs claim that Defendant is responsible for VVT's calls to class members under federal agency law and ask the Court

to grant summary judgment on their claim that Defendant is vicariously liable for VVT's TCPA violations.

The Court must first address a threshold concern. In their Consolidated Class Action Complaint, Plaintiffs never made explicit a claim against Defendant for vicarious liability or stated any facts or theories of control, identified any agent, or asserted that the agent is liable for TCPA violations. As a result, Defendant argues, Plaintiffs cannot now be entitled to summary judgment on a claim of vicarious liability.

This argument fails. First, Plaintiffs allege in their Consolidated Class Action Complaint that "Defendants and/or their agents made phone calls to the cellular telephone numbers of Plaintiffs and the other Class members *en masse* without their prior express consent." (Consol. Class Action Compl. ¶ 141, Dkt. No. 31). Defendant essentially asks the Court to find that because Plaintiffs did not develop their legal theories and summary judgment arguments at the pleading stage, they cannot now argue their vicarious liabilities claims. This is not the standard courts impose at the pleading stage. The more "particular theories of vicarious and joint liability upon which [Plaintiffs] ultimately rest their claims may have become clear to [Defendant] only more recently," but Plaintiffs had no obligation to develop these theories fully in their complaint. *Aranda v. Caribbean Cruise Line, Inc.*, 179 F.Supp.3d 817, 830 (N.D. Ill. 2016). It is enough that

"[Defendant has] been on notice since near the outset of the case" that by referring to Defendant's agents in the complaint, Plaintiffs might seek to hold Defendant vicariously or jointly liable. *Id.*

The Court turns to the merits of the agency argument. Under the Hobbs Act, a final FCC order that governs the matter at hand is binding on the Court. *CE Design, Ltd. v. Prism Bus. Media, Inc.*, 606 F.3d 443, 450 (7th Cir. 2010); *see also* 28 U.S.C. § 2342 ("The court of appeals… has exclusive jurisdiction to enjoin, set aside, suspend . . . all final orders of the Federal Communications Commission"). Through rulemaking and adjudicative orders, the FCC has ruled that liability for a TCPA violation may be imputed to a principal that did not directly place the calls if the entity that placed the calls did so as an agent of the principal. *In re Joint Petition filed by Dish Network, LLC*, 28 F.C.C.R. 6574, 6593 ¶ 48 (2013) (FCC declaratory ruling). Federal common law agency principles apply in the TCPA context. *Id.* at 6574 ¶ 1. The federal common law of agency is in accord with the Restatement of Agency. *See Opp v. Wheaton Van Lines, Inc.*, 231 F.3d 1060, 1064 (7th Cir. 2000). An agency relationship "arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests asset or otherwise consents so to act." Restatement (Third) Agency § 1.01 (2006). The

hallmark of an agency relationship is the power to give interim instructions to the agent. *See Smith v. State Farm Mutual Automobile Insurance Company*, 30 F.Supp.3d 765, 775–76 (N.D. Ill. 2014); *see also* Restatement (Third) of Agency § 1.01 cmt. (f)(1).

Vicarious liability for a TCPA violation can result from "a broad range of agency principles, including not only formal agency, but also principles of apparent authority and ratification." *Dish Network*, 28 F.C.C.R. at 6582 ¶ 28. Formal agency, also known as actual authority, may be express or implied. *Bridgeview Health Care Center, Ltd. v. Clark*, 816 F.3d 935, 938–39 (7th Cir. 2016). Express actual authority exists when a principal "expressly grants the agent authority to perform a particular act." *Aranda*, 179 F.Supp.3d at 831.

Plaintiffs advance four theories of agency between Defendant and VVT: (1) Defendant expressly granted VVT the authority to call consumers to promote its Grand Celebration vacation package; (2) VVT called class members under Defendant's implied authority because Defendant approved prerecorded voice files played to promote the Grand Celebration vacation package; (3) VVT had apparent authority to make calls on behalf of Defendant because it gave VVT access to a multitude of information; and (4) Defendant ratified VVT's conduct as its own because Defendant enjoyed the benefits of VVT's promotional efforts without repudiating them.

The Court need only address the first argument, as it is determinative.

To establish actual authority, Plaintiffs must demonstrate that the principal controlled or had the right to control the purported agent. This right of control presupposes the principal's retention of the capacity to assess the agent's performance, to provide instructions to the agent, and to terminate the relationship by revoking the agent's authority. *See generally* Restatement (Third) of Agency § 2.01.

