**THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| ANGEL BAKOV, et al, | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| v. | ) | No. 15 C 2980 |
| | ) | |
| CONSOLIDATED WORLD TRAVEL, INC. | ) | Chief Judge Virginia M. Kendall |
| d/b/a HOLIDAY CRUISE LINE, a Florida | ) | |
| corporation, et al, | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

The Court directed the Clerk to enter a default judgment of $47,053,500 for the Illinois Class against the Defendant, Consolidated World Travel, Inc. d/b/a Holiday Cruise Line, on July 9, 2024. (Dkt. 379). Since then, Plaintiffs have sought to discover the assets of the Defendant judgment debtor by issuing citations, including to Defendant CWT's founders, directors, and presidents James H. Verrillo, Daniel E. Lambert, Jennifer Poole, and Donna Higgins. (Dkt. 384) (collectively "Principals"); (Dkt. 395 at 11-13). The Court granted that request in its April 23, 2025, Order. (Dkt. 386). For nearly four months, the Principals apparently did not comply. Rather, on August 15, 2025, they moved to quash the citations. (Dkt. 390). For the reasons below, the Court denies the Principals' motion. The Principals are hereby ordered to comply with Plaintiffs' requests in full and in good faith in accordance with and no later than three weeks from the date of this Order. The Court may sanction the Principals and hold them in contempt if they fail to comply. Ill. Sup. Ct. R. 277(h). The parties must file a joint status report three weeks from the date of this Order.

1

## BACKGROUND

The Court has discussed the facts of this case in detail in several prior Opinions and will not do so again except as pertinent to the current ruling. (*See, e.g.*, Dkts. 332, 298, 272, 215, 78).[1] This case concerns Defendant's intentional violations of the Telephone Consumer Protection Act which makes it illegal to call any cell phone "using" an "artificial or prerecorded voice." 47 U.S.C. § 227(b)(1)(A). Defendant contracted with and directed an Indian company called Virtual Voice Technologies Pvt. Ltd. ("VVT") to call thousands of Americans—including tens of thousands of Illinois citizens—using virtual voice technology software to offer them "a free cruise." (Dkt. 272).

On December 9, 2019, the Court entered summary judgment for the Illinois Class on their TCPA claim. (*Id.*) The facts giving rise to these intentional violations are "troubling." (*Id.* at 24). The Principals engaged in a "pattern" of setting up new entities, serially violating the TCPA—by directing automated calls to thousands of citizens in Illinois for profit—and then quickly shuddering shop—only to set up a new corporation to disclaim liability or control over the old, dissolved company. (*Id.* at 20-26); (*see also id.* at 24) (explaining how the Principals are "the founders and operators of" Caribbean Cruise Line, Inc. which was the predecessor company that was reorganized into Defendant Holiday Cruise Line during these proceedings) (quoting *Aranda v. Caribbean Cruise Line, Inc.*, 179 F. Supp. 3d 817, 832 (N.D. Ill. 2016) (finding Caribbean Cruise Line, Inc. was controlled by the Principals)); (*see also* Dkt. 225-13) (Lambert, Verrillo, and their entities entering into a Final Judgment and Consent Decree with Illinois Attorney General after "engag[ing] in trade or commerce within the meaning of the Illinois Consumer Fraud and Deceptive Business Practices Act" by offering "vacation packages in connection with the

---

[1] This case is consolidated with *Kinaya Hewlett, on behalf of herself and all others similarly situated, v. Consolidated World Travel, Inc. d/b/a Holiday Cruise Line*, No. 17 C 973 (N.D. Ill.) and related to *Herrera, individually and on behalf of all others similarly situated, v. Consolidated World Travel, Inc., d/b/a Holiday Cruise Line*, No. 15 C 4030 (N.D. Ill.).

2

solicitation for sale and sale of time-shares to those consumers" and being subject to $1.5 million in restitution). The Court found that Defendant's TCPA violations were "willful" and "knowing under the TCPA" and held that trebling damages was necessary to deter future wrongdoing. (*Id.* at 25-26) (citing 47 U.S.C. § 227(b)(3)) (quotes omitted).[2] On March 6, 2024, the Court Ordered Defendant to pay the class notice costs of $725,150 by March 31, 2024. (Dkt. 335).

Immediately after being ordered to pay, Defendant's counsel—who now represent the Principals—withdrew from representation. (Dkts. 360-365).[3] Defendant never retained new counsel. Instead, Defendant intentionally abandoned the litigation and violated the Court's order by failing to pay the costs of the class. (Dkt. 370). On May 8, 2024, Plaintiffs filed a motion for an order to show cause why Defendant should not be held in civil contempt of court (Dkt. 368). On May 14, 2024, the Court ordered Defendant to appear for that motion on May 30, 2024. (Dkt. 369). Defendant violated that Order as well by failing to appear. (*See* Dkt. 379). The Court therefore granted Plaintiffs' motion for an order to show cause. (Dkt. 370). After Defendant defaulted, the Court entered a default judgment of $47,053,500 against Defendant on July 9, 2024. (Dkt. 379). To discover the debtor Defendant's assets, Plaintiffs moved to issue citations, including against the Principals; the Court granted Plaintiffs' motion to issue citations in its April 23, 2025, Order. (Dkts. 384, 386). About four months later, apparently instead of complying with the April 23, 2025, Order or the citations to discover assets, the Principals—now represented by the same attorneys who represented the Defendant—moved to quash, raising a litany of challenges to the citations. (Dkt. 390).

---

[2] The Court did not determine the specific amount of damages when ruling on summary judgment.
[3] The Counsel that represented Defendant and currently represents the Principals were part of the representation for the Caribbean Cruise Line, Inc. *See Aranda*, 12 C 4069, 179 F.Supp.3d 817.

**LEGAL STANDARD**

A citation to discover assets initiates a supplementary proceeding governed by Federal Rule of Civil Procedure 69. Rule 69 provides that supplementary proceedings "to and in aid of judgment or execution" "must accord with the procedure of the state where the court is located." Fed. R. Civ. P. 69(a)(1). Illinois law entitles a judgment creditor to prosecute citations to discover assets for the purposes of examining the judgment debtor or any other person to discover assets or income of the debtor. 735 ILL. Comp. Stat. 5/2-1402; Ill. Sup. Ct. R. 277.

**DISCUSSION**

I. **Ancillary Jurisdiction**

a. **Personal Jurisdiction**

The parties conflate and misapply different legal theories in their briefs regarding jurisdiction. The Court addresses each in turn, but under the proper analyses and sections below. The Court has subject matter jurisdiction. *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 387 (2012). The question is whether it has personal jurisdiction over the Principals.

The Principals summarily claim that the Court has no personal jurisdiction over them because they are non-residents with nominal contacts with Illinois. (Dkt. 390 at 9); (Dkt. 398 at 12). They cite to a prior order from a different lawsuit where they submitted affidavits attesting to their lack of contacts with Illinois. (Dkt. 398 at 12). They resubmitted substantially similar affidavits in their motion to quash. (*See* Dkt. 390-5 *through* 390-8). Plaintiffs counter by noting that the Principals were directly involved in Defendant's operations and were "deeply entangled in the underlying litigation." (Dkt. 395 at 11). Plaintiffs also point to Judge Leinenweber's description of the Principals' "troubling pattern" of creating companies to violate the TCPA, as well as deposition testimony showing substantial control over the Defendant entity. (*Id.* at 12-13).

This degree of "contacts," Plaintiffs contend, is "certainly" sufficient for the Court to exercise personal jurisdiction over the Principals for supplementary proceedings. (*Id.* at 13).

The "current framework for assessing personal jurisdiction under the Fourteenth Amendment derives from *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945)." *Fuld v. Palestine Liberation Org.*, 606 U.S. 1, 12 (2025). "Under that framework, a tribunal's authority over a defendant depends on the defendant's having such contacts with the forum State that the maintenance of the suit is reasonable, in the context of our federal system of government, and does not offend traditional notions of fair play and substantial justice." *Id.* (quotes omitted).