To answer the question whether the requirements for actual authority have been satisfied, the Court need look no further than the contract between Defendant and VVT. (*See* Agreement.) This document outlines the relationship between Defendant and VVT and the responsibilities of each party. First, and perhaps most importantly, Defendant was "solely responsible for the accuracy of the scripts and their compliance with applicable laws." (Agreement.) Further, VVT was "under no circumstances . . . [to] make any modifications from or deviate from an approved script or marketing materials without the prior written consent of [Defendant]." (Agreement.) Defendant had the sole authority to modify the script at any time—in other words, to give interim instructions. Defendant also agreed to provide weekly performance reports to VVT detailing the total number of daily transfers reaching Defendant's switch and the number of daily transfers that

lasted 60 seconds or more. Finally, Defendant and VVT both had the ability to terminate the Agreement with five day's written notice. Thus, all of the requirements that denote an agency relationship with actual authority exist here. Defendant had sole control over the script and could provide interim instructions in the form of a script update, provided VVT weekly performance updates, and could terminate the agency relationship and revoke VVT's authority to make calls on its behalf.

Contrasting this case with a pair of recent Seventh Circuit cases demonstrates further why a finding of vicarious liability through express authority is appropriate. In *Bridgeview Health Care Center, Ltd. v. Clark*, 816 F.3d 935 (7th Cir. 2016) and *Paldo Sign and Display Company v. Wagener Equities, Incorporated*, 825 F.3d 793 (7th Cir. 2016) the Seventh Circuit held there was no vicarious liability imputed through actual authority. In *Bridgeview*, the owner of a small company in Terre Haute, Indiana, contracted with a company called B2B to send fax advertisements, and verbally instructed the company to send about 100 faxes to local businesses within a 20-mile radius of Terre Haute. *Bridgeview Health Care Center*, 816 F.3d at 937. Instead, B2B sent 4,849 ads to businesses across Indiana, Illinois, and Ohio. *Id.* The trial court found the owner liable only for the faxes sent within the 20-mile radius of Terre Haute, and the Seventh Circuit affirmed. *Id.* The owner could not be held vicariously liable for the faxes

sent outside that 20-mile radius. For express actual authority to have existed, "[the owner] must have directly spoken or written to B2B, telling it to send nearly 5,000 fax ads across multiple states. *Id.* at 939. Similarly, in *Paldo Sign*, the owner of a company considered sending fax advertisements to businesses that might be interested in his services and worked with a third-party company to design the ads. *Paldo Sign*, 825 F.3d at 794–95. The owner wanted to approve the final ads and potential recipients; instead, the third-party, without the owner's knowledge or approval, sent the fax to more than ten thousand recipients. *Id.* at 795. A jury declined to hold the owner and his company liable for sending the faxes, and the Seventh Circuit affirmed. *Id.* at 796. This was because "[Defendant noted] that . . . no advertisement would be sent without his final approval . . . and that the faxes were sent without an opportunity to review the contact list or to approve the final content and form of the ad." *Id.* at 798. In both cases, the defendants were held not liable even though advertisements violating in the TCPA were sent on their behalf because the third-parties sent the advertisements in direct contradiction of the defendants' orders.

Defendant places great weight on two points: first, that the Agreement between Defendant and VVT gave VVT great discretion about when to place the telephone calls, and to whom by requiring VVT to generate its own leads; and second, that this discretion was

contingent on VVT's compliance with the TCPA and any other applicable law. However, VVT's TCPA violation does not hinge on *whom* VVT called or *when* VVT called them, but rather that VVT used the prerecorded voice script that it was contractually obligated to use. For this reason, Defendant cannot eschew liability by pointing out that VVT was contractually obligated to obey the TCPA. Defendant cannot create a contract with a company to make calls on its behalf that by its terms requires it to violate the TCPA and then shirk liability by arguing that VVT was contractually obligated to comply with the TCPA. Here the facts present the opposite situation from *Clark* and *Paldo Sign*: rather than VVT violating the TCPA in express contradiction to Defendant's orders, VVT committed TCPA violations *pursuant to* Defendant's orders.

Defendant had the right to provide interim instructions to VVT in the form of a script modification, to give VVT weekly performance reports, to control aspects of the phone call through providing a script, and to terminate the relationship and revoke VVT's authority under the Agreement. This is enough to establish actual authority. Because Defendant does not claim that VVT exceeded its authority under the Agreement and because the Agreement establishes an agency relationship, Defendant is vicariously liable for VVT's TCPA violation.