There are two types of personal jurisdiction: general and specific. *Id.*; *Bristol-Myers Squibb Co. v. Superior Court of Cal., San Francisco Cty.*, 582 U.S. 255, 262 (2017). "General jurisdiction lies in the forum where the defendant is domiciled or 'fairly regarded as at home.'" *Id.* (quoting *Bristol-Myers Squibb*, 582 U.S. at 269). "A court in such a forum 'may hear *any* claim against that defendant, even if all the incidents underlying the claim occurred in a different State.'" *Id.* (quoting *Bristol-Myers Squibb*, 582 U.S. at 262). No party contends that the Principals are subject to general jurisdiction in Illinois.

"Specific jurisdiction is different: It covers defendants less intimately connected with a State, but only as to a narrower class of claims." *Id.* (quoting *Ford Motor Co. v. Montana Eighth Judicial Dist. Court*, 592 U.S. 351, 359 (2021)). "A state court may exercise specific jurisdiction 'over a nonresident defendant only so long as there exist "minimum contacts" between the defendant and the forum State.'" *Id.* (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291(1980)). "The requisite contacts for this kind of jurisdiction often go by the name purposeful availment." *Id.* at 12-13 (quotes omitted). "The defendant . . . must take some act by

5

which it purposefully avails itself of the privilege of conducting activities within the forum State. . . . And the plaintiff's claims . . . must derive from[] or be connected with those activities." *Id.* at 13 (cleaned up).

"There are various formulations of the standard for establishing specific personal jurisdiction, but they may be condensed to three essential requirements: (1) the defendant must have purposefully availed himself of the privilege of conducting business in the forum state or purposefully directed his activities at the state," "(2) the alleged injury must have arisen from the defendant's forum-related activities," and "(3) the exercise of jurisdiction must comport with traditional notions of fair play and substantial justice[.]" *Felland v. Clifton*, 682 F.3d 665, 673 (7th Cir. 2012) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) and *Int'l Shoe,* 326 U.S. at 316)).

### i. Conduct "purposefully directed" at Illinois

"[T]he Supreme Court's important decision in *Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984), provides useful contours in conducting the purposeful-direction analysis in a tort case." *Felland*, 682 F.3d at 674.[4] The Seventh Circuit's "opinion in *Tamburo* distilled three requirements from *Calder* for determining whether conduct was 'purposefully directed' at the forum state: (1) intentional conduct (or 'intentional and allegedly tortious' conduct); (2) expressly aimed at the forum state; (3) with the defendant's knowledge that the effects would be felt—that is, the plaintiff would be injured—in the forum state.'" *Felland*, 682 F.3d at 674-75 (quoting *Tamburo v. Dworkin*, 601 F.3d 693, 703 (7th Cir. 2010)).

---

[4] A violation of the TCPA sounds in tort, not contract. *Abante Rooter & Plumbing, Inc. v. Oh Ins. Agency*, 2018 WL 993883, at *3 (N.D. Ill. Feb. 20, 2018) ("[T]he TCPA can be seen as merely liberalizing and codifying the application of a common law tort to particularly invasive type of unwanted telephone call.") (quoting *Mey v. Got Warranty, Inc.*, 193 F. Supp. 3d 641, 645 (W. Va. 2016)); *see also Dolemba v. Illinois Farmers Ins. Co.*, 213 F. Supp. 3d 988, 993 (N.D. Ill. 2016) (agreeing with this reasoning and holding same).

First, the Principals were the founders, owners, presidents, and primary officers of Defendant CWT. (Dkt. 272 at 23-24); (Dkt. 395 at 11-13). The Court has already found that they exercised *significant* control over every aspect of the Defendant's day-to-day operations, C-Suite decisions, and the specific conduct that violated the TCPA. (*Id.* at 23-25). The Court has also already found, when deciding to treble damages against Defendant, that Defendant's conduct was "intentional," "willful," and "knowing" because Defendant was "making its call intentionally, rather than inadvertently." (*Id.* at 21-22). The Principal's arguments in opposition attempt to shield themselves from jurisdiction based on corporate formalities that boil down to this: because they were employees, the Court cannot exercise jurisdiction over them. (Dkt. 390 at 6-9); (Dkt. 398 at 7-15). The Principals' "status as employees does not somehow insulate them from jurisdiction," however. *Calder v. Jones*, 465 U.S. 783, 790 (1984). *Calder* is instructive on this point. In *Calder* the Court held that a California court properly exercised personal jurisdiction over a reporter and editor who both worked for the *National Enquirer* but who were Florida residents who had written and edited an allegedly libelous article concerning a California resident. *Id.* at 785-86. The Court rejected the defendants' arguments that they were not responsible for the *National Enquirer*'s distribution in California and had no stake in its publication there; rather, it held that their intentional and allegedly tortious actions were "expressly aimed at California." *Id.* at 789. It is therefore without question that the Court may look at the Principals' conduct and consider their individual actions—separate and apart from the company they work for—when deciding whether personal jurisdiction over them is proper. *Id.* at 790.

The Principals were the key decision makers at Defendant CWT with knowledge of and control over its day-to-day activities. They intentionally directed tens of thousands of illegal calls into Illinois. (Dkt. 272 at 23-25); (Dkt. 395 at 11-13). Principal Lambert, declared under oath that

he, "[a]s the President of [Defendant] CWT," has "knowledge of [Defendant] CWT's financial performance and condition and ha[s] access to its banking and financial records." (Dkt. 354, ¶ 2). It is undisputed that Principals Lambert and Verrillo were "running the operations" of the Defendant and "checking on all departments, marketing, fulfillment, and customer service." (Dkt. 244 at 21-22) (cleaned up). It is likewise undisputed that both Lambert and Verrillo "exercised significant control over the Defendant" and that they were "the founders and operators of" Caribbean Cruise Line which reorganized into the Defendant CWT. (Dkt. 272 at 24) (quoting *Aranda*, 179 F.Supp.3d at 832). Principals Lambert and Verrillo also "authoriz[ed] payments to employees" and "the Agreement between Defendant and VVT." (*Id.*) These are just a few of the reasons why this Court previously held that it "is clear . . . that Plaintiffs have presented enough evidence that [Caribbean Cruise Line] and Defendant are related and that Lambert and Verrillo were involved enough in managing these two companies to convince the Court that it should consider using its discretion to treble damages for the purpose of deterring future bad behavior." (*Id.* at 25).

As for Principals Poole and Higgins, they were Defendants CWT's Presidents who were in control of and directed its telemarketing activities. (Dkt. 395 at 12-13); (Dkt. 395-2 at 9); (Dkt. 229 at 4). These telemarketing activities—calls using artificial or prerecorded voices—are the very thing that the Court found intentionally violated the TCPA. (Dkt. 272 at 20-26). Both Poole and Higgins exercised control over the script that VVT used when making its calls to Illinois citizens; they analyzed the call reports, detailing information such as call volume and length; and they were also involved with the contracting process with VVT. (Dkt. 395 at 12-13). These are just a few of the instances that show that each of the four Principals purposely directed ***immense*** intentional tortious conduct into the state of Illinois. (*See also* Dkts. 225, 226, 228-230, 241-246, 250-254).

8

Indeed, the tortious conduct that the Principals directed at Illinois was not a one-off incident. It was a deliberate, widespread *campaign* that targeted and injured nearly 40,000 Illinois citizens. (Dkt. 215 at 17, 43, 45, 48). Just as in *Calder*, the Principals' "intentional" and "tortious" "actions were expressly aimed at" Illinois. *Calder*, 465 U.S. at 789.