Finally, Defendant argues that the record in this case precludes summary judgment, and that the existence and scope of an

agency relationship involves issues of fact inappropriate for disposal at summary judgment. (Def.'s Resp. at 9.) However, vicarious liability is like any other issue of fact: it "may be adjudicated summarily only where the evidence would not permit a reasonable jury to find for the nonmoving party." *Aranda*, 179 F.Supp.3d at 829 (citing *Spitz v. Proven Winners N.A., LLC*, 759 F.3d 724, 731 (7th Cir. 2014)). The record in this case supports summary judgment on this point.

Because the Court finds that Defendant gave VVT actual authority to act as its agent, the Court need not address Plaintiffs' other theories of vicarious liability.

## C. Consent

Plaintiffs move for summary judgment on the grounds that Defendant cannot prove its affirmative defense as to consent. The TCPA prohibits making calls using prerecorded voice without prior express consent of the called party; express consent serves as an affirmative defense. *See Blow v. Bijora, Inc.*, 855 F.3d 793, 803 (7th Cir. 2017). The party asserting this defense bears the burden of proof. *Id.* Plaintiffs argue that Defendant cannot meet this burden.

Defendant does not respond to the merits of Plaintiffs' argument on this point and instead argues that "consent was only required if, for purposes of this case, the VVT calls used a 'prerecorded voice' in violation of the TCPA. That was not the

case." (Def.'s Resp. at 13.) The Court has ruled, however, that VVT did use prerecorded voice. Because Defendant has not developed this argument, the defense is waived. *See e.g., Argyropolous v. City of Alton*, 539 F.3d 724, 738 (7th Cir. 2008) (undeveloped arguments are waived). Therefore, summary judgment for Plaintiffs on this matter is appropriate.

### D.  Willful or Knowing Conduct

Plaintiffs further claim that Defendant violated the TCPA "willfully or knowingly." This finding permits the Court, in its discretion, to award up to treble damages. 47 U.S.C. § 227(b)(3).

The TCPA does not define "willful" or "knowing," and courts have drawn different conclusions about what these words mean. Plaintiffs urge the Court to adopt an interpretation of "willfully or knowingly" that "simply requires that the act be intentional, as opposed to inadvertent" and that does not turn on whether the defendant knew that the conduct violated the statute. Defendant responds that for a violation to be "willful" or "knowing," it must have had actual knowledge that the conduct at issue was a TCPA violation. Under this interpretation, Defendant argues, the Court cannot grant summary judgment for Plaintiffs because there is no evidence in the record that Defendant knew that its agents were making calls using prerecorded voice in violation of the TCPA.

To support this point, Defendant relies on a Federal Trade Commission staff opinion letter issued on September 11, 2009 (the

"FTC Letter"). The letter concluded that a system similar to VVT's did not constitute delivery of prerecorded voice. (DSOF ¶ 41.) (*See also* Letter from Lois Greisman to Michael Bills, Ex. Q to DSOF, Dkt. No. 229-17.) However, as the Court previously noted, the FTC Letter "did not address TCPA enforcement, nor was it issued by the government body that enforces and interprets the TCPA (which is the FCC)." *Bakov*, 2019 WL 1294659, at *6. Furthermore, Defendant merely provides this letter as an exhibit and does not claim or present any evidence that Defendant saw the letter, relied on it, or was even aware of its existence. Therefore, Defendant cannot here rely on the FTC Letter as a defense.

Other courts in this District have made rulings on treble damages on which this Court can draw. Courts in this District have ruled that a willful or knowing TCPA violation does not require that the defendant had actual knowledge that an action violated the TCPA, but only that the action itself was intentional. *See Newbold v. State Farm Mutual Automobile Insurance Co.*, 2015 WL 1368554, at *5 (N.D. Ill. Jan. 23, 2015) ("Courts generally have interpreted [willful or knowing] to mean voluntary, intentional, actions, and not to require specific knowledge that the action constitutes a violation of the TCPA."); *Bridgeview Health Care Center Ltd. v. Clark*, 2013 WL 1154206, at *7 (N.D. Ill. March 19, 2013) ("The Court adopts the more common interpretation that 'willfully' or 'knowingly' simply requires that the act be

intentional or volitional, as opposed to inadvertent, and not that defendant must have known that the conduct would violate the statute."); *Sengenberger v. Credit Control Services, Inc.*, 2010 WL 1791270, at *6 (N.D. Ill. May 5, 2010) (no requirement of knowledge that an act violated the TCPA for treble damages); *Charvat v. Allstate Corporation*, 29 F.Supp.3d 1147, 1151 (N.D. Ill. March 5, 2014) (willful or knowing TCPA violation only requires defendant knew of facts constituting the offense).