The Principals' arguments against this purposeful availment are cursory and unavailing. They rely on affidavits they submitted in a different court proceeding. (Dkt. 398 at 12); (citing *Bakov et al. v. Consolidated Travel Holdings Group, Inc. et al.*, 20 C 2459 (N.D. Ill. 2020)). These affidavits contain a list of averments attesting to nominal contacts with Illinois for each Principal. (Dkt. 30-18 *through* Dkt. 30-21). The Principals also resubmitted substantially similar affidavits in their motion to quash. (Dkt. 390 at 8-9); (Dkt. 390-5 *through* 390-8). None of these averments are relevant to the specific inquiry before the Court: the specific conduct that the Principals engaged in that caused tens of thousands of illegal phone calls to be sent into Illinois. To the extent some of the broad averments can be read that way, they are contradicted by the record. For example, Lambert avers that "I do not do business in and have no contacts with Illinois." (*Bakov et al.*, 20 C 2459 Dkt. 30-18). While perhaps there is a nugget of truth in this, it is mostly fool's gold. It is hard to square this against the fact that Lambert founded, managed, and oversaw all aspects of the Defendant—"exercising significant control over the company," "authorizing payments," and "the Agreement between Defendant and VVT." (Dkt. 272 at 24). Lambert knowingly contracted with VVT so that VVT would use its software to direct thousands of illegal calls into Illinois. (*Id.*); (Dkt. 215 at 43). While Lambert tries to wash his hands of the illegality under corporate formalities, the personal jurisdiction inquiry is not so narrow. *Calder*, 465 U.S. at 790. The Principals' conduct—where they were the driving force causing the damage to tens of thousands of Illinois residents amounting to nearly fifty million dollars' worth of harm—is just the

sort of "minimum contacts with the forum state such that he or she 'should reasonably anticipate being haled into court' there." *Felland*, 682 F.3d at 673 (quoting *Tamburo*, 601 F.3d at 701); *Burger King*, 471 U.S. at 474.

The same stands true for each of the other three Principals as their affidavits are substantially similar in this regard. (*Bakov et al.*, 20 C 2459, Dkt. 30-18 *through* Dkt. 30-21) (virtually identical affidavits as relevant here); (Dkt. 390-5 *through* 390-8) (same); *see Calder*, 465 U.S. at 790 ("Each defendant's contacts with the forum State must be assessed individually."). The first prong is therefore satisfied. (Dkt. 272 at 23-25); (Dkt. 395 at 11-13); *Calder*, 465 U.S. at 790; *Felland*, 682 F.3d at 675 ("Clifton's communications were intentional misrepresentations under Wisconsin law, which suffices to establish intentional and allegedly tortious conduct.") (quotes omitted); *Tamburo*, 601 F.3d at 704 ("Tamburo alleges that the individual defendants intentionally published defamatory statements on their websites or in blast emails. He further alleges that this conduct tortiously interfered with his business, constituted a trade libel, and that the defendants entered into a conspiracy to commit these wrongful acts against him. These are intentional-tort allegations, bringing this case squarely within the *Calder* formula even if the scope of the inquiry is more narrowly focused on the alleged tortious acts."); *Catalyst Consulting Grp., Inc. v. Smith*, 2025 WL 2734302, at *3 (N.D. Ill. Sept. 25, 2025) ("Defendants allegedly gathered confidential information owned by Plaintiff in Illinois and disclosed that data to Plaintiff's direct competitor, another Illinois corporation. In so doing, Defendants had to have known that Plaintiff would have been injured in Illinois. This is enough to establish purposeful availment."); *contrast with Mobile Anesthesiologists Chicago, LLC v. Anesthesia Assocs. of Houston Metroplex, P.A.*, 623 F.3d 440, 444 (7th Cir. 2010) (finding no purposeful availment when Defendant's only

contacts with Illinois were maintaining a website accessible in Illinois, receiving a cease and desist letter regarding a dispute about Defendant's website, and being members of Illinois associations).

### ii. "Express aiming" at the forum state

There is little doubt that the Principals "expressly aimed" their intentional conduct at Illinois. To hold otherwise would be to ignore the entirety of the case: indeed, Plaintiffs secured class certification *for the Illinois Class* based on the Principals directing nearly 40,000 illegal calls at Illinois residents. (Dkt. 272 at 1-5); (Dkt. 215 at 43). In *Calder*, the Supreme Court found that directing one article to California was sufficient contacts for personal jurisdiction. *Calder*, 465 U.S. at 788-90. In *Felland*, the Seventh Circuit found that "several letters, multiple phone calls, and almost two dozen emails . . . to the Fellands' home in Wisconsin . . . were 'expressly aimed' at Wisconsin" . . . and thus, "under the doctrine established in *Burger King* and *Calder*, Clifton's actions are properly considered as having been purposefully directed at the forum state." 682 F.3d at 676. In *Tamburo*, the Seventh Circuit found that Defendants' tortious conduct—publishing false and defamatory statements, sending blast emails, and making calls—were sufficient "to establish personal jurisdiction over these defendants under either a broad *or* a more restrictive view of *Calder*" because "these defendants specifically aimed their tortious conduct at Tamburo and his business in Illinois[.]" 601 F.3d at 706.

### iii. The Principals' knowledge that the Plaintiffs would be injured in Illinois

The Court has already found that while the Principals were running the Defendant they "intentionally" directed nearly 40,000 calls into the state of Illinois in violation of the TCPA. (Dkt. 272 at 20-26). Each violation injured an Illinois resident. (*Id.*); (*see also id*. at 1-5). The entire purpose of the illegal calls was to lure as many Illinois residents into purchasing Defendant's products and services. (*See id*. at 1-5); (*see also* Dkt. 215 at 17) ("during CWT's Holiday Cruise

11

Line campaign, a total of 1,674,565 calls were transferred to CWT's call centers"). It is scarcely indisputable that the Principals had knowledge that the effects would be felt in Illinois. (Dkt. 272 at 20-26); (*see also* Dkt. 215 at 43) (discussing how "39,969 unique phone numbers contained an Illinois area code"). Each of the four Principals' roles at Defendant further demonstrate this. Verrillo and Lambert ran all aspects of the business, signed the agreement with VVT, and received reports regarding the VVT calls—which showed the call details. (*See, e.g.*, Dkt. 272 at 23); (Dkt. 395 at 11-12); (Dkt. 395-3 at 39); (Dkt. 246 at 3-4, 12-13). Poole and Higgins were each, at one point, the President of Defendant, and both exercised control over Defendant's telemarketing— which included the VVT calls. (Dkt. 395 at 12-13) (citing Poole and Vogel depositions regarding same). In other words, the Principals "knew that the brunt of that injury would be felt by [Plaintiffs] in the State in which [they] live[] and work[.]" *Calder*, 465 U.S. at 789-90. Indeed, the Principals "knew from the beginning" that they "directed" not just "multiple communications" but tens of thousands of communications at Illinois residents which now constitute the Illinois Class. *Felland*, 682 F.3d at 675. This inquiry is therefore satisfied for all these reasons plus the reasons noted above for the "express aiming" inquiry. *Tamburo*, 601 F.3d at 704 ("As an analytical matter, *Calder's* 'express aiming' inquiry overlaps with the question whether the defendant knew the plaintiff would suffer the injury in the forum state").

### b. Whether the injury arose from Defendant's forum-related activities

The illegal calls are central to Plaintiffs' TCPA claim and are the but for and proximate cause of the injuries to the Illinois class. (Dkt. 272 at 23-25). The Court has already found that Defendant intentionally violated the TCPA. (*Id.*) It likewise found that the Principals exercised significant control over the Defendant and purposefully directed their immense tortious conduct at

Illinois. (*Id.*); *supra* at 7-12. Plaintiffs' "claims arise directly out of the individual [Principals'] contacts with Illinois." *Tamburo*, 601 F.3d at 709; *Felland*, 682 F.3d at 676-77.