This Court agrees with other courts in this District: for Defendant to be liable for treble damages in this case, Plaintiffs must demonstrate that Defendant knew that VVT was making its calls intentionally, rather than inadvertently. Defendant does not claim that VVT made the offending calls inadvertently. Because the Court has held that VVT's calls violated the TCPA, that VVT was Defendant's agent, and that Defendant cannot demonstrate that class members consented to the calls, there is no dispute of material fact that Defendant's actions were willful and knowing.

Further, treble damages can be appropriate when there is a need to deter future violations. *See e.g. Krakauer v. Dish Network, LLC*, 925 F.3d 643 (4th Cir. 2019) (trebling appropriate when TCPA "violations are known, tolerated, and even encouraged"). Plaintiffs claim that Defendant's owners are serial TCPA violators who have been subject to multiple lawsuits for doing the exact thing they are accused of here. Defendant denies that there is any

evidence that Defendant is connected to any other company, by common ownership or otherwise, and that the past TCPA violations of Defendant's alleged owners are irrelevant to this dispute.

Plaintiffs allege that Defendant's operators are not new to cruises, telemarketing, or TCPA violations. Daniel Lambert ("Lambert") and James Verrillo ("Verrillo") owned and operated Defendant, according to Plaintiffs, and exercised control over the company. (PSOF ¶¶ 36, 38, 39.) Defendant argues that there is "no evidence" that Lambert and Verrillo exercised control over Defendant or VVT's work for Defendant. However, Lambert and Verrillo ran Defendant's operations, including "check[ing] on all departments, marketing, fulfillment, [and] customer service," as well as determining salaries for high-ranking CWT employees. (Poole Dep., 36:18–37:12, 34:22–35:10). Further, Lambert authorized the agreement between Defendant and VVT; Verrillo authorized payment to VVT and others; and Lambert and Verrillo received reporting regarding VVT call volume. (PSOF ¶ 39.) Defendant does not explain who, if not Lambert and Verrillo, owned and operated CWT.

Plaintiffs also claim that Lambert and Verrillo owned and controlled Caribbean Cruise Line, Inc. ("CCL"), a company that another court in this District held liable for TCPA violations. (PSOF ¶ 58.) *See generally Aranda*, 179 F.Supp.3d 817. CCL offered "free" cruises to the Bahamas but took call recipients' credit

card numbers "and informed them that they would be responsible for taxes, port fees, and gratuities, as well as the cost of any upgraded amenities or activities during their trip." *Aranda*, 179 F.Supp.3d at 819. Plaintiffs claim CCL effectively reorganized into Defendant at the start of the class period, citing a deposition from an employee who stopped working for CCL and started working for Defendant, "in the same location," at "the same desk," on the "same computer" and continued to be paid by CCL after the name change. (PSOF ¶ 59.) In response, Defendant asserts that CCL and Defendant are separate entities with separate names; to support this, Defendant cites only to CCL's and Defendant's Articles of Incorporation. (*Id.*)

Despite Defendant's denials, it is clear there is a troubling pattern. Defendant denies that Verrillo and Lambert owned or operated Defendant, but the unrebutted evidence shows that they exercised significant control over the company, including authorizing payments to employees, as well as the Agreement between Defendant and VVT. Further, Defendant denies that Lambert and Verrillo owned CCL. In support, Defendant claims "[n]othing in the *Aranda* decision states that Lambert or Verillo [sic] were owners of the company or controlled it." (PSOF ¶ 58.) This is flatly contradicted by the *Aranda* decision itself: "Lambert and James Verrillo, the founders and operators of CCL . . ." *Aranda*, 179 F.Supp.3d at 832. Needless to say, Defendant's unsupported

denials, in the face of clear contradictory evidence, are unconvincing.

It is beyond belief that CCL and Defendant offered the same "free" cruise package, using the same operators, and the same employees who worked at the same place, at the same desks, on the same computers, with the same phones, but were completely unrelated entities. Defendant argues that the evidence of Lambert's or Verrillo's role in managing Defendant is not strong enough for personal liability, but the Court need not decide that question. What is clear is that Plaintiffs have presented enough evidence that CCL and Defendant are related and that Lambert and Verrillo were involved enough in managing these two companies to convince the Court that it should consider using its discretion to treble damages for the purpose of deterring future bad behavior. Defendant's illegal conduct seems to be part of a pattern, and that pattern should not be ignored. In this case, it is strong evidence that trebling may be appropriate.