### c. Traditional notions of fair play and substantial justice

"The final inquiry in the specific-jurisdiction analysis is whether the exercise of personal jurisdiction over an out-of-state defendant would offend traditional notions of fair play and substantial justice." *Felland*, 682 F.3d at 677 (citing *Int'l Shoe,* 326 U.S. at 316). To make this determination, the Court "evaluate[s] 'the burden on the defendant,' 'the forum State's interest in adjudicating the dispute,' 'the plaintiff[s]' interest in obtaining convenient and effective relief,' 'the interstate judicial system's interest in obtaining the most efficient resolution of controversies,' and the 'shared interest of the several States in furthering fundamental substantive social policies.'" *Burger King*, 471 U.S. at 477 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980)). All factors favor personal jurisdiction. The burden to the Principals is no different than any out-of-state resident subject to personal jurisdiction and they have offered no factual basis for the Court to find otherwise. (*See* Dkts. 390, 398). Illinois has a ***significant*** interest in adjudicating this dispute. With nearly 40,000 calls made to Illinois numbers, and each one an intentional violation of the TCPA, Illinois carries a significant stake in this litigation. The Plaintiffs—the Illinois Class—also share this significant interest. This Court is familiar with the immense record from this case, forcing new courts to take on this case, merely for purposes of issuing initial discovery citations, would not be a wise use of judicial resources. Social policy also supports jurisdiction. The Principals cannot be surprised at being haled into this Court by their conduct; it is reasonable to venture that when you direct tens of thousands of illegal calls into a state, you may be haled into court there. Lastly, social polices further favor a singular ruling on this matter.

The Principals resubmitted affidavits averring that they are not domiciled in Illinois and lack contacts with Illinois. (*See* Dkt. 390-5 *through* Dkt. 390-8). First, physical presence in the state is not necessary: "jurisdiction cannot be avoided 'merely because the defendant did not *physically* enter the forum State.'" *Tamburo*, 601 F.3d at 701 (quoting *Burger King*, 471 U.S. at 476). Second, their affidavits speak nothing of the central issue giving rise to personal jurisdiction for purposes of these supplementary proceedings: their conduct directing immense unlawful activity into the state of Illinois. (*See* Dkt. 390-5 *through* Dkt. 390-8). As discussed, it is undisputed that the Principals played the key role directing tens of thousands of illegal calls into Illinois; conduct so egregious that the Court decided to treble damages against the Defendant. (Dkt. 272 at 24); (Dkt. 395 at 12-13); *supra* at 7-13. Third, if anything, it would be unfair, unjust, and unreasonable to the state of Illinois and the thousands of injured class members to hold that the Principals cannot be haled into this Illinois Court to determine the judgment debtor's assets. This much is so given that the Defendant intentionally abandoned the litigation—violating Court orders along the way. Lastly, there are inconsistencies with the Principals' declarations that give the Court pause. For example, Poole avers that she was just the "Director of Marketing" with no "dealings" with CWT "since 2016 or 2017" despite testifying that she was actually the President and the Florida Department of State's records showing that she was the Director from 2012 through 2014. (Dkt. 395-2 at 5). Likewise, Principal Lambert avers that he was a mere "consultant" for CWT when the record shows he was far more than that. (Dkt. 390-5 at 2). Even more concerning, Lambert, as the President and Owner of Defendant CWT dissolved CWT *during* these Court proceedings on September 27, 2024—right after the Court entered its $47,053,50 judgment against CWT. (Dkt. 379).[5]

---

[5] "A court may take judicial notice of facts that are (1) not subject to reasonable dispute and (2) either generally known within the territorial jurisdiction or capable of accurate and ready determination through sources whose accuracy

The Court finds that it has personal jurisdiction over the four Principals for purposes of this supplementary proceeding to issue initial citations to discover assets of the Defendant judgement debtor and that this specific jurisdiction here does not violate the due process principles under the Fourteenth Amendment. *Fuld*, 606 U.S. at 12.

### d. Law of the Case

The Principals contend that the Court has no personal jurisdiction over them based on the law of the case. Judge Leinenweber previously ruled here and in a separate case that it does not have personal jurisdiction over the then Defendants and now Principals. (Dkt. 78); (*Bakov et al.*, 20 C 2459, Dkt. 50). The Principals cite no law on this issue save one case: *Creek v. Vill. of Westhaven*, 144 F.3d 441, 445 (7th Cir. 1998). They instead repeatedly point back to Judge Leinenweber's prior two rulings. (Dkt. 390 at 8-9); (Dkt. 398 at 7-15).

"The doctrine of law of the case establishes a presumption that a ruling made at one stage of a lawsuit will be adhered to throughout the suit." *Cannon v. Armstrong Containers Inc.*, 92 F.4th 688, 701-02 (7th Cir. 2024) (quoting *Avitia v. Metro. Club of Chi., Inc.*, 49 F.3d 1219, 1227 (7th Cir. 1995)). "The doctrine is discretionary, 'not an inflexible dictate.'" *Id.* (quoting *Chi. Joe's Tea Room, LLC v. Village of Broadview*, 894 F.3d 807, 818 (7th Cir. 2018)); *see also Peterson v. Lindner*, 765 F.2d 698, 704 (7th Cir. 1985) ("[Law of the case] must yield to rational decision

---

cannot be questioned." *Ennenga v. Starns*, 677 F.3d 766, 773-74 (7th Cir. 2012). "Courts may take judicial notice of information from an official government website which is not subject to reasonable dispute." *Ziklag IP LLC v. Netflix, Inc.*, 2025 WL 904311, at *3 (N.D. Ill. Mar. 25, 2025); *see also Denius v. Dunlap*, 330 F.3d 919, 926 (7th Cir. 2003) (holding that information from National Personnel Records Center, Military Personnel Records "is appropriate for judicial notice because it is not subject to reasonable dispute"); *Outley v. City of Chicago*, 407 F. Supp. 3d 752, 767 (N.D. Ill. 2019) (taking judicial notice of information from the city's website); *Ambrosetti v. Oregon Catholic Press*, 458 F. Supp. 3d 1013, 1017 n.1 (N.D. Ind. 2020) ("In particular, the Court may take judicial notice of public record information obtained from an official government website.").

making." (citing 20 A.L.R. Fed. 13 (1974)); *Avitia*, 49 F.3d at 1227 ("But [law of the case] is no more than a presumption, one whose strength varies with the circumstances; it is not a straitjacket.") (citation omitted). When departing from the doctrine Courts consider "(1) substantial new evidence introduced after the first review, (2) an intervening change in the law, and (3) a clearly erroneous decision." *Id.* (citing *Kathrein v. City of Evanston*, 752 F.3d 680, 685 (7th Cir. 2014)).

The doctrine does not apply here. The prior rulings on personal jurisdiction were based on different issues and law, under different procedural postures, and with different evidence presented to the Court. The Principals' arguments fundamentally misunderstand the differences between establishing personal jurisdiction for initial proceedings to establish liability under federal law compared with supplementary proceedings after a judgment to issue initial citations to discover assets to enforce a judgment under state law. The former concerns liability, the latter enforcement. Indeed, "[t]he jurisdictional analysis . . . plays out differently depending on the posture of the enforcement proceeding[.]" *Boim v. Am. Muslims for Palestine*, 9 F.4th 545, 552 (7th Cir. 2021). The Plaintiffs do not seek to hold the Principals liable in these proceedings. They seek to discover assets of the judgment debtor under Federal Rule of Civil Procedure 69, 735 ILL. Comp. Stat. 5/2-1402, and Ill. Sup. Ct. R. 277. This is permissible and within the bounds of proper supplementary proceedings and distinguishable from the prior rulings on personal jurisdiction. *See Boim*, 9 F.4th at 552.

The two prior rulings Principals repeatedly intone require quashing of the citations are not relevant. The first is a ruling from over a decade ago where the Court dismissed the then Defendant-Principals from the lawsuit due to lack of personal jurisdiction. This ruling is plainly distinguishable for several reasons. (*See* Dkt. 78). First, the jurisdictional inquiry whether the court

16

possesses personal jurisdiction under federal law over a Defendant for which he may ultimately be found liable is different from that under supplementary proceedings to discover assets to enforce a judgment under state law. *See* Fed. R. Civ. P. 69; 735 ILL. Comp. Stat. 5/2-1402; Ill. Sup. Ct. R. 277; *Boim*, 9 F.4th at 552. Indeed, the Supreme Court has "approved the exercise of ancillary jurisdiction over a broad range of supplementary proceedings involving third parties to assist in the protection and enforcement of federal judgments." *Peacock v. Thomas*, 516 U.S. 349, 356 (1996). Second, a decade later, the record is vastly different. When Judge Leinenweber dismissed the Principals from this lawsuit in 2016, he did not have the benefit of the key evidence and testimony that this Court now has. (*Compare* Dkt. 78 *with* Dkts. 390, 395, and 398). So even if this prior ruling were to count as the law of the case, it would fall into the exception that permits deviation when new evidence arises. *Cannon*, 92 F.4th at 701-02.