Summary judgment is therefore appropriate for Plaintiffs on this point. Defendant's TCPA violations were "willful" and "knowing" under the TCPA. Because the Court is not now deciding damages and will require separate briefing on the total amount of class damages necessary, it will decide at a later point whether and to what extent to amplify damages. For now, the Court finds only that Defendant's TCPA violation was willful and knowing and

that as a result the law supports the Court using its discretion to treble damages if necessary.

## E. Plaintiff Herrera's Claims

Defendant argues that Herrera, separately from all other class members, cannot prove she received a call from VVT, and moves to reduce the class by one person by granting summary judgment in its favor on Herrera's TCPA claims. Defendant argues that there is no admissible evidence that VVT called her, that she answered the call, or that she heard prerecorded voice when she answered the call.

Herrera claims she received a call on her cell phone at 11:59 p.m. on May 3, 2015. (DSOF ¶ 42.) The phone call woke Herrera up and when she answered, she "heard a message that [she] could not make out." (DSOF ¶ 43.) Herrera said that when she answered the call, she heard what "sounded like a [garbled] recording." (*Id.*) Herrera claims that she did not hear any references to Holiday Cruise Line, CWT, or VVT. (DSOF ¶ 45.) Defendant claims that the phone number that called Herrera was not one of the over 13,000 telephone numbers that VVT used. (DSOF ¶ 46.) However, Plaintiffs dispute this and note that an email confirmed that VVT placed an outbound call to Herrera's cell phone. (*Id.*)

Plaintiffs point to evidence in the record of an email from VVT to Defendant confirming that VVT agents dialed Herrera's number six times, including on May 4, 2015. (Email, Ex. H to Supplemental

Exhibits, Dkt. No. 242.) Plaintiffs also cite Herrera's unrebutted deposition testimony that she answered the call on May 4, 2015 and heard a recorded voice on the other end of the line. (Herrera Decl., Ex. H to Supplemental Exhibits.)

Defendant argues that the email from VVT to Defendant confirming that VVT called Herrera is inadmissible hearsay because the email was sent by a person not party to this case. A court "may consider only admissible evidence in assessing a motion for summary judgment." *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). However, Federal Rule of Evidence 801(d)(2)(D) provides a hearsay exception when a statement is offered against an opposing party and "was made by the party's agent or employee on a matter within the scope of that relationship and while it existed . . . ." FED. R. EVID. 801(d)(2)(D). Because the Court has found that VVT was Defendant's agent, the email falls under the agency hearsay exception, is admissible, and can be considered for summary judgment purposes.

The email is clear evidence that VVT called Herrera. Defendant argues that the number that appeared on Herrera's caller ID is not one of the thousands that VVT used. However, in a previous ruling, this Court referred to that argument as "inconsequential" because Defendant's own internal emails confirmed that VVT "placed an outbound call to Herrera's phone number." *Bakov*, 2019 WL 1294659, at *17. Defendant has presented no new arguments as to why the

Court should not continue to rely on the email as evidence that VVT called Herrera.

Additionally, Herrera provided unrebutted testimony that she answered the phone call. (Herrera Decl.) Her contemporaneous social media post provides further evidence that she received a call and that she answered it. (Herrera Facebook Post, Ex. H to Supplemental Exhibits.) Finally, Defendant admits in its briefing that "[at] best, Herrera has evidence that she *received* and *answered **one*** telephone call . . ." (Def.'s Mot. at 23.) (emphasis in original). Because the Court has ruled that VVT violated the TCPA by playing prerecorded voice in every answered call, the evidence presented is enough to defeat Defendant's argument. Herrera received and answered a single call; this is enough to establish a TCPA violation. As a result, the Court denies Defendant's Motion for Summary Judgment as to Plaintiff Herrera's claim.

## IV. <u>CONCLUSION</u>

For the reasons stated herein, Plaintiffs' Motion for Partial Summary Judgment (Dkt. No. 225) is granted and Defendant's Motion for Summary Judgment (Dkt. No. 228) is denied.

The Court rules as follows:

(1) enters summary judgment for the class on their TCPA claim;

(2) finds Defendant CWT liable for VVT's actions; and

(3) makes the finding of fact enabling the Court to award treble damages, but will decide to what extent, if any, to amplify damages after briefing on damages.

**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

Dated: 12/9/2019