Moreover, and critically so, the Court specifically noted as a key basis for finding no personal jurisdiction a decade ago that Plaintiffs failed to produce affirmative evidence supporting the exercise of jurisdiction to overcome the then Defendant-Principals' affidavits. (Dkt. 78 at 3-4). Not so anymore. Since then, the Plaintiffs have provided sufficient evidence, including undisputed testimony from the Principals themselves, showing that jurisdiction is proper. *See supra* at 7-14. Lastly, even if the issue before the Court fell squarely within law of the case doctrine, the doctrine is discretionary. It gives way to the Court's discretion when, under circumstances such as these, later revelations reveal that abiding by it would do injustice. So, on that basis as well, as discussed further below, the Court declines to find that the law of the case doctrine is applicable here. *See infra* at 29-31 (discussing Defendant's violations)

The second fails for all these same reasons. The order is from *Bakov et al. v. Consolidated Travel Holdings Group, Inc. et al.*, 20 C 2459, Dkt. 50 (N.D. Ill. May 5, 2020). This is a separate

17

case where the Court dismissed the complaint with prejudice because it was "a refiling" of a Florida case which was itself a refiling of this case. (*Id.*, Dkt. 50 at 1). This fails because the discretionary doctrine of the law of the case does not apply to different cases. "Precedent teaches that, 'as most commonly defined, the law of the case doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages *in the same case.*'" *Jarrard v. CDI Telecommunications, Inc.*, 408 F.3d 905, 911-12 (7th Cir. 2005) (cleaned up) (quoting *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815-16, (1988)).

### e. Collateral Estoppel

The Principals make passing reference to the doctrine of collateral estoppel as another basis for finding that the Court lacks personal jurisdiction over the Principals. (Dkt. 390 at 8, n.3); (Dkt. 398 at 8). The Principals fail to provide analysis why this doctrine should apply.

"The preclusive effect of a federal-court judgment is determined by federal common law." *Taylor v. Sturgell*, 553 U.S. 880, 891 (2008) (citing *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 507-508 (2001)); *see also Scherer v. Balkema*, 840 F.2d 437, 442-43 (7th Cir. 1988) (applying federal common law to determine preclusive effect of prior federal proceedings in federal question case). Under federal common law, "[i]ssue preclusion has the following elements: (1) the issue sought to be precluded is the same as an issue in the prior litigation; (2) the issue must have been actually litigated in the prior litigation; (3) the determination of the issue must have been essential to the final judgment; and (4) the party against whom estoppel is invoked must have been fully represented in the prior action." *Adams v. City of Indianapolis*, 742 F.3d 720, 736 (7th Cir. 2014).

The Principals failed to provide any analysis, argument, or case law supporting their position save one case in a footnote that merely lists the elements for collateral estoppel. (Dkt. 390

at 8, n.3); (Dkt. 398 at 8). Neither of the two rulings the Principals apparently contend possess preclusive effect satisfy each of the four required elements. Judge Leinenweber's August 4, 2016, Order did not deal with the same issues here nor was it "essential to the final judgment." (*See* Dkt. 78). Similarly, Judge Leinenweber's May 5, 2021, Order dealt with different issues. (*Bakov et al.*, No. 20 C 2459, Dkt. 50). The issue here is whether the Court should quash the Plaintiffs' citations; under this analysis, the question of personal jurisdiction is not the same as Judge Leinweber's May 5, 2021, Order. As explained above, the jurisdictional inquiry here is strictly for purposes of these supplementary proceedings. The Court's inquiry must first determine whether it would violate due process under the Fourteenth Amendent to hold that it has jurisdiction over the Principals to require them to comply with the discovery citations. But it does not stop there. The jurisdictional analysis under supplementary proceedings must also assesses—even if federal due processes concerns are satisfied—if the extension of the Court's personal jurisdiction comports with Illinois state law, the Illinois long arm statute, and the Illinois supreme Court rules. *See infra* at 22-29. Judge Leinenweber analyzed none of those inquiries.

        **f. Fiduciary Shield Doctrine**

The Principals next contend the Court has no personal jurisdiction over them due to the fiduciary shield doctrine. (Dkt. 390 at 9); (Dkt. 398 at 14-15). They contend, for example, that Principal Lambert's affidavit was made "as the President of CWT" and therefore "clearly made in a corporate capacity[.]" (Dkt. 398 at 14) (emphasis removed). The Principals argue that, a finding against the application of the fiduciary shield doctrine here has "no place in any system that even pretends to provide due process protections" and would be the death of declarations and 30(b)(6) representatives. (*Id.* at 15) (contending without support that "[n]o 'employee' would be willing to sign a declaration or appear as a Rule 30(b)(6) representative").

The Illinois Supreme Court has "[r]ecogniz[ed] the fiduciary shield doctrine as valid Illinois law[.]" *Rollins v. Ellwood*, 141 Ill. 2d 244, 280 (1990) (Stamos, J.). "This doctrine, recognized by the courts of many states including Illinois—though also much criticized and by many jurisdictions rejected . . . denies personal jurisdiction over an individual whose presence and activity in the state in which the suit is brought were solely on behalf of his employer or other principal." *Rice v. Nova Biomedical Corp.*, 38 F.3d 909, 912 (7th Cir. 1994). "The doctrine shields nonresident employees from personal jurisdiction when they are in Illinois 'not to serve [their] personal interests, but to serve those of [their] employer or principal.'" *Reger v. Beason*, 805 F. Supp. 3d 864, 870 (N.D. Ill. 2025) (quoting *Rollins*, 141 Ill. 2d at 280).

This doctrine, however, is foremost equitable and discretionary. *Id.* at 874 ("The fiduciary shield doctrine is discretionary, not absolute.") (quoting *Patel v. CBC Pharma Holdco LLC*, 2025 WL 972868, at *8 (N.D. Ill. 2025)); *see also Rice*, 38 F.3d at 914 ("[T]he doctrine is usually said to be discretionary or 'equitable,' rather than absolute."); *Sommese v. Am. Bank and Trust Co., N.A.*, 2012 WL 3006824, at *3 (N.D. Ill. 2012) ("Application of the doctrine is discretionary or equitable, not absolute."); *Interlease Aviation Investors II (Aloha) LLC v. Vanguard Airlines, Inc.*, 262 F. Supp. 2d 898, 912 (N.D. Ill. 2003) ("[T]he fiduciary shield doctrine is discretionary or 'equitable,' rather than an absolute entitlement, and should be applied only where equity demands it."); *Intercon Sols., Inc. v. Basel Action Network*, 969 F. Supp. 2d 1026, 1062-63 (N.D. Ill. 2013), *aff'd*, 791 F.3d 729 (7th Cir. 2015).

"The Illinois Supreme Court underscored the equitable nature of the fiduciary-shield doctrine when it gave its blessing to the doctrine decades ago. Again, the doctrine ensures that courts exercise personal jurisdiction 'only when it is *fair, just, and reasonable* to require a nonresident defendant to defend an action in Illinois, considering the quality and nature of the

20

defendant's acts which occur in Illinois or which affect interests located in Illinois.'" *Reger*, 805 F. Supp. 3d at 870; (quoting *Rollins*, 141 Ill.2d at 275); *Femal v. Square D Co.*, 388 Ill. App. 3d 134, 140 (2009); *Brujis v. Shaw*, 876 F. Supp. 975, 979 (N.D. Ill. 1995). "Put simply, if an employee has control over his own duties, is a decision-maker for the company, and acts in his own personal interest, the fiduciary shield doctrine does not prevent the court from taking personal jurisdiction over that employee." *Walls v. VRE Chicago Eleven, LLC*, 344 F. Supp. 3d 932, 953 (N.D. Ill. 2018); *see also Crisostomo v. Schneider-Kidan,* 2017 WL 2880893, at *2 (N.D. Ill. July 6, 2017) (listing cases).

The doctrine does not apply. *Id.*; *see supra* at 7-15 (discussing extensive "control" and "decision-mak[ing]" abilities for the Defendant). To the extent this equitable doctrine even applies under these circumstances, the Court declines to invoke it. The Principals attempt to use this doctrine as a complete and automatic bar to the Court having personal jurisdiction over an employee of a company. (Dkt. 390 at 9, n.4); (Dkt. 398 at 14-15). The Principals offer scant evidence showing how being subjected to the discovery Plaintiffs seek would be inequitable. As discussed further below, the Court finds that the Plaintiffs' discovery requests are reasonable and tailored to the facts of this case, the lengthy record, and Defendant's egregious conduct. *See infra* at 31-33. That the Principals may be displeased with the breadth or scope of certain requests is a product of their own making and the facts of this old case. *Id.* Furthermore, none of the key compelling bases for courts to exercise their discretion to disclaim jurisdiction are apparent here; rather, the opposite appears at play. As explained, the Principals exercised significant "control" as "decision-maker[s] for the company." *Walls*, 344 F. Supp. 3d at 953; *see supra* at 7-15. The Defendant's and Principals' conduct during these proceedings, and others, also show that the Principals were acting in their "own personal interest[s]"—not what is best for the Defendant

21

entity. *Id.*; *see supra* at 1-3, 7-15. Lambert and Verrillo have continued their improper conduct of setting up shell companies to quickly turn a profit and then disband, reorganize, or shudder the corporate entity to move onto the next one. They did just that shortly after the Court entered its judgment. *Supra* at 14. It would be inequitable to apply this doctrine—discovery is necessary to enforce the Court's nearly 50-million-dollar judgment.

### g. Long Arm Statute

The second and final step of the jurisdictional analysis in supplementary proceedings is to ensure that, even if the assertion of jurisdiction comports with due process under the Fourteenth Amendment, it also comports with state law. The parties raise conflicting positions whether the Plaintiffs have complied with Illinois law.

The Principals contend that Illinois law requires that, "[b]efore a judgment creditor may proceed against a third party who is not the judgment debtor, the record must contain some evidence that the third party possesses assets of the judgment debtor." (Dkt. 390 at 11) (emphasis removed) (quoting *Margules v. Beckstedt*, 142 N.E.3d 325, 332 (Ill. Ct. App. 2019)). They state that the Plaintiffs have not met this burden because they have only provided "the bald, conclusory, throwaway assertion," [that] "'Plaintiffs believe [that the Principals] have property of or are indebted to the judgment debtor Defendant.'" (*Id.*) (quoting Dkt. 384 at 5). The Principals claim that Illinois law requires that a Plaintiff seeking to initiate a supplementary proceeding to issue citations to discover assets must already have "some evidence" that the Principals "presently possess" Defendant's assets. (Dkt. 398 at 17-18) (relying on *Margules v. Beckstedt*, 142 N.E.3d 325, 332 (Ill. Ct. App. 2019); *R & J Constr. Supply Co. v. Adamusik*, 70 N.E.3d 266, 271 (Ill. Ct. App. 2017); and *Schak v. Blom*, 777 N.E.2d 635, 639 (Ill. Ct. App. 2002)). In other words, a Plaintiff cannot issue a citation to a third party to discover a judgement debtor's assets without

already having evidence that the third party possesses the judgment debtor's assets. (*See id.* at 17-22).

In direct contrast to the Principals' position, the Plaintiffs contend that "the judgment creditor does not need to have evidence of specific assets or income sought, it only needs a belief that the third party possess assets of the judgment debtor" (Dkt. 395 at 15) (quoting *Lorillard Tobacco Co. v. Canstar (U.S.A.) Inc.*, 2005 U.S. Dist. LEXIS 16163, *4 (N.D. Ill. Aug. 4, 2005)); and, because of this, a "'fishing expedition' for assets *is* permissible in the context of an initial proceeding to discover assets, if it is based on the belief that such assets are in the third party's possession." *Id.* (cleaned up) (quoting *Regan v. Garfield Ridge Trust and Savings Bank*, 247 Ill. App. 3d 621, 624 (Ill. App. Ct. 1993)). Thus, Plaintiffs' reasonable belief that the Principals possess Defendant's assets is based on Judge Leinenweber's finding that Defendant engaged in a "'pattern' of 'illegal conduct' in creating a series of limited liability entities (Caribbean Cruise Line, Holiday Cruise Line, Consolidated World Travel, etc.) with the intent to engage in marketing campaigns in violation of the TCPA, reap the benefits of those campaigns, then move on to the next illegal venture and claim that the shell entity they created has 'no assets' while enriching themselves." (*Id.* at 16).

Plaintiffs have complied with Illinois law. After a judgment creditor secures a judgment, they may initiate supplementary proceeding to seek discovery "[i]n aid of the judgment or execution[.]" Fed. R. Civ. P. 69(a)(2). The rules proscribing discovery are broad. They state that a judgment creditor "may obtain discovery from **any person** . . . as provided in these rules or by the procedure of the state where the court is located." *Id.* (emphasis added). The Court applies Illinois procedural law because, in supplementary proceedings, the procedure "must accord with the

23

procedure of the state where the court is located[.]" Fed. R. Civ. P. 69(a)(1). Illinois law is equally expansive on this issue.

> A judgment creditor . . . **is entitled to prosecute citations to discover assets** for the purposes of examining the judgment debtor **or any other person** to discover assets or income of the debtor not exempt from the enforcement of the judgment, a deduction order or garnishment, and of compelling the application of non-exempt assets or income discovered toward the payment of the amount due under the judgment.

735 ILCS 5/2-1402(a) (emphasis added). Likewise, Illinois Supreme Court Rule 277 states that "[a] supplementary proceeding authorized by section 2-1402 of the Code of Civil Procedure may be commenced at any time with respect to a judgment which is subject to enforcement. **The proceeding may be against** the judgment debtor **or any third party** the judgment creditor **believes** has property of or is indebted to the judgment debtor." Ill. Sup. Ct. R. 277(a) (emphasis added).

Illinois state courts that have analyzed these statutes have interpreted them just as broadly as the plain language of the statutes permit. In *Regan v. Garfield Ridge Tr. & Sav. Bank*, the Court found the language of 735 ILCS 5/2-1402(a) expansive, stating that "it is apparent that, for purposes of an *initial* citation to discover assets, a judgment creditor need not specifically identify the assets or income sought. Instead, the language indicates that the supplementary proceedings can be used against *any person* to *discover* a judgment debtor's assets or income." 247 Ill. App. 3d 621, 623 (1993). The Court there analyzed "the joint committee comments following this section" and found that they "indicate that the section 'is designed to provide a statutory foundation for an efficient and expeditious procedure *for discovery of assets* and income of the judgment debtor and compelling their application to payment of the judgment or decree.'" *Id.* (citing Ill. Ann. Stat., ch. 110, par. 2-1402, Joint Committee Comments, at 862 (Smith-Hurd 1983)). The Court found Supreme Court Rule 277 equally expansive and held that "a 'fishing expedition' for

24

assets *is* permissible in the context of an initial proceeding to discover assets, if it is based on a belief that such assets are in the third party's possession." *Id.* at 624 (quoting *Federal Loan Corp. v. Harris*, 17 Ill. App. 3d 49, 50 (1974)). The Court concluded that, "[i]n light of the language of these cases interpreting and applying section 2-1402, we determine that specific assets need not be identified prior to the initiation of supplementary proceedings." *Id*.

Courts have rejected the Principals' position that a judgment creditor must have "some evidence" that the third party "presently possess[es]" some assets of the judgment debtor before the Court may initiate supplementary proceedings and issue citations. *See, e.g. In re Emerald Casino, Inc.*, 223 F. Supp. 3d 740, 751 (N.D. Ill. 2016) (distinguishing line of cases finding that "some evidence" applies).

The Court in *Emerald Casino* found that "[n]one of these cases is instructive on what evidence is required to initiate a citation proceeding because they address only what evidence is required to enter a judgment or order against the citation respondent." *Id.* Instead, the Court found that a judgment creditor need not identify specific property, holdings, or assets in order to begin supplementary proceedings to discover assets belonging to a judgment debtor which are held by a third party but only "'a belief' that the third party possesses collectable assets." *Id.* at 752; (quoting *Regan v. Garfield Ridge Trust and Savings Bank*, 247 Ill. App. 3d 621, 623-24 (Ill. App. Ct. 1993) (a "'fishing expedition' for assets *is* permissible in the context of an initial proceeding to discover assets, if it is based on a belief that such assets are in the third party's possession.")).

This makes sense and it exposes the flaw in the Principals' position. To hold otherwise would require a party to know what it cannot—evidence in the possession of third parties—before it is allowed to discover it—during *initial* citation proceedings. Furthermore, it appears that parties have sought to capitalize on this somewhat loose language of the "some evidence" rule by

attempting to cut short a citation proceeding before they can even begin. This finds no support in the text of 735 ILCS 5/2-1402(a) nor Illinois Supreme Court Rule 277—both which permit expansive discovery. Likewise, Illinois courts routinely hold that "[t]he provisions of section 2–1402 are to be liberally construed." *Schak,* 267 Ill.Dec. 832.

Each of the three cases Principals stake their claim on fail for these reasons. *Margules* concerned a case where "plaintiffs issued a third-party citation to discover assets against the debtors' lawyer," Richard Steck, to discover "the source of payments for" the lawyer's representation. *Margules v. Beckstedt*, 2019 IL App (1st) 190012, ¶¶ 1-3. "***During Stecks citation examination***, he explained that a third party, also his client, had asked him to represent the debtors. . . . Plaintiffs moved to compel Steck to reveal the identity of his third-party client. The trial court granted the motion . . . [and Steck] challenge[d] the trial court's" order. *Id.* (emphasis added). *Margules* is distinguishable because citation examination already occurred there (i.e., the court allowed discovery to commence to discover the assets). *Id.* When Steck pushed back against more discovery, the court rejected the position Principals now assert—highlighting the illogic of it: "But plaintiffs cannot even attempt to put forward 'some evidence' until they know the identity of the third party. Steck's assertion of privilege as to his client's identity has cut off the litigation before questions about plaintiffs' evidentiary basis could even be asked." *Id.* ¶ 22.

The Principals also contend that "*R & J Construction* is illustrative." (Dkt. 390 at 11) (citing *R & J Constr. Supply Co., Inc. v. Adamusik*, 2017 IL App (1st) 160778, ¶ 11)). The Court there stated that the subject of the appeal was "[t]he **hearing** that the trial court conducted . . . **on the propriety of the section 2-1401 petition**" and the judgments the trial court entered—"**not** the propriety of the issuance of the third-party citation." *R&J*, 2017 IL App (1st) 160778, ¶ 10 (emphasis added). While the court discussed the third-party citation, it did so under a different

26

procedural lens (i.e., after discovery had occurred and the court held a hearing on the petition itself whether to enter a judgment based on that evidence). *Id.*, ¶¶ 7-13. The court's reference to the "some evidence" rule was therefore not for the proposition the Principals now assert it. This fact is further affirmed by looking at the case the *R & J* court cites for the "some evidence" rule: *Schak v. Blom*, 334 Ill. App. 3d 129, 133 (2002). The *Schak* court stated the commonsense rule that a court has no jurisdiction to proceed to a petition hearing to order a third party to produce assets unless they have the assets of the judgment debtor:

> Before a judgment creditor may proceed against a third party who is not the judgment debtor, the record must contain some evidence that the third party possesses assets of the judgment debtor. Only then does the citation court have the jurisdiction to order that party **to produce those assets to satisfy the judgment**. . . . . If the third party possesses no assets of the judgment debtor, then the court has no authority to enter any judgment against the third party in a supplementary proceeding.

*Id.* (emphasis added). This is precisely why the court in *Schak* stated that "[n]othing in the Code authorizes the entry of a judgment at a supplementary proceeding against a third party who does not possess assets of the judgment debtor." *Id.* This line of law has *nothing* to do with *initiating* supplemental proceedings to issue *initial* citations to *discover* assets. *In re Emerald Casino, Inc.*, 223 F. Supp. 3d at 751. The Principals' attempt to latch onto loose language is unpersuasive and unfounded under Illinois law; holding otherwise would undermine the purpose of supplementary proceedings to enforce a judgment by requiring a party to prove the existence of evidence without giving them the opportunity to even discover it. The case that is instructive on this point is *Regan v. Garfield Ridge Tr. & Sav. Bank*, where the court held that:

> [I]t is apparent that, for purposes of an *initial* citation to discover assets, a judgment creditor need not specifically identify the assets or income sought. Instead, the language indicates that the supplementary proceedings can be used against *any person* to *discover* a judgment debtor's assets or income. Indeed, the joint committee comments following this section indicate that the section is designed to provide a statutory foundation for an efficient and expeditious procedure *for*

27

*discovery of assets* and income of the judgment debtor and compelling their application to payment of the judgment or decree.

247 Ill. App. 3d at 623 (quotes omitted). The Seventh Circuit also directly addressed this question and explained that "more than one [Illinois] appellate court has held that extensive searching for assets—even described as 'a "fishing expedition"'—is permissible against a third-party citation respondent 'if it is based on a belief that such assets are in the third party's possession.'" *GE Betz, Inc. v. Zee Co.*, 718 F.3d 615, 628 (7th Cir. 2013) (quoting *Regan*, 247 Ill. App. 3d at 624); *Federal Loan Corp,* 17 Ill. App. 3d at 50 ("A general 'fishing expedition' for assets may be had only on the initial citation").

"In sum, the above rules and cases tell us that a judgment creditor in Illinois, like [the Plaintiffs], [are] entitled to 'prosecute' a citation action to discover assets against a third party, like [the Principals], as long as the creditor reasonably believes that the third party holds a judgment debtor's assets." *Id.* (citing 735 Ill. Comp. Stat. 5/2–1402(a)). "After bringing the citation action, the creditor is entitled to search through the third party's books, papers, and records to locate the debtor's assets and to determine the validity of the third party's claim to those assets." *Id.*

## II. Valid Judgment

The Principals contend that the Court should quash the citations "because no judgment has been entered and, even if there were a default judgment, it was entered without the necessary hearing and evidence of damages." (Dkt. 390 at 9-10). They continue that Judge Leinenweber never "ruled [on] the determinations of damages," "any enhancement to damages," and they also claim that the "number of violations . . . to be decided . . . require[s] submission of affidavits." (*Id.* at 10) (emphasis removed); (*see also* Dkt. 398 at 15-17). The Plaintiffs counter by pointing to the Court's "Order Granting Motion For Entry Of Default And For Default Judgment Against Defendant, Consolidated World Travel, Inc. d/b/a Holiday Cruise Line" where the Court found

that "Defendant has exhibited a willful refusal to properly litigate this case or comply with unequivocal Court orders" and so it directed the clerk "to enter default judgment on behalf of the Illinois Class against Defendant in the amount of $47,053,500." (Dkt. 379 at 1-2). Plaintiffs also state that the Principals' attempt to challenge the facts giving rise to the Default Judgment Order now, after Defendant abandoned the litigation, is untimely and Plaintiffs did in fact provide the court with definite figures on damages that the Defendant did not challenge. (Dkt. 395 at 15).

"A judgment is final within the meaning of 28 U.S.C. § 1291 'if the district court has otherwise indicated its intent to finally dispose of all claims.'" *L. Offs. of David Freydin, P.C. v. Chamara*, 24 F.4th 1122, 1128 (7th Cir. 2022) (quoting *Wisconsin Central Ltd. v. TiEnergy, LLC*, 894 F.3d 851, 854 (7th Cir. 2018)); *Chase Manhattan Mortgage Corp. v. Moore*, 446 F.3d 725, 726 (7th Cir. 2006) ("The test is not the adequacy of the judgment but whether the district court has finished with the case.")). "An order is final for purposes of § 1291 if it 'ends the litigation on the merits and leaves nothing for the [district] court to do but execute the judgment.'" *India Breweries, Inc. v. Miller Brewing Co.*, 612 F.3d 651, 657 (7th Cir. 2010) (quoting *Catlin v. United States*, 324 U.S. 229, 233 (1945)); *BKCAP, LLC v. CAPTEC Franchise Trust 2000–1*, 572 F.3d 353, 357 (7th Cir. 2009).

The Court entered an order of default on July 8, 2024, in Docket Entry 378: "Plaintiff's Motion for entry of Default and for Default Judgment against Defendant, Consolidated World Travel, Inc., 375 is granted. Enter Order of Default as to Defendant Consolidated World Travel, Inc. Plaintiff shall submit a proposed Default Judgment Order for the Court to review." (*Id.*) The next day the Court entered its final judgment. (Dkt. 379) (ordering the "entry of default judgment"). In that Order, the Court stated its reasons for entering final judgment and included a definite amount for damages of $47,053,500. (*Id.* at 2). To the extent that the Principals believe that this is

29

insufficient for an entry of a final judgment, they have failed to support that assertion and it otherwise fails. *L. Offs. of David Freydin*, 24 F.4th at 1128 ("A judgment is final within the meaning of 28 U.S.C. § 1291 if the district court has otherwise indicated its intent to finally dispose of all claims.") (quotes omitted). The Court clearly indicated its "intent" for its July 9, 2024, Order (Dkt. 379) to constitute its final judgment. *Id.* To the extent that the Principals are seeking strict adherence to the "separate-document rule" by demanding a *third* separate document entry, that too fails and Defendant failed to make this arguments so it is waived. *Bankers Tr. Co. v. Mallis*, 435 U.S. 381, 387-88 (1978) ("Here, the District Court clearly evidenced its intent that the opinion and order from which an appeal was taken would represent the final decision in the case. A judgment of dismissal was recorded in the clerk's docket. And petitioner did not object to the taking of the appeal in the absence of a separate judgment. Under these circumstances, the parties should be deemed to have waived the separate-judgment requirement of Rule 58, and the Court of Appeals properly assumed appellate jurisdiction under § 1291."); *see* Fed. R. Civ. P. 58(c).

Once the Court ordered the Defendant to pay costs, the Defendant, its attorneys, (and no doubt the Principals in charge of the Defendant), suddenly abandoned this litigation and then dissolved CWT right after the Court entered its final judgment. Now the Principals of the Defendant are attempting to wash their hands of their conduct. This conduct shows a conscious choice to litigate until loss was clear, and then attempt to hide behind corporate formalities once the bills became due. In so doing, Defendant willfully violated two Court Orders. (*See* Dkt. 379). The Principals and their attorneys knew what they were doing. The conduct that this Court found "troubling" continues. *Supra* at 14; (Dkt. 225-13).[6] The Principals' contentions that they are now

---

[6] *See also Aranda*, 179 F. Supp. 3d at 832 ("There is also evidence that would permit a reasonable jury to find VOMT liable for the unlawful calls because it is either the alter ego of [Caribbean Cruise Line ("CCL")] or gave CCL and ESG actual authority to take action on its behalf. VOMT and CCL share identity of ownership and management; indeed, Daniel Lambert served as the Rule 30(b)(6) witness for both CCL and VOMT, and he testified that it was

entitled to a hearing on damages, after they knowingly abandoned the litigation their corporate entity was embroiled in, lacks merit.

### III.    Requests

The Court has reviewed the requests. All are permissible as drafted with a few exceptions: Interrogatory Nos. 3 and 11 and Request for Production Nos. 5 and 12 are impermissible. They seek information solely from the Principals—and not from the judgment debtor. This comes too close to the line in which a party can be said to be seeking to pierce the corporate veil. *Pro. Neurological Servs., Ltd. v. City of Chicago Comm'n on Hum. Rels.*, 2025 IL App (1st) 231705, ¶ 12 ("Illinois courts have previously ruled that a judgment creditor may not bring an action to pierce the corporate veil within supplementary proceedings and must instead commence a separate action.").[7] The Plaintiffs are granted leave to amend to revise these requests, to the extent permissible under Illinois law, so long as they adhere to the proper scope of inquiry: "(1) whether the judgment debtor is in possession of assets that should be applied to satisfy the judgment or (2) whether a third party is holding assets of the judgment debtor that should be applied to satisfy the judgment." *Id.* (quoting *Pyshos*, 258 Ill. App. 3d at 623). Revised requests must be served within 7 days of the date of this Order. Additionally, to the extent that the Plaintiffs do not seek to revise Interrogatory No. 3 to accord with Illinois law, then they must revise each request that seeks information based off of Interrogatory Nos. 3, which includes Interrogatory Nos. 5 and 9 and Request for Production Nos. 1 and 2. If Plaintiffs revise Interrogatory No. 3, then Interrogatory

---

difficult even for him to clearly distinguish his role with VOMT from his role with CCL. Lambert and James Verrillo, the founders and operators of CCL and VOMT and the only employees of VOMT, used the same telephone lines and CCL email accounts to conduct business for both companies.").

[7] The Court notes that it is not finding that Plaintiffs are foreclosed from seeking to pierce the corporate veil of the Defendant or any of the Principals' entities. The Court is noting that Plaintiffs must file a separate action to do so. *Roofers' Pension Fund v. Robinson Roofing, Inc.*, 2010 WL 4962820, at *3 (N.D. Ill. Dec. 1, 2010) (noting that although the plaintiff could not pierce the corporate veil in the supplemental proceedings, the plaintiff could still "file a new case in state court to pierce the corporate veil"); *see also Golden v. Lim*, 2018 WL 5921317, at *2 (N.D. Ill. Nov. 12, 2018) (noting same).

31

Nos. 5 and 9 and Request for Production Nos. 1 and 2 are permissible as drafted. To the extent the Principals object on the grounds of legal privilege, they must serve detailed and clear privilege logs that may be subject to *in camera* review. The Court has considered the Principals' remaining arguments concerning burden and scope and find them unpersuasive in view of the facts of this case, the broad statutory mandate underpinning these proceedings, and the elevated risk of impermissible asset shifting and financial comingling. *Pro. Neurological Servs.*, 2025 IL App (1st) 231705, ¶ 11 ("The supplementary proceedings statute grants the court broad powers to compel the application of discovered assets or income in order to satisfy a judgment, and we construe it liberally. . . . [T]he legislature's purpose in enacting the statute was to provide an efficient and expeditious procedure for enforcing judgments.") (cleaned up).[8]

## CONCLUSION

The Principals' Motion to Quash is denied. (Dkt. 390). The Principals are hereby ordered to comply with Plaintiffs' requests in full and in good faith in accordance with and no later than three weeks from the date of this Order. The Court may sanction the Principals and hold them in contempt if they fail to comply. Ill. Sup. Ct. R. 277(h). The parties must file a joint status report three weeks from the date of this Order.

Virginia M. Kendall
United States District Judge

Date: March 24, 2026

---

[8] The Principals seek to block all discovery before April 2025 based on 735 ILCS 5/2-1402(m) and *Hayward v. Scorte*, 2020 IL App (1st) 190476, ¶ 29, contending that no discovery is permitted before the service of the citation. (Dkt. 390 at 15). That is not the law nor an accurate reading of § 1402(m) or *Hayward*, both of which pertain to liens on the underlying judgment and entering judgment against citation respondents—not the proper scope of discovery for initial citations. *Compare with Regan*, 247 Ill. App. 3d at 623-24.